**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 13-cr-00392-CMA


**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**1.  GEORGE THOMAS BROKAW,**
**2.  JOHN J. PAWELSKI, and**
**3.  MIMI M. VIGIL,**

**Defendants.**

_____

**REPORTER'S TRANSCRIPT**
**(Jury Trial - Day 2)**
_____

Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 8:13 a.m. on the 4th
day of November, 2014, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
MATTHEW T. KIRSCH and MARTHA A. PALUCH, U.S. Attorney's
Office - Denver, 1225 17th St., Suite 700, Denver, CO
80202

**FOR DEFENDANT BROKAW:**
Pro Se.
**FOR DEFENDANT PAWELSKI:**
Pro Se.
**FOR DEFENDANT VIGIL:**
Pro Se.

<u>I N D E X</u>

<u>WITNESSES:</u>                                                          <u>PAGE</u>

**KRISTY MORGAN**
DIRECT EXAMINATION BY MR. KIRSCH                          226

**STACIE GLEESON**
DIRECT EXAMINATION BY MS. PALUCH                          311

**SPECIAL AGENT DAVID RIORDAN**
DIRECT EXAMINATION BY MR. KIRSCH                          318

**WILLIAM MCLEOD**
DIRECT EXAMINATION BY MS. PALUCH                          353

**KELLY HANSON**
DIRECT EXAMINATION BY MS. PALUCH                          360

**MIKE GORHAM**
DIRECT EXAMINATION BY MS. PALUCH                          365

**TONI PAYNE**
DIRECT EXAMINATION BY MR. KIRSCH                          386

**TAMIE LUCAS**
DIRECT EXAMINATION BY MS. PALUCH                          423

<u>E X H I B I T S</u>

<u>NO.</u>                                                             <u>ADMITTED</u>

10 ........................................   255
11 ........................................   259
12 ........................................   262
13 ........................................   263
14 ........................................   264
15 ........................................   266
16 ........................................   267
17 ........................................   268
18 ........................................   270
19 ........................................   272
20 ........................................   272
21 ........................................   274
22 ........................................   275
23 ........................................   244
30 ........................................   277
31 ........................................   279
32 ........................................   281
33 ........................................   282
34 ........................................   283

35 ........................................ 285
36 ........................................ 287
37 ........................................ 288
38 ........................................ 289
39 ........................................ 291
40 ........................................ 291
41 ........................................ 292
42 ........................................ 293
50 ........................................ 232
51 ........................................ 425
52 ........................................ 238
53 ........................................ 241
60 ........................................ 247
61 ........................................ 250
62 ........................................ 254
70 ........................................ 383
70-73 ........................................ 390
74, ........................................ 419
257,
263
80-p49 ........................................ 355
80-p50 ........................................ 358
, p52
90, ........................................ 326
94,
99,
103,
106,
300
91, ........................................ 342
104
92, ........................................ 344
96,
97,
100,
101,
102,
301
93, 98 ........................................ 337
110 ........................................ 377
125 ........................................ 362
202 ........................................ 294
203 ........................................ 427
204 ........................................ 428
205 ........................................ 430
206 ........................................ 431
207 ........................................ 433
208 ........................................ 434
209 ........................................ 300
212 ........................................ 298

| | | |
|---|---|---|
| 215 | ........................................ | 436 |
| 216 | ........................................ | 302 |
| 218 | ........................................ | 304 |
| 219 | ........................................ | 313 |
| 220 | ........................................ | 306 |
| 221 | ........................................ | 437 |
| 250, 251, 253- 256, 258- 262, 272 | ........................................ | 404 |

**No.**                                                          **REFUSED**

........................................

1                    **NOVEMBER 4, 2014**

2              (Proceedings commence at 8:13 a.m.)

3              THE COURT:  You may be seated.

4              All right.  We are now back for day two of the

5    criminal trial in 13-cr-00392-CMA, United States of

6    America v. George Thomas Brokaw, John J. Pawelski, and

7    Mimi M. Vigil.

8              Counsel for the Government and the Government

9    representative are present.  There are no defendants

10   present.

11             We did hear from the probation office that

12   Ms. Vigil, at least, sent an e-mail to the probation

13   officer last night which says "the birth certificate does

14   not need to be in the Court.  As agent for the general

15   executive office, I will not be bringing the birth

16   certificate because the Judge says it doesn't need to be

17   there."  Which indicates to me that she does not intend to

18   appear here today.

19             We have not heard from either Mr. Brokaw or

20   Mr. Pawelski, and I have not heard from their probation

21   officers that they have heard.  My assumption is, based on

22   the advisement yesterday, if they were not here by 8

23   o'clock, and it is now 8:15, that we would proceed without

24   them, because I would assume that meant they did not

25   intend to appear here today.

 1          They have also violated my order that they contact

 2     the probation officer before 8 o'clock this morning to let

 3     them know whether they intended to appear.  And I will

 4     have to figure out how I proceed with respect to that.

 5          Now, I did see there is a motion filed by the

 6     Government to require home monitoring.  I will need to

 7     figure out how I deal with that with the defendants not

 8     present here, because they would have to be present for me

 9     to make that modification.  But we will continue with this

10     trial on the basis that the defendants do not intend to

11     participate, as they did not participate yesterday.

12          At this time, I thank the marshals and the court

13     security officer for being here.  I don't think I will

14     need you here.  So you are excused.

15          All right.  With that being said, does the

16     Government wish to make any statement for the record?

17          MR. KIRSCH:  No, Your Honor.  I will let the Court

18     know, we didn't have time to research yet the particular

19     issue about whether the defendants' presence can be deemed

20     waived with respect to the bond modification.  I will see

21     if, when we have a break, if I can get someone in our

22     office to try to start working on that issue, and if we're

23     able to assist the Court with that question, we will.

24          THE COURT:  That would be great.  Thank you.  And I

25     would like to have, for the record, this e-mail, which was

 1    forwarded to me by the probation officer from Ms. Vigil,

 2    marked as an exhibit in this case.

 3         So, Ms. Hartmann, when the time comes, just make

 4    sure this gets into the record.

 5         COURTROOM DEPUTY:  Yes, Your Honor.

 6         THE COURT:  All right.  With that, let's bring in

 7    the jury.

 8         (The following is had in open court, in the hearing

 9    and presence of the jury.)

10         THE COURT:  All right.  You may be seated.

11         Good morning, ladies and gentlemen, welcome back.

12    It appears that we are not going to have the defendants

13    participating.  They did not show up today.  So we're

14    assuming that was their voluntary choice.

15         That means this case will probably go much faster

16    than we had originally anticipated, so we are hopeful

17    maybe we will be done by the end of the week, first part

18    of next week.

19         With that being said, Mr. Kirsch, you may call your

20    next witness.

21         MR. KIRSCH:  Thank you, Your Honor.  The Government

22    calls Kristy Morgan.

23         COURTROOM DEPUTY:  Your attention, please.  Please

24    raise your right hand.

25                         **KRISTY MORGAN**

1   having been first duly sworn, testified as follows:

2          COURTROOM DEPUTY:  Please be seated.

3          Please state your name, and spell your first and

4   last names for the record.

5          THE WITNESS:  Kristy Morgan.  K-R-I-S-T-Y

6   M-O-R-G-A-N.

7                    **DIRECT EXAMINATION**

8   **BY MR. KIRSCH:**

9   Q.   Ms. Morgan, can you tell the jury where you live.

10  A.   I live in Ogden, Utah.

11  Q.   Do you work there?

12  A.   I do.

13  Q.   What is your position?

14  A.   I am a witness court administrator at the Ogden

15  Campus, Internal Revenue Service.

16  Q.   What are your duties as a witness court coordinator?

17  A.   Assist special agents and attorneys in preparation

18  for trial.  Also secure tax returns and documents that are

19  maintained in the normal course of business by the IRS.  I

20  certify those documents, then testify on behalf of the

21  Commissioner as a custodian of record regarding those

22  specific documents.

23  Q.   And how long have you performed those types of duties

24  for the IRS?

25  A.   I have been the coordinator for 5 years.  And I have

 1   been testifying since 2002.

 2   Q.   Were you with the IRS before you started testifying

 3   about those kind of matters in 2002?

 4   A.   Yes.

 5   Q.   What sort of positions did you hold previously with

 6   the IRS?

 7   A.   Initially, when I was hired, I worked in processing;

 8   basically reviewing tax returns, looking for errors.  Was

 9   there just for a short time.  The next 18 years I spent in

10   the examination function, where I did some audits.  And

11   then also moved into an area for the bogus return program,

12   where I was the civil account coordinator for

13   approximately 12 years.  Then into criminal investigation,

14   where I am now, working field support for the agents and

15   as custodian and as the witness court coordinator.

16        THE COURT:  Can you slow down just a little bit so

17   the court reporter can keep up.

18        THE WITNESS:  Sure, absolutely.

19   Q.   (BY MR. KIRSCH)  During your time with the IRS, then,

20   have you become familiar with the process by which paper

21   tax returns are handled by the IRS Service Centers?

22   A.   Yes.

23   Q.   Could you explain, in basic terms, how a paper tax

24   return would get processed at an IRS service center?

25   A.   It is received in the mailroom, where it is opened

1     and they are sorted by type of tax returns; whether it be

2     business or individual.  They then move to an area that is

3     called Code and Edit, where they will look at the tax

4     returns, make sure they are complete, they have all of the

5     schedules, W2s attached, whatever is needed, then they go

6     on to an area called Batching.  They are counted out in

7     groups up to 100 tax returns.  Then they go to an area

8     called Numbering, where they get a document locator

9     number, identifies the tax return until it is destroyed,

10    then to our data clerk, where the data clerk will enter

11    information from the tax return into the computer system.

12    It is then posted to the master file, which the master

13    file computer is in Martinsburg, West Virginia.  Then it

14    becomes part of the record.

15    Q.   So I think you probably just said this, but just to

16    be clear, is it part of the IRS's regular activity to make

17    the entries into that master computer system in West

18    Virginia?

19    A.   It is.

20    Q.   And is it part of the IRS's regular activity to then

21    keep the records once they are entered into that system?

22    A.   That is correct.

23    Q.   Are those records made at or near the time of the

24    events reflected in the records?

25    A.   Yes.

1   Q.   And are they made by a person with knowledge about

2   those events; namely the person who's reviewing the

3   returns?

4   A.   Yes, they are.

5   Q.   And does the IRS take steps to make sure that the

6   information in that database remains accurate?

7   A.   Absolutely.

8   Q.   Are you familiar with the general time frame in which

9   the IRS attempts to process returns, at least those --

10  let's start with those that are timely filed?

11  A.   Yes.

12  Q.   Can you explain what that process or that time frame

13  is to the jury, please.

14  A.   Congress has mandated that the IRS process tax

15  returns and issue refunds by the 16th -- excuse me, the

16  15th of June.  So at that time, if we're not timely

17  processing tax returns, the IRS pays interest.  So it is a

18  cost to the Government.  So there is a mandate that we

19  process timely-received returns by the 15th of June.

20  Q.   Does that time frame have any effect on the ability

21  of the IRS to at least to sometimes confirm that returns

22  are accurate before, say, refund claims are paid?

23  A.   Yes.

24  Q.   I want to ask you now a little bit about some of the

25  entities that provide information to the IRS.  Let's start

1    with taxpayers.  Taxpayers provide information to the IRS;

2    right?

3    A.   Yes, they do.

4    Q.   In what form, typically?

5    A.   Usually on the tax return.

6    Q.   And what -- just sticking with individual returns,

7    what is the -- what are the common forms of individual tax

8    returns that get filed?

9    A.   The most common, of course, is the 1040.  There is a

10   1040 A or 1040 EZ.  Just simpler tax return.

11   Q.   And how about entities that are paying income to

12   individuals, do they file information or returns with the

13   IRS, as well?

14   A.   Yes, they do.

15   Q.   Can you give some examples of the kinds of forms that

16   entities that are paying money to individuals would file

17   with the IRS?

18   A.   One of the most common is the W2.  When you receive

19   your W2, the IRS also receives that same information from

20   the Social Security Administration.  We share that

21   information.  There is also banks.  If you have a savings

22   account, they will report interest that you've earned on

23   that account.  It is reported also to the IRS.

24   Q.   Does that happen on a form called a 1099 INT?

25   A.   Correct.

1    Q.    Are there a variety of forms of income that get

2    reported on different kinds of 1099s?

3    A.    Yes.

4    Q.    When the IRS receives information from those third

5    parties that have been paying income, does that

6    information get entered into the same master database that

7    you described before?

8    A.    Yes.

9    Q.    Is it entered under all of the same conditions as

10   those that you described before, as well?

11   A.    Yes.

12   Q.    What about entities that pay mortgage interest to

13   individual taxpayers, do they report that to the IRS, as

14   well?

15   A.    Yes, that information is received.

16   Q.    And what sort of form does that come on?

17   A.    That is a -- I am not for sure on the form number.  I

18   am sorry.

19   Q.    That is all right.  Does that same information get

20   maintained in the central database, as well?

21   A.    Yes, it does.

22   Q.    Okay.  Now, is it fair to say that we asked you to

23   review and certify a fairly large number of documents

24   prior to this trial?

25   A.    That's correct.

 1   Q.   I am going to go ahead and start asking you to look

 2   at some of those documents now.  Most of them, at least

 3   for now, are going to be in the box right there next to

 4   you.  And I will ask you to start, if you would, with what

 5   we marked as Government Exhibit 50.  50.

 6   A.   I have that.

 7   Q.   Okay.  Can you tell us what that exhibit is?

 8   A.   This is a certified copy of an unprocessed Individual

 9   Income Tax Return Form 1040 for Mimi Vigil.

10   Q.   For what year?

11   A.   2005.

12        MR. KIRSCH:  Your Honor, I would move to admit and

13   publish Government Exhibit 50.

14        THE COURT:  50 is admitted.

15        (Exhibit No. 50 is admitted.)

16        THE COURT:  And you may publish.

17        MR. KIRSCH:  Thank you, Your Honor.

18   Q.   (BY MR. KIRSCH)  So, can you see what we have on the

19   screen now, Ms. Morgan?

20   A.   Yes.

21   Q.   Can you tell the jury what that page is?

22   A.   That is the cover sheet that all of the

23   certifications will have on it.  It is a Form 2866.

24   Identifies the type of return, has the official seal of

25   the Internal Revenue Service, and a signature that has the

1    authority to sign these.

2    Q.   So does that -- if that document is affixed to any of

3    these exhibits from the IRS, does that indicate that it

4    is, in fact, an official copy of something from the IRS's

5    records?

6    A.   Yes.

7         MR. KIRSCH:  Can you expand the text right in the

8    middle of that page, please.

9    Q.   (BY MR. KIRSCH)  The other information that's here,

10   the name and Social Security and that sort of thing, where

11   does that come from to get onto this certificate?

12   A.   Actually from the return that was filed.

13   Q.   Okay.  And you noted that it says that this is an

14   unprocessed return.  Can you explain what that means,

15   please?

16   A.   It means it was received at the IRS, there is a date

17   stamp showing that.  However, the IRS did not accept it

18   and process it as an official document.

19        MR. KIRSCH:  Okay.  Can we publish page 2 of that

20   exhibit now, please.

21   Q.   (BY MR. KIRSCH)  We're going to start just with the

22   whole page on the screen there, Ms. Morgan.  You mentioned

23   a date stamp.  Can you explain to the jury, is that -- are

24   one or more of those stamps visible on the screen now?

25   A.   Yes.

1    Q.   Just explain to the jury what you are talking about

2    when you say "date stamp" there, please?

3    A.   When the tax return is received, it is stamped.   If

4    it is late filed, we have a date that we know when it was

5    received.   There is also a postmark that is at the top of

6    the form in the upper left-hand corner of the return.   As

7    it moves, if it is referred to another area for

8    processing, those areas will date stamp it as they receive

9    it.

10   Q.   So on this -- appears there are a number of different

11   stamps on the first page of this.

12   A.   Yes.

13   Q.   What does that tell you?

14   A.   It shows that it was received and actually moved to

15   an area for review, is what happened to this return.

16        MR. KIRSCH:   Okay.   Can we expand the top, just a

17   third or so of that document now, please.

18   Q.   (BY MR. KIRSCH)  So the information that we talked

19   about a moment ago on this certificate for name and

20   address and that sort of thing, did that come here from

21   the top part of this return?

22   A.   Yes.

23   Q.   If we can go page down just a little bit now, I want

24   to see if we can see what is reported on line 22 for

25   income there.   What is that amount listed on line 22,

1   Ms. Morgan?

2   A.   The total income is $14,805.

3        MR. KIRSCH:   Can we display page 3 now, please, and

4   focus on the lower half.   I am interested in lines 63 and

5   64 in particular.

6   Q.   (BY MR. KIRSCH)   What did Ms. Vigil report was the

7   federal income tax that had been withheld from her in the

8   year she reported $14,800 of income?

9   A.   It shows a withholding on line 64 of $373,965.

10  Q.   In your experience, would it be unusual for someone

11  to have hundreds of thousands of dollars more withheld

12  than the person otherwise earned in income?

13  A.   Absolutely impossible.

14  Q.   What amount of refund did Ms. Vigil claim for 2005?

15  A.   The return shows on 73(a) a requested refund of

16  $372,169.

17  Q.   Are you able to read the date that appears next to

18  the signature line on the bottom of the screen there?

19  A.   Signature date shows December 10, 2008.

20  Q.   And there is information filled out in the box that

21  says "Paid Preparer Use Only."   When does information get

22  filled into that part of the return?

23  A.   If there is someone that is professionally preparing

24  the tax document, they would put their information there

25  also.

1    Q.   What is the information that is reflected there for

2    the firm name and address?

3    A.   Shows Numbers and Beyond.  The address is 5996 Pine

4    Ridge Drive, Elizabeth, Colorado.

5         MR. KIRSCH:  Thank you.  Can we display page 4 of

6    that exhibit now, please.  And highlight the top part,

7    "Interest."  Part 1, "Interest."

8    Q.   (BY MR. KIRSCH)  So what's the entry reflected here

9    for interest, Ms. Morgan?

10   A.   It shows from Mistar Financial.  Amount of interest

11   received is $373,965.

12   Q.   And then there is a line at the bottom that appears

13   to say "OID Adjustment.  Return Principal to Originator

14   and Surety."  Do you see that?

15   A.   I do.

16   Q.   Do you know what that means?

17   A.   I don't know specifically what they mean, other than

18   there is an adjustment reversing all of this interest

19   income off the schedule.

20        MR. KIRSCH:  Okay.  Can we please display page 5.

21   And just highlight the top section, if you could.  Thank

22   you.

23   Q.   (BY MR. KIRSCH)  What gets reported on this kind of

24   form, Ms. Morgan?

25   A.   This is your Social Security and Medicare tax

1    information.

2    Q.    Okay.  And so am I reading this correctly that

3    Ms. Vigil was reporting $14,805 of that kind of income?

4    A.    Yes.

5    Q.    Do you recall how that compares to the amount of

6    income that she reported on line 22 of the return?

7    A.    It is the same amount.

8    Q.    Okay.  Can I ask you to take a look now, please, at

9    what is marked as Government's Exhibit 52.

10   A.    52?

11   Q.    Do you have that?

12   A.    I do.

13   Q.    Do you recognize that exhibit?

14   A.    Yes.

15   Q.    What is it, please?

16   A.    This is the third-party income information for the

17   taxpayer tax period 2005.

18   Q.    For which taxpayer?

19   A.    This would be for Mimi Vigil.

20   Q.    And the third-party income information, can you just

21   explain what that is a little bit more, please?

22   A.    That would be our records from third parties.  For

23   instance, your employer, bank, financial institutions,

24   would report all of that information to us.

25   Q.    And so this report is for Ms. Vigil for 2005?

1    A.    Correct.

2          MR. KIRSCH:  I move to admit and publish Government

3    Exhibit 52.

4          THE COURT:  Exhibit 52 is admitted.

5          (Exhibit No. 52 is admitted.)

6          THE COURT:  And you may publish.

7    Q.    (BY MR. KIRSCH)  So we have the first page on the

8    screen now, Ms. Morgan.  Is that the certificate again?

9    A.    It is.

10   Q.    Can you go to the second page of that exhibit for us,

11   please.  Can you just sort of walk us through this entry

12   that we have on the screen now, Ms. Morgan, so everybody

13   knows what we are looking at.

14   A.    At the top it shows us we are at 2005 tax period.  It

15   shows TY, 2005.  Shows Mimi Vigil is the payer or the

16   borrower for this Form 1098.  Shows that the lender was

17   World Savings Bank.  And that the bottom the "MTG IN PD"

18   stands for mortgage interest.  So that is the amount of

19   mortgage interest that was paid, which is $2,711.

20   Q.    And does that get reported to the IRS so that it can

21   be checked against amounts of mortgage interest that are

22   claimed by particular taxpayers?

23   A.    Correct.

24         MR. KIRSCH:  Can we display the lower portion of

25   that page now, please.

239

1    Q.    (BY MR. KIRSCH)   Now, this one says 1099 MISC on the

2    left.  Do you see that?

3    A.    Yes.

4    Q.    What kind of information or income is reported in

5    1099 MISC?

6    A.    This would be what is called non-employee

7    compensation.  So if, for instance, you are a plumber and

8    you contracted with someone to do some work, they paid

9    you, this is the type of information they would send to

10   the IRS as far as reporting the income that you made.

11         MR. KIRSCH:   Okay.  Can we display the next page of

12   that exhibit, please.  And go ahead and just zoom in all

13   of the text for that.

14   Q.    (BY MR. KIRSCH)   So is this the remainder of this

15   document, Ms. Morgan?

16   A.    Yes, it is.

17   Q.    And what kind of income is reported on the top part

18   of the screen there?

19   A.    This 1099 Miscellaneous shows just whether or not a

20   federal income tax was withheld by Slumber Parties, Inc.,

21   which there was none.

22   Q.    Then what is the information at the bottom there?

23   A.    That would be a summary of the total amount of income

24   and the mortgage interest that was paid on this document.

25   Q.    Okay.  When we looked at Government Exhibit 50 a

1    moment ago, on that line about the adjustment, there was a

2    reference to the term OID?

3    A.   Yes.

4    Q.   Do you remember that reference?  Are you familiar

5    with the form called a 1099 OID?

6    A.   I am.

7    Q.   Can you -- what is that form?

8    A.   Basically, it's called an original issue discount.

9    It is a form that would report, for instance, interest if

10   you bought a bond at a reduced face value amount, maybe

11   the bond was worth 10,000, you only paid 9,500, as it

12   matures you would receive some interest from that.  The

13   financial institution would report that on a 1099 OID to

14   the IRS, and also send a copy to you.

15   Q.   And then if a person receives 1099 OID income, would

16   you ordinarily expect that that form, the 1099 OID form,

17   would be included with the taxpayer's return?

18   A.   Yes.  It would be reported on a Schedule B.

19   Q.   Okay.  And would you expect the taxpayer to prepare a

20   form 1099 OID or the entity that had issued the bond?

21   A.   The entity that issues the bond, the financial

22   institution.

23   Q.   Okay.  If there were 1099 OID income for a particular

24   year, would that -- that was reported to the IRS, would

25   that be captured in a report like this one that we are

1    looking at in Government Exhibit 52?

2    A.   Yes, it would.

3    Q.   Is there any 1099 OID income reported to the IRS in

4    2005 for Mimi Vigil?

5    A.   No.

6    Q.   Now I would like to ask you to look, please, at

7    Government Exhibit 53.

8    A.   I have that.

9    Q.   Do you recognize that one?

10   A.   Yes, I do.

11   Q.   Can you identify that one for us, please?

12   A.   This is actually a printout of command code we use

13   called ENMOD.   It is also from the master file.

14   Q.   And what taxpayer does it relate to?

15   A.   It relates to Mimi Vigil.

16   Q.   Does it contain information about correspondence that

17   would have been sent by the IRS to Ms. Vigil?

18   A.   It does.

19        MR. KIRSCH:   I would move to admit and publish

20   Government Exhibit 53.

21        THE COURT:   53 is admitted.

22        (Exhibit No. 53 is admitted.)

23        THE COURT:   And you may publish.

24   Q.   (BY MR. KIRSCH)   We have the first page on the

25   screen.   Again, Ms. Morgan, is that the Certificate,

1    again, we are looking at?

2    A.   Yes, it is.

3         MR. KIRSCH:  Can we go to the second page of that

4    exhibit, please.  And focus on the top quarter or so.

5    Q.   (BY MR. KIRSCH)  What information is reflected here,

6    Ms. Morgan?

7    A.   This shows the Social Security number, name and

8    address of the individual that the record is for.

9         MR. KIRSCH:  Okay.  Can we display page 3 of that

10   exhibit now.  The lower half.  Hopefully this is dark

11   enough to read.

12   Q.   (BY MR. KIRSCH)  Can you see that on the screen,

13   Ms. Morgan?

14   A.   I can.

15   Q.   Okay.  What kind of information is reflected in this

16   part of the screen now, the bottom of page 3?

17   A.   This is some of the notices or letters that were

18   mailed to Mimi Vigil at the address on this form.

19   Q.   Okay.  I want to direct your attention to an entry

20   about halfway down the list here.  I was trying to make a

21   mark on the screen there, I think I made a very small blue

22   mark next to it.  Can you explain what that entry is,

23   please?

24   A.   This shows that on April 14, 2009, a letter called a

25   3176 was sent.

1    Q.   So let me break that down a little bit.  How do you

2    know it was sent on April 14, 2009?

3    A.   On the far left-hand side, we have a date on

4    04-14-2009 that identifies the date.

5         THE COURT:  There is a little stylus on the top of

6    the monitor if you want to highlight that.

7         THE WITNESS:  Let's see if I can make a mark.

8    Q.   (BY MR. KIRSCH)  You did it better than I did.

9    A.   That is the date.

10   Q.   That is the date.  And then how is it you know it was

11   a 3176 C letter?

12   A.   The person that sends it, sends the letter,

13   identifies that form type.

14   Q.   When you look at that information there, can you --

15   are you able to determine what tax year the 3176 C letter

16   pertained to?

17   A.   It does.  Right below that, same date.  It shows it

18   was for the 2005 tax period.

19   Q.   Okay.  And then it looks like there is a similar set

20   of entries again right below that.

21   A.   Correct.

22   Q.   What does that mean?

23   A.   It shows that, again, on May 29, 2009, the same type

24   of letter regarding the 2005 was again sent to the

25   individual.

1    Q.    Okay.  The 3176 C letter, let me ask you about that a

2    little bit.  Is that a form letter that the IRS uses?

3    A.    It is.

4    Q.    Can I ask you to look now at what is marked as

5    Government Exhibit 23.

6    A.    I have that.

7    Q.    Do you recognize that?

8    A.    I do.

9    Q.    What is that?

10   A.    This is a certified copy of the Form 3176 C.

11   Q.    Okay.  What taxpayer was that letter sent to?

12   A.    This was sent to George T. and Debra S. Brokaw.

13   Q.    For what tax period?

14   A.    The tax period this is addressing is the 2003 tax

15   period.

16        MR. KIRSCH:  Your Honor, I move to admit and

17   publish Government Exhibit 23.

18        THE COURT:  23 is admitted.

19        (Exhibit No. 23 is admitted.)

20        THE COURT:  You may publish.

21        MR. KIRSCH:  Can we go ahead and display page 2 of

22   that, please.  And highlight just from the date down to

23   the bottom of the text if you could.

24   Q.    (BY MR. KIRSCH)  Okay.  Is that large enough for you

25   to see on the screen now Ms. Morgan?

1    A.    Yes.

2    Q.    So this letter is addressed to George T. and Debra

3    Brokaw.  But is this the same type of letter that would

4    have been sent to Ms. Vigil based on that record that we

5    just looked at?

6    A.    Yes.

7    Q.    Okay.  And this information under the "Why We Are

8    Contacting You," what information is conveyed to the

9    taxpayer with this letter under that heading?

10   A.    It is informing the taxpayer that the tax return that

11   was received is a frivolous type of tax return and it

12   could be subject to a penalty.  There is no basis in law

13   for this type of filing.  Gives them an opportunity to do

14   some research based on what is on the letter, as far as

15   irs.gov.  Also is telling them they could be imposed the

16   $5,000 penalty if they don't correct the tax return.

17   Q.    You mentioned that website irs.gov.  Does the IRS

18   take steps to put information on the website that relate

19   to arguments or positions that the IRS considers

20   frivolous?

21   A.    Yes, they do.

22         MR. KIRSCH:  Can we go to the next page of that

23   exhibit, please.  And highlight the text there, if you

24   could.

25   Q.    (BY MR. KIRSCH)  So what information, essentially, is

1    conveyed to the taxpayer on this page, Ms. Morgan?

2    A.    It gives them the information as far as the time

3    frame, as far as filing a corrected return, which is 30

4    days to submit the corrected return.  Then explains if

5    they don't correct the return, they could be possibly

6    assessed a $5,000 penalty and also be subject to an audit.

7    Q.    There's a reference to another publication, 2105.  Is

8    that publication included with letters like this when they

9    are sent out?

10   A.    Yes.  It is an enclosed.

11        MR. KIRSCH:  And if we can just scroll down on this

12   screen a little bit to right there.

13   Q.    (BY MR. KIRSCH)  Down in the lower right-hand part of

14   the screen there is a number there next to the letter.  Is

15   that the reference to the 3176 C that we looked at a

16   moment ago on the summary?

17   A.    It is.

18   Q.    I want to ask you now about a few documents related

19   to a different person, Clara Mueller.  Can I ask you first

20   to look at what is marked as Government's Exhibit 60.

21   A.    I have that.

22   Q.    Do you recognize that exhibit?

23   A.    I do.

24   Q.    What is it?

25   A.    This is a certified copy of an amended 1040 X

1    Individual Income Tax Return for Clara Mueller for tax

2    period 2005.

3           MR. KIRSCH:  I move to admit and publish Government

4    Exhibit 60.

5           THE COURT:  60 is admitted.

6           (Exhibit No. 60 is admitted.)

7           THE COURT:  And you may publish.

8           MR. KIRSCH:  Can we go to page 2 of that exhibit

9    and highlight the top half to begin with.

10   Q.   (BY MR. KIRSCH)  So you mentioned that this is

11   amended, Ms. Morgan, and this form says 1040 X.  What is a

12   1040 X?

13   A.   This is a form that you can use if you need to change

14   information on a tax return that you have already filed.

15   So you are either adding or subtracting some information

16   based on new information you have.

17   Q.   Do those changes get summarized in the section of the

18   return that is on the lower half of the screen now?

19   A.   Yes, in Part II.

20          MR. KIRSCH:  Could we go ahead and just scroll down

21   to the bottom of that page.

22   Q.   (BY MR. KIRSCH)  Is there information in the "Paid

23   Preparer" section of this return?

24   A.   Yes, there is.

25   Q.   What is the firm's name that is listed there?

1    A.    Numbers and Beyond.

2    Q.    Can we go to page 4 of that exhibit now, please.

3    What is this page?

4    A.    This is the actual supporting documents for the

5    amended.  It is the Form 1040 for 2005.

6          MR. KIRSCH:  Okay.  Can we go ahead and highlight

7    the income section in the middle of the page, please.

8    Q.    (BY MR. KIRSCH)  So what did Ms. Mueller report in

9    terms of income from wages, salary, and tips for '05 in

10   this amended return?

11   A.    The wages, salaries and tips, which is on page 7,

12   shows $8,173.

13   Q.    And how about taxable interest?

14   A.    8a is showing $559,873.

15         MR. KIRSCH:  Can we go to page 5, please, and

16   display the lower part of that page.

17   Q.    (BY MR. KIRSCH)  What did Ms. Mueller report had been

18   withheld from her for income tax for 2005?

19   A.    That is line on 64, $560,001.

20   Q.    And so what amount -- what amount of refund did she

21   claim on line 72 for 2005?

22   A.    That is $382,530.

23   Q.    And what is the date that appears next to the

24   signature line for the taxpayer there?

25   A.    This was signed January 6, 2009.

1          MR. KIRSCH:  Can we go to page 6, please.  The top

2     half.

3     Q.   (BY MR. KIRSCH)  So, again, what would you expect to

4     be reported in Part I of Schedule B on a return like this,

5     Ms. Morgan?

6     A.   This would be the interest that you earned on your

7     savings accounts or financial institutions had paid to

8     you.

9     Q.   Okay.  And how many entities -- can you just read the

10    entities that Ms. Mueller listed there?

11    A.   First is Carrington Mortgage Services.  Then Key

12    Bank.  And then ENT Federal Credit Union.  Wells Fargo

13    Bank.  Countrywide Home Loans is entered twice.

14    Q.   Okay.  And what is the total amount of interest that

15    she reported from those institutions?

16    A.   Shows $559,873.

17          MR. KIRSCH:  All right.  Can we just display page 7

18    of that exhibit.  The next page.

19    Q.   (BY MR. KIRSCH)  So what is this page, Ms. Morgan?

20    A.   This is the actual envelope that this information was

21    mailed to the IRS.

22    Q.   Okay.  Now I want to ask you to look at Government

23    Exhibit 61.

24    A.   I have that.

25    Q.   Do you recognize it?

1    A.    I do.

2    Q.    What is it?

3    A.    This is a Form 1096, Annual Summary and Transmittal

4    for Clara M. Mueller for 2005.

5    Q.    And was that sent to the IRS in connection with her

6    2005 return?

7    A.    Yes.

8          MR. KIRSCH:  I move to admit and publish Government

9    Exhibit 61.

10          THE COURT:  61 is admitted.

11          (Exhibit No. 61 is admitted.)

12          THE COURT:  And you may publish.

13          MR. KIRSCH:  We have the first page on the screen

14    now.  Can we expand the top half of that down to the

15    signature line, please.

16    Q.    (BY MR. KIRSCH)  Is this a form that you are familiar

17    with, Ms. Morgan, the 1096?

18    A.    Yes, I am.

19    Q.    How does a 1096 usually get used?

20    A.    It is a transmittal where the financial institution

21    will attach specific types of income information and mail

22    it to the IRS.  And there is a box here in the bottom

23    where they identify what type of information they are

24    mailing to the IRS.

25    Q.    That is hard to read, at least on the screen.  On the

```
 1    original can you determine -- can you tell what is the box
 2    that has the X in it there?
 3    A.   It is for 1099 OID.
 4    Q.   Would you expect a 1096 form to be -- to have the
 5    taxpayer's name listed under the filer's name section?
 6    A.   No.
 7         MR. KIRSCH:  Can we display the next page of this
 8    exhibit, please.  I am sorry, one more.
 9    Q.   (BY MR. KIRSCH)  And now just looking at this entire
10    screen for a minute, what kind of forms are shown on the
11    screen here, Ms. Morgan?
12    A.   This is the 1099 OID.
13    Q.   Okay.  Am I correctly reading this that on the screen
14    on this page there is one from Carrington Mortgage
15    Services, one that says Key Bank, and one that says ENT
16    Federal Credit Union?
17    A.   Yes.
18    Q.   When the IRS receives a Form 1099 OID from financial
19    institutions, does it receive them with more than one
20    institution listed on the same page?
21    A.   No.
22         MR. KIRSCH:  Can you go ahead and expand on the top
23    one there, please, the Carrington Mortgage Services.
24         THE WITNESS:  This information is showing
25    Carrington Mortgage.  And the actual recipient is Clara M.
```

```
1    Mueller, received income, which is in Box 1, of $296,895.

2    And also in Box 4, it is showing that withholding was paid

3    of $296,895.

4    Q.   (BY MR. KIRSCH)  So what does this -- based on this

5    form --  let me ask it a different way.

6         Is this form making a representation about the

7    amount of income that was withheld from Ms. Mueller in

8    2005 by Carrington Mortgage Services?

9    A.   That's correct, yes.

10   Q.   What does this form represent about that amount of

11   withholding?

12   A.   It shows that it is the same amount that was paid, as

13   far as in the OID.  So all of it was held for withholding

14   and sent to the IRS, according to the form.

15   Q.   In Box 5, do you see where it says "Mortgage Loan

16   Account"?

17   A.   Yes.

18   Q.   Based on your understanding of the 1099 OID, would it

19   be proper to issue an 1099 OID in connection with a

20   mortgage loan?

21   A.   It would not.

22   Q.   It is also a little hard to read on the screen, but

23   do you see the entry that says "Unknown"?

24   A.   Yes.

25   Q.   Can you tell the jury what text appears behind
```

1    "Unknown," the text that is hard to read on the screen?

2    A.   It's asking for the payer's identification number.

3    Q.   Would that be an employer identification number?

4    A.   Correct.  Yes.

5    Q.   And in your experience, if an entity like Carrington

6    Mortgage Services was going to prepare and file a document

7    with the IRS, would it put "unknown" in the box for its

8    own employer identification number?

9    A.   No.  I am sure Carrington Mortgage knows their

10   employer identification number.

11        MR. KIRSCH:  Can we go ahead and display the next

12   page of this exhibit, please, as well.

13   Q.   (BY MR. KIRSCH)  What is -- what appears on the next

14   page of this exhibit, Ms. Morgan?

15   A.   These are additional 1099 OIDs from Wells Fargo Bank,

16   and Countrywide Home Loan, there are two entries for that.

17   Q.   And, again, are there three different ones on the

18   same page here?

19   A.   Yes.

20   Q.   Now, I want to ask you to look at Government Exhibit

21   62.

22   A.   I have that.

23   Q.   Do you recognize that?

24   A.   I do.

25   Q.   What is that one?

1    A.    This is the certification of third-party income

2    information for Clara Mueller for 2005.

3          MR. KIRSCH:  Okay.  I am going to ask to admit and

4    publish Government Exhibit 62, Your Honor?

5          THE COURT:  62 is admitted.

6          (Exhibit No. 62 is admitted.)

7          THE COURT:  And you may publish.

8          MR. KIRSCH:  If we could go to the last page of

9    that exhibit.

10   Q.   (BY MR. KIRSCH)  While we are getting to the last

11   page on the screen, Ms. Morgan, I want to ask you, is

12   there any 1099 OID income reported for Ms. Mueller in 2005

13   anywhere in that exhibit, Government Exhibit 62?

14   A.   No, there is not.

15         MR. KIRSCH:  Can we expand the bottom part of that.

16   Is that the last page?

17   Q.   (BY MR. KIRSCH)  Okay.  If there was 1099 OID

18   reported, would it be there in that summary?

19   A.   It would be in a summary, yes.

20   Q.   Okay.  Now I want to ask you about some documents

21   related to George Thomas Brokaw.  I want to start with

22   what is marked as Government Exhibit 10.  Do you recognize

23   that exhibit?

24   A.   I do.

25   Q.   What is that exhibit?

1    A.    This is also an unprocessed tax return that was

2    received.  It is an Amended Tax Return for 2003 for George

3    T. And Debra S. Brokaw.

4         MR. KIRSCH:  I move to admit and publish Government

5    Exhibit 10.

6         THE COURT:  10 is admitted.

7         (Exhibit No. 10 is admitted.)

8         THE COURT:  And you may publish.

9         MR. KIRSCH:  Thank you, Your Honor.

10   Q.    (BY MR. KIRSCH)  I want to start with page 2 of that

11   exhibit, if we could.  Is this a document that was

12   included with this return?

13   A.    Yes.

14   Q.    And what does it indicate at the top there?  What is

15   the date?  Let's start with that.  What is the date

16   reflected at the top?

17   A.    According to this, it is the 1st day of May 2009.

18   Q.    Okay.  And who does that first paragraph indicate

19   appeared with the following documents listed below?

20   A.    It shows George Thomas Brokaw.

21   Q.    And is there -- what is the name that appears in the

22   bottom section as the notary public?

23   A.    That notary is Mimi Vigil.

24   Q.    And then can we just expand the list of documents

25   mailed there.  So this appears to reference tax forms for

1    a number of different years?

2    A.    Correct.

3    Q.    Did the IRS, in fact, receive tax forms listed there

4    for all of those years in the same mailing?

5    A.    Yes.

6    Q.    For the purposes of this trial, did you help create

7    versions of those that were separated by year?

8    A.    Yes.

9    Q.    Okay.  But the IRS got them all at once in this batch

10   as listed here; is that right?

11   A.    That's correct.

12        MR. KIRSCH:  Can we display page 13 of this

13   exhibit, please.  That's pretty hard to read, also.

14   Q.    (BY MR. KIRSCH)  Is that the envelope that all of

15   those documents came in?

16   A.    That's correct, yes.

17        MR. KIRSCH:  Can we go back to page 3 of Government

18   Exhibit 10 now, please.  And highlight the text of that

19   letter, if you could.

20   Q.    (BY MR. KIRSCH)  So who does this letter purport to

21   come from?

22   A.    It is from George Thomas Brokaw.

23   Q.    And does he make reference in this letter to the

24   particular -- to the Form 1040 X for 2003?

25   A.    Yes, he does.  First paragraph.

```
 1   Q.   Does he also make reference to "enclosed 1099 OIDs"?

 2   A.   Yes.

 3   Q.   And what does he say those showed?

 4   A.   As far as the OIDs?

 5   Q.   Yeah.  Just there in the first sentence.  End of the

 6   first sentence.

 7   A.   It's showing tax withheld.

 8   Q.   Okay.  Can we go to page 4, please, now.  What is

 9   this form, again, Ms. Morgan?

10   A.   This is the Amended 1040 X for 2003.

11        MR. KIRSCH:  Can you please highlight the signature

12   information at the bottom.  Expand that.

13   Q.   (BY MR. KIRSCH)  So who does it look like signed in

14   the taxpayer section?

15   A.   George Thomas Brokaw and Debra Sue Brokaw.

16   Q.   Is there a firm reflected in the "Paid Preparer"

17   section?

18   A.   Yes.  Numbers and Beyond.

19        MR. KIRSCH:  Can we please display page 6 of this

20   exhibit.

21   Q.   (BY MR. KIRSCH)  Is this the actual 1040?

22   A.   This is the supporting 1040 for the Amended.

23        MR. KIRSCH:  Okay.  Can you expand the income

24   section, please, in the middle of the screen.

25   Q.   (BY MR. KIRSCH)  So did Mr. Brokaw, did he report
```

1    anything for wages or salary that year?

2    A.    Not in 17, no.

3    Q.    What did he report for taxable interest?

4    A.    The 8a shows $148,351.

5         MR. KIRSCH:  Can we go to page 7 now, please.  And

6    highlight from the other taxes down, essentially.

7    Q.    (BY MR. KIRSCH)  What did Mr. Brokaw report had been

8    withheld in terms of income tax for 2003?

9    A.    Line 61 shows $148,393.

10   Q.    And what sort of a refund did he then request for

11   that same year?

12   A.    Refund is $68,063.

13        MR. KIRSCH:  Can we display page 8 of that exhibit

14   now.  And highlight the interest section.

15   Q.    (BY MR. KIRSCH)  What did Mr. Brokaw report in this

16   section on the Schedule B for interest?

17   A.    Shows Wells Fargo Bank paid an interest payment to

18   them of $148,341.

19        MR. KIRSCH:  Now can we please go to page 11 of

20   Exhibit 10.  And highlight the top part of that page.

21   Q.    (BY MR. KIRSCH)  So what is on the screen now,

22   Ms. Morgan?

23   A.    This is the Original Issue Discount.  It is attached

24   to the 1040 Amended Return.

25   Q.    And does it indicate that the payer was Wells Fargo

1    Bank?

2    A.   Yes, it does.

3    Q.   How does the amount that's listed on this form

4    compare to the amount that we just looked at on Schedule B

5    of the 2003 return?

6    A.   It is the same.

7    Q.   Now I would like you to look at Government Exhibit

8    11, if you would, please.

9    A.   I have that.

10   Q.   Do you recognize it?

11   A.   I do.

12   Q.   What is it?

13   A.   This is a certified copy of the third-party income

14   information for George T. Brokaw.

15   Q.   Is that for the year 2003?

16   A.   Correct.

17        MR. KIRSCH:  Move to admit and publish Government

18   Exhibit 11.

19        THE COURT:  11 is admitted.

20        (Exhibit No. 11 is admitted.)

21        THE COURT:  You may publish.

22        MR. KIRSCH:  Thank you, Your Honor.

23        You may start with page 2.  And can you just

24   highlight those two entries.

25   Q.   (BY MR. KIRSCH)  So the document that is listed on

 1   the top here under or the entry on the top under "Document

 2   Type," does that say 5498?

 3   A.   Correct.

 4   Q.   What is that?

 5   A.   That is the form where the financial institution will

 6   show payments for IRAs.

 7   Q.   IRA accounts?

 8   A.   Yes.

 9   Q.   Next section says 1099 B?

10   A.   Correct.

11   Q.   Is that another form of 1099?

12   A.   It is.

13   Q.   What kinds of things are on a 1099 B?

14   A.   Could be stocks and bonds.

15        MR. KIRSCH:  Can we go to page 4 of that exhibit,

16   please.  And highlight those two entries.  That would be

17   great.  Thank you.

18   Q.   (BY MR. KIRSCH)  At the top there is a 1098.  I think

19   we looked at that before.  Is that the mortgage

20   interest --

21   A.   It is.

22   Q.   -- kind of entry?  Then below that there is one that

23   says 1099 DIV.  Can you tell the jury what that is?

24   A.   That is the 1099 used to report dividends that are

25   paid, again, by a bank, financial institution.

1          MR. KIRSCH:  Okay.  Then can we go to page 6,

2     please.  And highlight maybe the one in the middle.

3     Q.   (BY MR. KIRSCH)  That one says -- looks like 1099

4     INT?

5     A.   Yes.

6     Q.   Is that the form that you described before where

7     interest income gets reported?

8     A.   That's correct.

9     Q.   Can you just go ahead and look through that entire

10    exhibit and tell me whether or not there is any 1099 OID

11    income that was reported by Wells Fargo?

12    A.   There is not any 1099 OID information on this.

13    Q.   Is there any information from Wells Fargo, period, in

14    that form?

15    A.   There is not.

16    Q.   Now I am going to ask you to look at Government

17    Exhibit 12, please.  And do you recognize that one?

18    A.   I do.

19    Q.   Is that the 2004 Amended Tax Return for Mr. and Mrs.

20    Brokaw?

21    A.   Yes.

22    Q.   Certified copy of that?

23    A.   Certified, yes.

24         MR. KIRSCH:  I move to admit and publish Government

25    Exhibit 12.

```
 1              THE COURT:  12 is admitted.

 2              (Exhibit No. 12 is admitted.)

 3              THE COURT:  And you may publish.

 4              MR. KIRSCH:  Thank you, Your Honor.

 5              Can we go ahead and go to page 3 of that exhibit,

 6      and highlight the text.

 7      Q.  (BY MR. KIRSCH)  What is this document on the screen

 8      now, Ms. Morgan?

 9      A.   This is the letter that was attached to this filing

10      identifying what type of information was filed with the

11      IRS.

12      Q.   This one specifically relates to the 2004 return?

13      A.   Yes.

14      Q.   Can we go to page -- go ahead and go to page 4.  Is

15      this the 1040 X form for that year?

16      A.   Yes, it is.

17              MR. KIRSCH:  Okay.  Can we go ahead and go to page

18      6, please.  And highlight the income section.

19      Q.  (BY MR. KIRSCH)  What did Mr. Brokaw report for

20      taxable interest in line 8a for this year?

21      A.   Shows $105,141.

22              MR. KIRSCH:  Can we go to page 7 of that exhibit,

23      please.  And highlight the lower half.

24      Q.  (BY MR. KIRSCH)  And what did he report in terms of

25      income tax withheld that year?
```

1   A.    Line 63 shows $106,701.

2   Q.    What did he claim for a refund on line 71?

3   A.    The refund requested is $55,185.

4         MR. KIRSCH:  Can we go to page 8, please.  And

5   highlight the interest portion at the top.

6   Q.    (BY MR. KIRSCH)  Who did Mr. Brokaw report had paid

7   him interest for 2004?

8   A.    It shows Wells Fargo Bank and Key Bank.

9         MR. KIRSCH:  And now can we go to page 11, please.

10  And expand the text of those two entries.

11  Q.    (BY MR. KIRSCH)  What are on the screen now,

12  Ms. Morgan?

13  A.    These are the Form 1099 OIDs supposedly from Wells

14  Fargo Bank and Key Bank.

15  Q.    And do they appear to correspond to the entries that

16  were on Schedule B of this return?

17  A.    Yes.

18  Q.    Now I would like you to look at Government Exhibit

19  13.  Is that the certified copy of third-party income that

20  was reported to the IRS for Mr. Brokaw in 2004?

21  A.    Yes.

22        MR. KIRSCH:  I move to admit and publish Government

23  Exhibit 13.

24        THE COURT:  Exhibit 13 is admitted.

25        (Exhibit No. 13 is admitted.)

1          THE COURT:  And you may publish.

2     Q.   (BY MR. KIRSCH)  I am actually going to just ask you

3     this question, Ms. Morgan.  Are there any entries in

4     Government Exhibit 13 for any income paid to Mr. Brokaw by

5     either Wells Fargo or ENT Federal Credit Union?

6     A.   There is not.

7     Q.   Go ahead and go to Government Exhibit 14.  Do you

8     recognize that exhibit?

9     A.   I do.

10    Q.   What is it?

11    A.   This is the unprocessed Individual Income Tax Return

12    for George T. Brokaw and Debra Brokaw for tax period 2005.

13    Q.   Is it a certified copy of that return, as well?

14    A.   It is.

15         MR. KIRSCH:  I move to admit and publish 14.

16         THE COURT:  14 is admitted.

17         (Exhibit No. 14 is admitted.)

18         THE COURT:  And you may publish.

19         MR. KIRSCH:  Let's go ahead and start with page 5

20    of that exhibit, please.  I am sorry, let's start with

21    page 4.  Can you highlight the income section, please.

22    Q.   (BY MR. KIRSCH)  Is this the Amended Form 1040 that

23    we have on the screen now, Ms. Morgan?

24    A.   Yes, it is.

25    Q.   What did Mr. Brokaw report on line 8a for taxable

1    interest for '05 in this return?

2    A.    $82,817.

3    Q.    You may go to the next page, please.  And under the

4    "Payment" section, what amount did Mr. Brokaw report had

5    been withheld for income tax?

6    A.    $82,817.

7    Q.    And what refund did he claim for that year?

8    A.    Refund requested is $48,131.

9         MR. KIRSCH:  Can we go to the next page, please.

10   And highlight the interest section.

11   Q.    (BY MR. KIRSCH)  Who did Mr. Brokaw report had paid

12   him that $82,817 worth of interest?

13   A.    Wells Fargo Bank, Key Bank, and American Express.

14   Q.    Can you go, I believe it is page 10 of the exhibit

15   now.  What is on the screen now?

16   A.    These are the original issue discounts which were

17   included with the amended return.

18        MR. KIRSCH:  Can you expand the one on the bottom

19   that says "American Express," please.

20   Q.    (BY MR. KIRSCH)  How much did Mr. Brokaw report had

21   been withheld by America Express from him for 2005?

22   A.    $5,000.

23   Q.    Do you see in Box 5 the description that begins

24   "credit card revolving account"?

25   A.    Yes.

```
 1   Q.   Based on your understanding, would it be appropriate

 2   to issue a 1099 OID in connection with a credit card

 3   revolving account?

 4   A.   No.

 5   Q.   Can I ask you now, please, to look at Government

 6   Exhibit 15.

 7   A.   I have that.

 8   Q.   Do you have that?  Is that the certified copy of

 9   third-party income reported for Mr. Brokaw for the tax

10   year 2005?

11   A.   Yes.

12        MR. KIRSCH:  I move to admit Government Exhibit 15.

13        THE COURT:  15 is admitted.

14        (Exhibit No. 15 is admitted.)

15        THE COURT:  And you may publish if you wish.

16        MR. KIRSCH:  Thank you, Your Honor.

17   Q.   (BY MR. KIRSCH)  I think, Ms. Morgan, I am just going

18   to ask you whether or not that document contains any

19   report of OID income from any of the three entities that

20   were just listed on those forms 1099 OID.

21   A.   No, there is not.

22   Q.   Now I want you to look, please, at Government Exhibit

23   16.

24   A.   I have that.

25   Q.   Is that a certified copy of the Amended Return
```

1    Mr. Brokaw filed in the name of Mr. Brokaw for the year

2    2006?

3    A.    Correct.

4         MR. KIRSCH:  I would move to admit and publish

5    Government Exhibit 16.

6         THE COURT:  16 is admitted, and you may publish.

7         (Exhibit No. 16 is admitted.)

8         MR. KIRSCH:  Thank you, Your Honor.

9         Can we go ahead and start with page 5 of that

10   exhibit.  I am off again.  Let's start with page 4, sorry.

11   Can you highlight the "Income" section for us, please.

12   Q.    (BY MR. KIRSCH)  What did Mr. Brokaw report for

13   taxable interest for 2006, Ms. Morgan?

14   A.    $112,030.

15        MR. KIRSCH:  Can we go to page 5 now and highlight

16   the payment section, please.

17   Q.    (BY MR. KIRSCH)  How much did he report was withheld

18   from him that year?

19   A.    $112,030.

20   Q.    So what sort of refund did Mr. Brokaw ask for for

21   that year?

22   A.    73 shows $71,858.

23        MR. KIRSCH:  Can we go to the next page, please.

24   And highlight the "interest" section.

25   Q.    (BY MR. KIRSCH)  How many entities did Mr. Brokaw

```
 1    report withheld or paid him interest for 2006?

 2    A.    Shows seven different entities.

 3          MR. KIRSCH:  And now can we go to page 10.  Let's

 4    actually go one page before that.  No, I had that one

 5    right.  Page 10 again, please.

 6    Q.    (BY MR. KIRSCH)  Okay.  I will just ask you,

 7    Ms. Morgan, you have the whole document there.  We have

 8    page 10 on the screen.  Are pages 10, 11 and 12 all

 9    similar?

10    A.    Yes.

11    Q.    What do they contain?

12    A.    They are the forms 1099 OID attached to the return

13    that are included in the Schedule B.

14    Q.    Okay.  Now I am going to ask you to look, please, at

15    Government Exhibit 17.  Is that the certified copy of the

16    third-party reported income for Mr. Brokaw for tax year

17    2006?

18    A.    Yes.

19          MR. KIRSCH:  I move to admit and publish Exhibit

20    17, please, Your Honor.

21          THE COURT:  Exhibit 17 is admitted.

22          (Exhibit No. 17 is admitted.)

23          THE COURT:  And you may publish.

24          MR. KIRSCH:  Can we go to page 2 of this exhibit,

25    please.  And go ahead and highlight that entire text.
```

```
 1   Q.   (BY MR. KIRSCH)  I want to direct your attention to

 2   the bottom of this screen there.  What kind of information

 3   is contained in the bottom entry on the screen there,

 4   Ms. Morgan?

 5   A.   This is a 1099 INT for interest paid from First

 6   National Bank to George T. Brokaw.  Shows the amount of

 7   interest is $1.

 8   Q.   Okay.  Is there anything on that form reporting 1099

 9   OID income from First National Bank?

10   A.   No.

11   Q.   Do you still have Government 16 in front of you

12   there?

13   A.   I have 16, yes.

14   Q.   Was there a 1099 OID from First National Bank

15   included with that return?

16   A.   There was.

17        MR. KIRSCH:  Can we go back to Government Exhibit

18   16, please.  Start with page 10.  Page down, please.

19   Expand the top of the screen.

20   Q.   (BY MR. KIRSCH)  Is that the OID that Mr. Brokaw

21   filed from -- first reportedly from First National Bank

22   with his tax return?

23   A.   Yes.

24   Q.   How much did he report First National Bank withheld

25   from him in interest income for that year?
```

1    A.   $22,021.11.

2    Q.   Now I am going to direct your attention, please, to

3    Government Exhibit 18.

4    A.   I have that.

5    Q.   Is that the certified copy of the 2007 Amended Tax

6    Return for George and Debra Brokaw?

7    A.   Yes.

8         MR. KIRSCH:  I move to admit and publish Government

9    Exhibit 18.

10        THE COURT:  18 is admitted.

11        (Exhibit No. 18 is admitted.)

12        THE COURT:  And you may publish.

13        MR. KIRSCH:  Thank you, Your Honor.

14        I will assume I made the same mistake and ask you

15   to start with page 4 of this exhibit.  Can you expand the

16   "income" section, please.

17   Q.   (BY MR. KIRSCH)  Ms. Morgan, what did Mr. Brokaw

18   report he received in taxable interest for 2007?

19   A.   $104,018.

20        MR. KIRSCH:  Can we go to page 5, please, and

21   expand the "payment" section and the "refund" section.

22   Q.   (BY MR. KIRSCH)  How much did Mr. Brokaw report had

23   been withheld from him that year?

24   A.   $104,018.

25   Q.   What kind of refund did Mr. Brokaw ask for for that

1    year?

2    A.   Refund requested is $52,374.

3         MR. KIRSCH:   Go to the next page of that exhibit,

4    please.  And highlight the "interest" section.

5    Q.   (BY MR. KIRSCH)  Who did Mr. Brokaw report had paid

6    him interest that year?

7    A.   Wells Fargo Bank, American Express, Washington Mutual

8    Bank and First National Bank.

9    Q.   Now can we go to page 10, please.  What is contained

10   on this page, Ms. Morgan?

11   A.   These are the Form 1099 OIDs for 2007 attached to

12   support the entries.

13   Q.   At the top of this screen, what entity does that

14   report to be from?

15   A.   First National Bank.

16   Q.   Can we go to the next page of this exhibit, please.

17   That is another OID that was contained in that same

18   return?

19   A.   Yes.

20   Q.   Now I want to ask you to look at Government Exhibit

21   19, please.  Is that the certified copy of third-party

22   income information reported for Mr. Brokaw for tax year

23   2007?

24   A.   Yes.

25        MR. KIRSCH:   Move to admit and publish Government

1       Exhibit 19.

2               THE COURT:  19 is admitted.

3               (Exhibit No. 19 is admitted.)

4               THE COURT:  And you may publish.

5               MR. KIRSCH:  Thank you, Your Honor.

6               Can we publish page 2, please.  And expand the text

7       on the top there, actually, both of them, please.

8       Q.   (BY MR. KIRSCH)  I want to direct your attention to

9       the bottom.  Is that the information that was reported by

10      First National Bank for that year?

11      A.   Yes, it.

12      Q.   What did First National Bank report?

13      A.   Shows interest paid was $12.

14      Q.   Is there any 1099 OID income reported anywhere in

15      that report from any entity?

16      A.   No.

17      Q.   Now I want to ask you to look at Government Exhibit

18      20, please.  Is that the certified copy of the Amended Tax

19      Return filed for Mr. and Mrs. Brokaw for tax year 2008?

20      A.   Yes.

21              MR. KIRSCH:  Move to admit and publish Government

22      Exhibit 20.

23              THE COURT:  20 is admitted.

24              (Exhibit No. 20 is admitted.)

25              THE COURT:  And you may publish.

```
 1          MR. KIRSCH:  Start with page 4 of that exhibit,
 2   please.  And highlight the "income" section.
 3   Q.   (BY MR. KIRSCH)  What did Mr. Brokaw report in terms
 4   of taxable interest for the year 2008 on this return?
 5   A.   Shows $97,380.
 6          MR. KIRSCH:  Can we go to page 5, please.  And
 7   expand that lower portion again.
 8   Q.   (BY MR. KIRSCH)  What did he report had been withheld
 9   from him that year?
10   A.   $97,380.
11   Q.   And how much of a refund did he claim for 2008?
12   A.   Requested refund is $62,607.
13          MR. KIRSCH:  Can we go to page 6, please.
14   Highlight that top portion.
15   Q.   (BY MR. KIRSCH)  Who did Mr. Brokaw report paid him
16   that interest for 2008?
17   A.   Wells Fargo Bank, American Express, First National
18   Bank.
19   Q.   Can we go to page 10, please.  What is contained on
20   this page, Ms. Morgan?
21   A.   These are the Original Issue Discount 1099 OID for
22   2008 to support these entries.
23   Q.   Now can I ask you to look at page 21, please.  I am
24   sorry, Government Exhibit 21.  Is that the certified copy
25   of the third-party income that was reported for Mr. Brokaw
```

1    for 2008?

2    A.   It is.

3         MR. KIRSCH:  I move to admit and publish Government

4    Exhibit 21.

5         THE COURT:  21 is admitted.

6         (Exhibit No. 21 is admitted.)

7         THE COURT:  And you may publish.

8         MR. KIRSCH:  Thank you, Your Honor.

9         I would like to start with page 2 of that document.

10   And if you can highlight that top entry for us.

11   Q.   (BY MR. KIRSCH)  This says -- looks like it says SSA

12   1099 under "Document Type."  Do you see that, Ms. Morgan?

13   A.   Yes.

14   Q.   What does that mean?

15   A.   This is the 1099 from the Social Security

16   Administration.

17   Q.   Okay.  Does that indicate, then, that Mr. Brokaw was

18   receiving money from the Social Security Administration in

19   2008?

20   A.   Yes.  The Social Security retirement payment.

21   Q.   Of how much?

22   A.   $16,676.

23   Q.   And then can we go to page 4, please.  And on the top

24   half is this an entry from First National Bank?

25   A.   Yes.

```
 1    Q.   For what kind of income?

 2    A.   This was the 1099 INT, interest.

 3    Q.   In what amount?

 4    A.   Paid $12.

 5    Q.   Are there -- was there any 1099 OID income reported

 6    for Mr. Brokaw for this year?

 7    A.   There is not.

 8    Q.   Now I would like you to take a look at Government

 9    Exhibit 22, please.

10    A.   I have that.

11    Q.   Can you tell us what that exhibit is?

12    A.   This is a certified copy of the ENMOD for George T.

13    Brokaw.

14    Q.   That is the document that we looked at a few moments

15    ago that contains correspondence with the taxpayer, among

16    other things?

17    A.   Yes.

18         MR. KIRSCH:  I move to admit and publish Government

19    Exhibit 22.

20         THE COURT:  22 is admitted.

21         (Exhibit No. 22 is admitted.)

22         THE COURT:  And you may publish.

23         MR. KIRSCH:  Thank you, Your Honor.

24         Can we start with page 7 of that exhibit, please.

25    Expand the lower half.
```

1    Q.   (BY MR. KIRSCH)  Are there any indications on the

2    portion of this document on the screen now that the kind

3    of 3176 C letter that you referenced before, that those

4    were sent to Mr. Brokaw?

5    A.   Yes, there is.

6    Q.   How many 3176 C letters does this part of the screen

7    indicate were sent to Mr. Brokaw?

8    A.   It shows one sent for 2006, 2007, 2008.  So three

9    different letters sent regarding the frivolous returns.

10   Q.   When were those sent?

11   A.   July 23, 2009, July 29, 2009, and October 8, 2009.

12        MR. KIRSCH:  Okay.  And then can we go to the next

13   page of this exhibit, please.  Expand that, if you could.

14   Q.   (BY MR. KIRSCH)  No more listed there, is that

15   correct?

16   A.   That's right.

17        MR. KIRSCH:  Now can we just publish again, please,

18   Government Exhibit 23?

19        THE COURT:  I am sorry, you may.

20        MR. KIRSCH:  Thank you, Your Honor.

21   Q.   (BY MR. KIRSCH)  Go to the next page down.  Again,

22   just as a reminder, is this a copy of a 3176 letter that

23   was sent to Mr. Brokaw?

24   A.   That's correct, yes.

25   Q.   Now I would like to ask you, Ms. Morgan, about some

1    documents related to John Joseph Pawelski.  I am going to

2    start by asking you to look at Government Exhibit 30.  Do

3    you recognize that document?

4    A.   I do.

5    Q.   What is it?

6    A.   This is a certified copy of the 2004 unprocessed tax

7    return for John J. Pawelski.

8    Q.   Okay.  Again "unprocessed" means that it wasn't

9    submitted for processing and payment and that sort of

10   thing; right?

11   A.   Correct.

12   Q.   But it doesn't mean that the IRS didn't get it?

13   A.   Correct.  It was received.

14   Q.   Okay.

15        MR. KIRSCH:  I move to admit and publish Government

16   Exhibit 30.

17        THE COURT:  Exhibit 30 is admitted.

18        (Exhibit No. 30 is admitted.)

19        THE COURT:  You may publish.

20        MR. KIRSCH:  Thank you, Your Honor.

21   Q.   (BY MR. KIRSCH)  Can we start with page 4 of that

22   exhibit, please.  What is that part of the exhibit,

23   Ms. Morgan?

24   A.   This is a copy of the envelope that this tax return

25   was mailed to the IRS.

1    Q.    Okay.  Now I want to publish page 2, please.  And

2    what are we looking at now?

3    A.    This is the actual Form 1040 that was received by the

4    IRS.

5          MR. KIRSCH:  Can you go ahead and expand from the

6    top of that down to the bottom of the income section.

7    Right there.

8    Q.    (BY MR. KIRSCH)  Okay.  So what did Mr. Pawelski

9    report for wages, salaries, or tips on line 7 for 2004?

10   A.    There is no entry.  It is zero.

11   Q.    What did he report for taxable interest in line 8a?

12   A.    $46,929.92.

13   Q.    Any other income that Mr. Pawelski reported in this

14   return for the year 2004?

15   A.    No.

16         MR. KIRSCH:  Can we go to page 3 now, please.  And

17   highlight the -- from the "payment" section on down.

18   Q.    (BY MR. KIRSCH)  What did Mr. Pawelski report had

19   been withheld from him for federal income tax for 2004?

20   A.    Line 63 shows $46,929.92.

21   Q.    And so how much of a refund did Mr. Pawelski request

22   for 2004?

23   A.    Refund requested was $40,598.92.

24   Q.    Can you read the date that appears next to the

25   signature on the bottom of that return?

```
 1    A.    November 21, 2008.

 2    Q.    Now, were there any 1099 OID forms that were included

 3    with this return when it was filed?

 4    A.    Not included with the return.

 5    Q.    Okay.  Let me ask you to look at Government Exhibit

 6    31.  Do you recognize that exhibit?

 7    A.    Yes, I do.

 8    Q.    What is it?

 9    A.    This is a certified copy of the Form 1096 that was

10    submitted by John J. Pawelski.

11    Q.    For 2004?

12    A.    For 2004.

13    Q.    Does it contain a Form 1099 OID?

14    A.    It does.

15          MR. KIRSCH:  I move to admit and publish Government

16    Exhibit 31.

17          THE COURT:  31 is admitted.

18          (Exhibit No. 31 is admitted.)

19          THE COURT:  And you may publish.

20          MR. KIRSCH:  Thank you, Your Honor.

21          Can you start with page 2, please.  Highlight the

22    top half, if you could.

23    Q.    (BY MR. KIRSCH)  Is this the Form 1096 that you

24    referenced a moment ago?

25    A.    Yes.
```

1    Q.   And does it appear to be prepared by Mr. Pawelski,

2    the taxpayer, as opposed to by a third party?

3    A.   Yes.

4    Q.   Can we go to page 4, please.  What is contained here

5    on page 4?

6    A.   These are the copies of the 1099 OIDs.

7         MR. KIRSCH:  Can we go to page -- display page 5,

8    please.

9    Q.   (BY MR. KIRSCH)  Are these more 1099 OIDs?

10   A.   Yes.

11   Q.   Do you see, again, on the lower two 1099s the word

12   "unknown" under the "Employer Identification Number"

13   section?

14   A.   Yes.

15   Q.   Again, is that something that you would expect to see

16   on a 1099 form from an entity like Wells Fargo Financial?

17   A.   No.

18   Q.   Can you now, please, look at Government Exhibit 32.

19   A.   I have that.

20   Q.   Is that a certified copy of third-party income

21   reported for Mr. Pawelski for 2004?

22   A.   It is.

23        MR. KIRSCH:  I move to admit and publish Government

24   Exhibit 32.

25        THE COURT:  32 is admitted.

1          (Exhibit No. 32 is admitted.)

2          THE COURT:  And you may publish.

3          MR. KIRSCH:  Start with page 2 of that exhibit,

4    please.  And if you can expand those entries.

5    Q.   (BY MR. KIRSCH)  What sort of income was reported by

6    third parties for Mr. Pawelski on -- in these entries?

7    A.   The first shows a non-employee compensation was paid

8    from Option One Mortgage Corporation for $1,953.

9    Q.   I am sorry.

10   A.   The second shows also from BNC -- excuse me BNC

11   Mortgage, Inc., non-employee compensation of $9,401 paid

12   to Mr. Pawelski.

13         MR. KIRSCH:  Can we go to the next page, please,

14   page 3.  Expand those entries again.

15   Q.   (BY MR. KIRSCH)  What information is contained there?

16   A.   The first shows non-employee compensation paid by

17   Argent Mortgage Company to Mr. Pawelski.  Second shows

18   Premiere Bank, paid non-employee compensation, $1,900 to

19   Pawelski.

20         MR. KIRSCH:  Finally, can we go to page 4.  And

21   expand that top portion.

22   Q.   (BY MR. KIRSCH)  And what information is contained in

23   the top entry there?

24   A.   Shows non-employee compensation paid by Mila, Inc.

25   paid to John Pawelski.

1   Q.   And then do we have the summary information for this

2   form at the bottom of the screen?

3   A.   Yes.

4   Q.   Any entities report paying any 1099 OID income to

5   Mr. Pawelski for that year?

6   A.   None.

7   Q.   Did you see any of the 23,000 in non-employee

8   compensation that is listed in that summary, was that

9   reported on the 2004 return for Mr. Pawelski?

10  A.   It was not.

11  Q.   Now I would like to you look, please, at Government

12  Exhibit 33.  Is that the 2005 certified copy of the Form

13  1040 filed for Mr. Pawelski?

14  A.   Yes, it is.

15       MR. KIRSCH:  I move to admit and publish Government

16  Exhibit 33.

17       THE COURT:  33 is admitted.

18       (Exhibit No. 33 is admitted.)

19       THE COURT:  It may be published.

20       MR. KIRSCH:  Thank you, Your Honor.

21       Can we start with page 2, please.  Expand the

22  "income" section, if you would.

23  Q.   (BY MR. KIRSCH)  How many sources of income did

24  Mr. Pawelski report for 2005?

25  A.   Sources of income only on line 8a.

```
 1    Q.   And how much did he report for taxable interest for

 2    that year?

 3    A.   $6,005,118.03.

 4         MR. KIRSCH:  Can we go to page 3 of that exhibit,

 5    please.  And expand the "payment" section.

 6    Q.   (BY MR. KIRSCH)  Did he report that that same amount

 7    had been withheld from him that year?

 8    A.   That's correct.

 9    Q.   And so how much of a refund did Mr. Pawelski ask for

10    for 2005?

11    A.   $5,797,182.70.

12    Q.   Now I am going to ask you to look, please, at

13    Government Exhibit 34.  Tell me if you recognize it,

14    please.

15    A.   I do.

16    Q.   What is it?

17    A.   Certified copy of the Form 1096 from -- the filer is

18    El Paso County Court, naming the person to contact is John

19    Joseph Pawelski.

20         MR. KIRSCH:  I will move to admit publish

21    Government Exhibit 34.

22         THE COURT:  34 is admitted.

23         (Exhibit No. 34 is admitted.)

24         THE COURT:  You may publish.

25         MR. KIRSCH:  Thank you, Your Honor.
```

 1          Can we start with page 2 of that exhibit.

 2     Highlight the top half, please.

 3     Q.   (BY MR. KIRSCH)  This document indicates that the

 4     filer was the El Paso County Court?

 5     A.   Yes.

 6     Q.   But the contact person was Mr. Pawelski?

 7     A.   Correct.

 8     Q.   Do you ordinarily receive handwritten tax forms like

 9     this from government agencies?

10     A.   No.

11          MR. KIRSCH:  Can we go to page 4 of this exhibit,

12     please.  Expand the top two sections.

13     Q.   (BY MR. KIRSCH)  Similar question, Ms. Morgan.  Would

14     you expect to receive handwritten form 1099 OIDs from a

15     governmental entity?

16     A.   No.

17     Q.   How much did Mr. Pawelski report had been withheld

18     from him in 2005 by the El Paso County Court and the El

19     Paso District Attorney, respectively?

20     A.   Each $3 million.

21     Q.   Now I am going to ask you to look, please, at

22     Government Exhibit 35.  Do you have that exhibit?

23     A.   I do.

24     Q.   Is that a certified copy of a set of documents that

25     was mailed to the IRS from Mr. Pawelski?

1    A.    That's correct.

2    Q.    Does it include additional Form 1099 OIDs for 2005?

3    A.    It does.

4          MR. KIRSCH:  I move to admit and publish government

5    Exhibit 35.

6          THE COURT:  35 is admitted.

7          (Exhibit No. 35 is admitted.)

8          THE COURT:  You may publish.

9    Q.    (BY MR. KIRSCH)  Start with page 4 of that exhibit.

10   What is that page that is on the screen now, Ms. Morgan?

11   A.    This is the envelope that the information was

12   included in.

13   Q.    And was it directed to the attention of a particular

14   person at the IRS?

15   A.    It was.

16   Q.    Who is that?

17   A.    Maureen Green.

18         MR. KIRSCH:  Can you now display, please, page 1.

19   I am sorry, page 2.  And expand that if you could a little

20   bit.

21   Q.    (BY MR. KIRSCH)  What is this document, Ms. Morgan?

22   A.    This is a copy of the 3176 C letter sent to John

23   Pawelski.

24   Q.    And then it has the stamps that you mentioned in the

25   upper right.  What does that indicate?

1    A.   Shows that this letter was received at Ogden, April

2    27, 2009, and then sent to the Frivolous Return Program

3    May 28, 2009.

4    Q.   So do I have the chain of events right; the IRS sent

5    this letter to Mr. Pawelski, Mr. Pawelski then mailed it

6    back to the IRS?

7    A.   Right, with the attachments.

8    Q.   Okay.  Let's go to page 5 if we could, please.  What

9    is this form?

10   A.   This is also the Form 1096, the transmittal.

11        MR. KIRSCH:  Okay.  And then can we display page

12   13, please.

13   Q.   (BY MR. KIRSCH)  What is contained on this page?

14   A.   These are copies of the Original Issue Discount 1099

15   OIDs.

16        MR. KIRSCH:  Can we expand the middle one there for

17   a moment, please, the Silverman Law Firm.

18   Q.   (BY MR. KIRSCH)  Do you see, Ms. Morgan, under the

19   description of this form OID, that it says "Court Case"?

20   A.   Yes.

21   Q.   Would you expect to see a Form 1099 OID issued in

22   connection with a court case?

23   A.   No.

24   Q.   Can we go to page 14, please.  Are these more 1099

25   OIDs contained in that enclosure?

1    A.    These are 1099 As.

2    Q.    I am sorry what is a 1099 A?

3    A.    This is the same type of information that would be

4    issued by the financial institution, only it is regarding

5    abandonment of property; for instance, a foreclosure on a

6    home.

7    Q.    I see.  Okay.  Would you expect to see a Form 1099 A

8    issued in connection with a credit card installment

9    account, as are listed in the bottom of this page?

10   A.    No.

11   Q.    Can we display page 19, please.  Is this another form

12   1099 OID that was contained in that transmittal?

13   A.    Yes.

14   Q.    Now I am going to ask you to look at Government

15   Exhibit 36, please.

16   A.    I have that.

17   Q.    Do you have that?  Is that the certified copy of

18   third-party income reported in connection with

19   Mr. Pawelski for tax year 2005?

20   A.    Yes.

21         MR. KIRSCH:  I move to admit Government Exhibit 36.

22         THE COURT:  36 is admitted.

23         (Exhibit No. 36 is admitted.)

24         MR. KIRSCH:  Thank you, Your Honor.

25   Q.    (BY MR. KIRSCH)  Ms. Morgan, is there any 1099 OID

```
 1    income reported by any party for Mr. Pawelski in that
 2    document?
 3    A.    No.
 4    Q.    Now I am going to ask you to look at Government
 5    Exhibit 37.  Is that a certified copy of the 2006 tax
 6    return filed in Mr. Pawelski's name?
 7    A.    It is.
 8          MR. KIRSCH:  I move to admit and publish Government
 9    Exhibit 37.
10          THE COURT:  37 is admitted.
11          (Exhibit No. 37 is admitted.)
12          THE COURT:  And you may publish.
13          MR. KIRSCH:  Thank you, Your Honor.
14          Can we start with page 2 of that exhibit, please.
15    And expand the "income" section, please.
16    Q.    (BY MR. KIRSCH)  How much taxable interest did
17    Mr. Pawelski report that he received in 2006?
18    A.    8a shows $14,102,841.88.
19          MR. KIRSCH:  Can we go to page 3 of that exhibit
20    now, please.  And expand that "payment" section.
21    Q.    (BY MR. KIRSCH)  How much did he report had been
22    withheld him that year?
23    A.    Also $14,102,841.88.
24    Q.    How much of a refund did Mr. Pawelski claim for 2006?
25    A.    The refund claimed is $9,189,983.58.
```

 1    Q.   Can I ask you to look now at what is marked as

 2    Government's Exhibit 38.

 3    A.   I have that.

 4    Q.   What is that exhibit?

 5    A.   This is a certified copy of the Form 1096 for John

 6    Pawelski for 2006.

 7         MR. KIRSCH:  Move to admit and publish Government

 8    Exhibit 38.

 9         THE COURT:  38 is admitted.

10         (Exhibit No. 38 is admitted.)

11         THE COURT:  You may publish.

12         MR. KIRSCH:  Thank you, Your Honor.

13         Can we go ahead and start with page 4 of that

14    exhibit.

15    Q.   (BY MR. KIRSCH)  Does this page contain forms OID

16    that Mr. Pawelski sent for 2006?

17    A.   Yes.

18    Q.   Can we go ahead and display the next page, please.

19    Does this contain more form 1099 OIDs for that year?

20    A.   Yes, it does.

21    Q.   Page 7, can we display that one, please.  Same thing

22    on this one, more form 1099 OID?

23    A.   Correct.

24         MR. KIRSCH:  Can we expand the lower one there on

25    the bottom.

1  Q.   (BY MR. KIRSCH)  Does the Internal Revenue Service

2  issue form 1099 OIDs to taxpayers?

3  A.   No.

4  Q.   If it did, would you expect the Internal Revenue

5  Service to know its employer identification number?

6  A.   Yes, they would.

7       MR. KIRSCH:  Can we go to page 10 of that exhibit,

8  please.  We will get it up on the screen for you, as well.

9  Q.   (BY MR. KIRSCH)  Does that contain more forms 1099

10  OID that Mr. Pawelski sent to the IRS?

11  A.   Yes.

12  Q.   Do these, again, say that they're coming from the El

13  Paso County Court and the El Paso County District

14  Attorney?

15  A.   Yes, they do.

16  Q.   Now I will have you look at that next one, Government

17  Exhibit 39, please.

18  A.   I have that.

19  Q.   Is that the certified copy of third-party income

20  reported for Mr. Pawelski for 2006?

21  A.   It is.

22  Q.   Was there any 1099 OID income reported from any

23  entity for him that year?

24  A.   There is none.

25       MR. KIRSCH:  I will move to admit Government

1    Exhibit 39, Your Honor.

2            THE COURT:  39 is admitted.

3            (Exhibit No. 39 is admitted.)

4    Q.  (BY MR. KIRSCH)  Now I would like you to look at

5    Government Exhibit 40, Ms. Morgan.  Is that the certified

6    copy of a 2007 Tax Return filed in Mr. Pawelski's name?

7    A.   It is.

8            MR. KIRSCH:  Move to admit and publish Government

9    Exhibit 40.

10           THE COURT:  40 is admitted.

11           (Exhibit No. 40 is admitted.)

12           THE COURT:  You may publish.

13           MR. KIRSCH:  Thank you, Your Honor.

14           Can we start with page 2, again.  And highlight the

15   "income" section.

16   Q.  (BY MR. KIRSCH)  What did Mr. Pawelski report for

17   taxable interest for 2007 in this return?

18   A.   8a shows $12,161,028.

19   Q.   And if we could go to page 3.  How much of a refund

20   did Mr. Pawelski request on line 74 for 2007?

21   A.   The refund requested is $7,933,781.70.

22   Q.   Did you attempt to see whether you could locate any

23   OID -- 1099 OID forms filed for Mr. Pawelski for this

24   year?

25   A.   Yes.

1    Q.    Were you able to locate any?

2    A.    We were not able to locate any.

3    Q.    Did you make the same kind of a search for

4    third-party income that was reported for him for this

5    year?

6    A.    Yes.

7    Q.    Can you look at Government Exhibit 41, please.

8    A.    I have that.

9    Q.    Is that the certified copy of the results of that

10   search for third-party income for Mr. Pawelski for that

11   year?

12   A.    Yes, it is.

13        MR. KIRSCH:  I move to admit Government Exhibit 41

14   and publish it, if I could, Your Honor.

15        THE COURT:  41 is admitted.

16        (Exhibit No. 41 is admitted.)

17        THE COURT:  And you may publish.

18        MR. KIRSCH:  Can we start with page 3 of that

19   exhibit, please.  Actually, let's go one more page F.  We

20   can make that a little bit bigger.

21   Q.    (BY MR. KIRSCH)  Any 1099 OID income reported for

22   Mr. Pawelski that year?

23   A.    No.

24   Q.    How much income was reported for Mr. Pawelski by

25   third parties for that year?

1   A.   $13,456.

2   Q.   Now I would like you to look, please, at Government

3   Exhibit 42.  Is that an ENMOD transcript like those you

4   described before for Mr. Pawelski?

5   A.   It is.

6        MR. KIRSCH:  I move to admit and publish Government

7   Exhibit 42.

8        THE COURT:  42 is admitted.

9        (Exhibit No. 42 is admitted.)

10       THE COURT:  You may publish.

11       MR. KIRSCH:  Can we go to page 5 of that exhibit,

12  please.  And highlight the lower section, again, if you

13  could.

14  Q.   (BY MR. KIRSCH)  Does this information on this screen

15  indicate that there were any of those 3176 C letters sent

16  to Mr. Pawelski?

17  A.   It does show that, yes.

18  Q.   Can you identify those on the screen for us again and

19  what years they pertained to?

20  A.   There is a 3176 for 2005.  That was sent March 26,

21  2009.  Then, towards the bottom, there is a 3176 for 2004,

22  sent March 3, 2010.  The 3176 for 2006, mailed also March

23  3, 2010.  The 3176 for 2004 was mailed March 10, 2006.  A

24  3176, again mailed March 10, 2006, which was also for the

25  2006 tax period.

1   Q.   Okay.  Now I would like you to look, please, at

2   Government Exhibit 202.

3   A.   I have that.

4   Q.   Great.  Do you recognize that document?

5   A.   I do.

6   Q.   Can you tell us what it is?

7   A.   This is a certified copy of a U.S. Non-Resident Alien

8   Income Tax Return Form 1040 NR for John Pawelski for 2004.

9   Q.   Is that the same year as one of the ones we looked at

10  a few moments ago?

11  A.   It is.

12  Q.   Is that also for Mr. Pawelski?

13  A.   Yes, it is.

14       MR. KIRSCH:  I move to admit and publish Government

15  Exhibit 202.

16       THE COURT:  202 is admitted.

17       (Exhibit No. 202 is admitted.)

18       THE COURT:  You may publish.

19       MR. KIRSCH:  Thank you, Your Honor.

20       Can we go ahead and start with page 2 of that

21  exhibit.  Just highlight the top part, if you could, for

22  us for right now.

23  Q.   (BY MR. KIRSCH)  You said this is a Non-Resident

24  Alien Income Tax Return?

25  A.   It is.

1   Q.   Who is supposed to use that form?

2   A.   People that are working in the United States that are

3   not citizens would report their income.  An example of

4   this would be a teacher that comes from Japan as a citizen

5   of Japan, comes to the United States to teach English in

6   the schools.  The schools pay that person.  They would

7   report that income on the 1040 NR.

8   Q.   Is this the kind of form that you would expect a

9   United States citizen to use to report his or her income?

10  A.   No.  That would be an incorrect form.

11       MR. KIRSCH:  If we can highlight or expand the

12  lower half of that document now.

13  Q.   (BY MR. KIRSCH)  What did -- on this form, what did

14  Mr. Pawelski report was his total income for the year

15  2004?

16  A.   It shows zeros.

17  Q.   And if we could go to the next page, please.  What

18  amount did he report -- did he report that any amount of

19  money had been withheld from him for 2004?

20  A.   No.  There is no entry.

21       MR. KIRSCH:  Can we go back to Government Exhibit

22  30, page 3, please.  And highlight the "payment" section

23  there.

24  Q.   (BY MR. KIRSCH)  On this version of his 2004 return,

25  how much did Mr. Pawelski report was withheld?

1    A.    $46,929.92.

2    Q.    Can we go back to Government Exhibit 202, please, go

3    to page 8.  Who's listed as the notary for the

4    Non-Resident Alien Tax Return Form that Mr. Pawelski

5    submitted for 2004?

6    A.    Shows Mimi Vigil.

7    Q.    And then can we go to page 10, please.  I am just

8    going to put page 10 on the screen, Ms. Morgan, but do the

9    next several pages of the exhibit, are they all different

10   versions of this form?

11   A.    Yes.

12   Q.    What is this Form 1040 V?

13   A.    That is a voucher that would be used when you are

14   sending a check or payment for income tax to the IRS.

15   Q.    Okay.  Were there any checks or payments enclosed

16   with this set of mailings that Mr. Pawelski sent in with

17   this return?

18   A.    No.

19   Q.    Can we go to page 15 of this exhibit.  What is that

20   form?

21   A.    This is the 1040 -- or, excuse me, 1099 OID.

22   Q.    And does that indicate that there was -- that the IRS

23   had withheld OID income from Mr. Pawelski?

24   A.    Yes.

25   Q.    Could that have been true?

1   A.   No.

2   Q.   Are there more pages in the exhibit of similar OIDs

3   that purport to be from the IRS?

4   A.   That's correct.

5        MR. KIRSCH:  Can we display page 20 of that

6   exhibit, please.  Can you expand the top half of that

7   document.

8   Q.   (BY MR. KIRSCH)  What is this document?

9   A.   This is the actually a Form 668, a Notice of Federal

10  Tax Lien.

11  Q.   Was this contained with that -- this tax return we

12  have been looking at, when Mr. Pawelski mailed it in?

13  A.   It is.

14  Q.   Can you read the top line of the handwriting that is

15  at the 45-or-so degree angle there?

16  A.   States, "Accepted for Value.  Return for -- " can't

17  make it "-- Ordinary Settlement and Close without delay.

18  All rights reserved."  Signed by Mr. Pawelski.

19  Q.   Does the IRS accept as any form of payment a Notice

20  of Federal Tax Lien with this sort of language written on

21  it?

22  A.   No.

23  Q.   Can we go to page 22, please.  What is that document,

24  Ms. Morgan?

25  A.   This is also a copy of the Notice Federal Tax Lien.

```
 1    Q.   Is this a different lien than the one we just looked

 2    at a moment ago?

 3    A.   It is.

 4    Q.   Does it have similar language written on it there?

 5    A.   It does.

 6    Q.   I want to ask you now about a few other documents

 7    associated with Mr. Brokaw, Mr. Pawelski, and Ms. Vigil.

 8    I would like to start with what is marked as Government

 9    Exhibit 212.

10    A.   I have that.

11    Q.   Is that a certified copy of a set of documents that

12    were sent to the IRS?

13    A.   It is.

14    Q.   On whose behalf?

15    A.   This is for Clara M. Mueller.

16    Q.   Is Mr. Brokaw referenced in those documents, as well?

17    A.   He is.

18         MR. KIRSCH:  Move to admit and publish Government

19    Exhibit 212.

20         THE COURT:  212 is admitted.

21         (Exhibit No. 212 is admitted.)

22         THE COURT:  You may publish.

23         MR. KIRSCH:  Thank you, Your Honor.

24         If we can start with page 2, and expand the text of

25    that, if you could.
```

299

1    Q.   (BY MR. KIRSCH)  So under the Certification of

2    Mailing section, who is certified to have appeared before

3    the notary with the documents listed below?

4    A.   George Thomas Brokaw.

5    Q.   And I want to direct your attention to the last

6    person listed on the list of addresses there.  Who is

7    that?

8    A.   That would be Maureen Green.

9    Q.   And whose name is listed as the notary on this

10   document?

11   A.   Clara M. Mueller.

12        MR. KIRSCH:  Can we display page 3 now, please.  If

13   we can just use it like that.

14   Q.   (BY MR. KIRSCH)  What is the caption of this document

15   there?  It starts with "Final Notice"?

16   A.   Final Notice of Default and Demand for Payment.

17   Q.   Is Ms. Green listed on that page under the section

18   "Libellees"?

19   A.   She is.

20   Q.   What is the amount of money that's requested at the

21   top of that document from Ms. Green?

22   A.   It shows $72 million.

23   Q.   Can we go to page 5 of that exhibit, please.  Whose

24   signature does that appear to be at the top of that

25   exhibit?

1    A.    George Thomas Brokaw.

2    Q.    And then can we go to page 6 of that exhibit, please.

3    What is that document?

4    A.    The envelope showing the mailing to Maureen Green.

5    Q.    Can I please ask you to look now at what is marked as

6    Government Exhibit 209.

7    A.    I have that.

8    Q.    Is that a certified copy of a set of documents that

9    was sent to the IRS?

10   A.    It is.

11   Q.    Does it purport -- does it relate to a person named

12   William Rogers?

13   A.    It does.

14         MR. KIRSCH:  I move to admit and publish Government

15   Exhibit 209.

16         THE COURT:  209 is admitted.

17         (Exhibit No. 209 is admitted.)

18         THE COURT:  And you may publish.

19         MR. KIRSCH:  Thank you, Your Honor.

20         Let's start with page 2, please.  Can you expand

21   the top half of that to begin with.

22   Q.    (BY MR. KIRSCH)  What is the title of this document?

23   A.    States Private Registered Bond for Setoff

24   Non-negotiable.

25   Q.    What is the value listed there?

1    A.   States 100 billion U.S. dollars.

2    Q.   Who is the name listed over on the left?

3    A.   William Moore Rogers.

4    Q.   And if we go down under the "Bond Order," is there

5    language related to using this amount to settle tax debt

6    related to Mr. Rogers?

7    A.   That's correct.

8    Q.   Who are listed -- who is listed as surety number one

9    on this document?

10   A.   Number one is George Thomas Brokaw.

11   Q.   Who is listed as Surety number two?

12   A.   John Joseph Pawelski.

13   Q.   Does the IRS honor documents like this one for

14   settlement of tax debts?

15   A.   No.

16   Q.   As far as you know, does this document have any kind

17   of legitimacy?

18   A.   It does not.

19   Q.   Let me ask you to look now, please, at what is marked

20   as Government's Exhibit 216.

21   A.   I have that.

22   Q.   Is that a certified copy of documents that were sent

23   to the IRS?

24   A.   Yes.

25   Q.   Did those come from Mr. Pawelski?

 1   A.   Yes.

 2        MR. KIRSCH:  I move to admit and publish Government

 3   Exhibit 216.

 4        THE COURT:  216 is admitted.

 5        (Exhibit No. 216 is admitted.)

 6        THE COURT:  You may publish.

 7        MR. KIRSCH:  Thank you, Your Honor.

 8        Start with page 2, please.  Expand that top half,

 9   if you could, please.

10   Q.   (BY MR. KIRSCH)  Who signed there at the bottom of

11   the or the middle of this page, Ms. Morgan?

12   A.   John Joseph Pawelski.

13   Q.   And can we go to page 4, please.  Is this a letter

14   that was contained in this mailing?

15   A.   It was, yes.

16   Q.   What is the date up there on the top of that letter?

17   A.   Sent January 12, 2012.

18   Q.   Okay.  And in the first -- can you just read the

19   first paragraph for us there, please?

20   A.   "On December 6, 2011, I submitted an instrument to

21   the IRS with specific instructions in order to have the

22   debt associated with Account No. 330429404 be discharged.

23   This was an EFT instrument which was sent certified by

24   mail --" states the number "-- under notary presentment."

25   Q.   That is fine.  You can stop there.  Who signed or

```
 1    what is the name on the signature for this document?

 2    A.   John Joseph Pawelski.

 3         MR. KIRSCH:  Can we go to page 5 now, please.

 4    Expand that if you could.

 5    Q.   (BY MR. KIRSCH)  Is this -- was a copy of this check

 6    contained with this mailing, as well?

 7    A.   It was.

 8    Q.   What is written on the top of that check next to the

 9    date?

10    A.   States "Not for Deposit.  EFT Only."

11    Q.   And what is in the memo line?  Can you read that?

12    A.   "EFT Only.  For Setoff of Debt."

13    Q.   What was the amount of this check?

14    A.   $132,000.

15         MR. KIRSCH:  Can we go to the next page, please,

16    page 6.  And expand that part of the text if you could,

17    please.

18    Q.   (BY MR. KIRSCH)  Who endorsed this check?

19    A.   John Joseph Pawelski.

20    Q.   Is that the same person who wrote the check?

21    A.   Correct.

22    Q.   And what did he write above his name on the

23    endorsement there?

24    A.   "Not for Deposit.  For EFT Only for Discharge of

25    Debt."
```

```
 1    Q.    Okay.  Does the IRS honor documents like this for

 2    payments of text debts?

 3    A.    No.

 4    Q.    Can I ask you to look now, please, at Government

 5    Exhibit 218.

 6    A.    218.  I have that.

 7    Q.    Do you recognize that exhibit?

 8    A.    I do.

 9    Q.    Is that a certified copy of correspondence that the

10    IRS received from Mr. Brokaw?

11    A.    It is.

12          MR. KIRSCH:  I move to admit and publish Government

13    Exhibit 218.

14          THE COURT:  218 is admitted.

15          (Exhibit No. 218 is admitted.)

16          THE COURT:  You may publish.

17          MR. KIRSCH:  Thank you, Your Honor.

18          Can we start with page 7 of that exhibit, please.

19    If we can highlight that text that would be great.

20    Q.    (BY MR. KIRSCH)  Is this a letter that is contained

21    within that packet, Ms. Morgan?

22    A.    It is.

23    Q.    What is the date on this letter?

24    A.    November 20, 2011.

25    Q.    And can you just read the first couple of sentences
```

 1    of the main paragraph there for us please.

 2    A.   "Enclosed you will find the instrument to set off the

 3    enclosed presentments regarding George T. Brokaw, Account

 4    278402356, $522,692.48."

 5    Q.   Okay.  And then that sentence that says "kindly

 6    process it"?

 7    A.   Yes.

 8    Q.   What does that say?

 9    A.   "Kindly process it through EFT, electronic funds

10    transfer, not ACH.  Not for deposit."

11    Q.   And then just one more sentence that begins, "I have

12    written"?

13    A.   "I have written the instrument to reflect apparent

14    current payoff statement charges plus approximately 25

15    percent to cover any additional fees."

16    Q.   Do you have experience with seeing the payments that

17    taxpayers make to the IRS over the course of your work

18    there?

19    A.   Yes.  They are recorded on the accounts.

20    Q.   So based on what you have seen, is it customary for

21    taxpayers to throw in an additional 25 percent beyond what

22    they owe just to cover any additional fees?

23    A.   No.

24         MR. KIRSCH:  Can we display page 8 of that exhibit,

25    please.  And expand the back of that.

1    Q.    (BY MR. KIRSCH)  This is copy of the document or the

2    check that was contained with this correspondence?

3    A.    It is.

4    Q.    And what is handwritten on the top of that check?

5    A.    "Not for Deposit.  EFT Only."

6    Q.    What is the amount of this check?

7    A.    $522,692.48.

8    Q.    And is there similar text written in the endorsement

9    section on the back of this check?

10   A.    Yes.

11   Q.    Did the IRS accept this check as payment for any tax

12   debt owed by Mr. Brokaw?

13   A.    No.

14   Q.    Finally, unless I get a different suggestion from my

15   co-counsel, I will ask you to look at Government Exhibit

16   220.

17   A.    I have that.

18   Q.    Is that a certified copy of correspondence sent to

19   the IRS from Ms. Vigil?

20   A.    It is.

21        MR. KIRSCH:  Move to admit and publish Government

22   Exhibit 220?

23        THE COURT:  220 is admitted.

24        (Exhibit No. 220 is admitted.)

25        THE COURT:  You may publish.

1    Q.   (BY MR. KIRSCH)  Start with page 2 of that exhibit,

2    please.  What is this page, Ms. Morgan?

3    A.   It states it is instructions for the enclosed

4    invoices.

5    Q.   And, again, could you just read the first paragraph

6    for us there.

7    A.   "All of the following enclosed documents have been

8    signed and accepted for value and returned for settlement

9    by the authorized representative, Mimi Michelle Vigil."

10   Q.   You can skip that number there if you would.  But

11   what does it say they are being submitted for?

12   A.   "Immediate payment via the Mimi Michelle Vigil

13   constructive trust account number."

14   Q.   Can we look at the next page of that exhibit, please.

15   Who was listed as the notary for this document?

16   A.   Clara M. Mueller.

17   Q.   What is the date she put there that Ms. Vigil

18   appeared before here?

19   A.   The 1st day of September 2011.

20   Q.   Then can we go to page 4, please.  What is this

21   document, Ms. Morgan?  Are you familiar with it?

22   A.   I am.

23   Q.   What is it?

24   A.   This is a CP 15.  This is a notice of the frivolous

25   return penalty being charged.

```
 1    Q.   And was this a document that originally had been sent

 2    to Ms. Vigil?

 3    A.   Correct.

 4    Q.   Can you read the -- at least the beginning of the

 5    handwriting on that document?

 6    A.   States "Accepted for Value.  Exempt from Levy."

 7    Q.   And underneath that does it say something that begins

 8    "Deposit to the United States Treasury"?

 9    A.   It does.

10    Q.   Would the IRS have accepted the penalty notice with

11    this handwriting on it as some sort of payment for

12    Ms. Vigil's tax debt?

13    A.   No.

14    Q.   Can we go to page 6, please.  Do you know what this

15    document is?

16    A.   This is the page where you would actually send your

17    payment for credit in the amount that you owe.

18    Q.   Okay.  Does it appear to have that same language

19    written at an angle on the top?

20    A.   It does.

21    Q.   Then on the bottom, do you see where the handwriting

22    says "Money Order.  Pay to the United States Treasury"?

23    A.   I do.

24    Q.   Did Ms. Vigil's writing of those words on the bottom

25    of that payment voucher turn it into a money order that
```

1    the IRS would except for payment?

2    A.   No.

3         MR. KIRSCH:  Can we go to page 8 of that exhibit,

4    please.  Can you expand that.

5    Q.   (BY MR. KIRSCH)  What does this document appear to

6    be?

7    A.   This is basically a bill from AT&T.

8    Q.   Does it have that same kind of handwriting on it?

9    A.   Yes, it does.

10   Q.   Same question.  Does the placement of that kind of

11   handwriting on a bill from AT&T turn it into the

12   equivalent of a payment -- some form of payment that the

13   IRS will accept?

14   A.   No.

15   Q.   Can we go to page 11, please.  What is this document?

16   A.   This is a bill from Colorado Springs Utilities.

17   Q.   Okay.  Does it appear to have the same kind of

18   writing on it?

19   A.   Same language, yes.

20   Q.   Are there other similar kinds of documents contained

21   within this mailing from Ms. Vigil?

22   A.   There is.

23   Q.   Did the IRS accept any of those as payments for

24   Ms. Vigil's tax debt?

25   A.   No.

1          MR. KIRSCH:  Could I have one moment, please, Your

2    Honor?

3          THE COURT:  You may.

4          MR. KIRSCH:  Thank you, Your Honor.  I don't have

5    any other questions for Ms. Morgan.

6          THE COURT:  All right.  Thank you very much, ma'am,

7    you may step down.

8          We have been going for just shy of 2 hours.  I

9    think it is time for a break.  I remind the jury that you

10   cannot discuss this case among yourselves or with anyone

11   else.  You can conduct no research.  We will be in recess

12   until about 10:30.  Court will be in recess.

13          (A break is taken from 10:13 a.m. to 10:31 a.m.)

14          THE COURT:  All right.  You may be seated.

15          Ms. Hartmann, you may bring in the jury.

16          THE COURT:  All right.  You may be seated.  You may

17   proceed.

18          MS. PALUCH:  Thank you, Your Honor.  The Government

19   calls Ms. Stacie Gleeson.

20          COURTROOM DEPUTY:  Remain standing.

21          Your attention, please.

22          Please raise your right hand.

23                         **STACIE GLEESON**

24   having been first duly sworn, testified as follows:

25          COURTROOM DEPUTY:  Please be seated.

```
1          Pleas state your name, and spell your first and

2    last names for the record.

3          THE WITNESS:  Stacie Gleeson.  S-T-A-C-I-E.  Last

4    name is G-L-E-E-S-O-N.
```

5                          **DIRECT EXAMINATION**

6    **BY MS. PALUCH:**

```
7    Q.   Good morning, Ms. Gleeson.

8    A.   Good morning.

9    Q.   How are you employed?

10   A.   I am a financial assistant at the United States

11   District Court for the District of Colorado.

12   Q.   You work here in this building?

13   A.   Yes, I do.

14   Q.   How long have you held that position?

15   A.   Just over 13 years.

16   Q.   And prior to working for the United States District

17   Court, how were you employed?

18   A.   I was employed in the banking industry.

19   Q.   How long were you employed in the banking industry?

20   A.   Over 10 years.

21   Q.   And what are your duties as a financial assistant for

22   the Court?

23   A.   In a nutshell, I take in all money that comes into

24   the Court for any civil or criminal cases.

25          THE COURT:  Can I ask you to move closer the
```

1    microphone, please.

2            THE WITNESS:  Yes.

3            I take in all money for any civil or criminal

4    cases, anything coming into the Court.  I set up all of

5    the cases in the system, and disburse the funds out to the

6    victims of the case.

7    Q.   (BY MS. PALUCH)  Also to parties involved in suits?

8    A.   Yes.

9    Q.   Okay.  I would like to show you what has been marked

10   as Government's Exhibit 219.  Do you have that in front of

11   you, ma'am?

12   A.   I do.

13   Q.   Do you recognize that exhibit?

14   A.   I do.

15   Q.   And, generally, can you state what that is?

16   A.   It is a copy of a check from Mr. Brokaw in a packet

17   with all of the back-up information.

18   Q.   Is it actually an original check there, rather than a

19   copy?

20   A.   It is the original check, yes.

21   Q.   Okay.  And did you receive that, in fact?

22   A.   I did.

23   Q.   It was directed to you once it was received by the

24   Clerk's Office?

25   A.   Yes.

```
 1              MS. PALUCH:  Your Honor, at this time I move for

 2    admission and publishing of Government's Exhibit 219.

 3              THE COURT:  219 is admitted.

 4              (Exhibit No. 219 is admitted.)

 5              THE COURT:  You may publish.

 6    Q.   (BY MS. PALUCH)  Ms. Gleeson, what is the amount of

 7    that check?

 8    A.   $5,978,963.

 9    Q.   The date of that check?

10    A.   April 26, 2012.

11    Q.   Who signed that check?

12    A.   George Thomas Brokaw.

13              MS. PALUCH:  Your Honor, with the Court's

14    permission, I would ask that Ms. Gleeson be allowed to

15    just hold up that check for the jurors to see.

16              THE COURT:  She may.

17              THE WITNESS:  (Indicating).

18              THE COURT:  Is that supposed to be published?  It

19    wasn't.

20              MS. PALUCH:  Your Honor, I would ask that we

21    publish, please, page 5 of Exhibit 219.

22    Q.   (BY MS. PALUCH)  And, Ms. Gleeson, can you take a

23    look at the check and look at what is displayed on the

24    screen in front of you.  Is that a copy of the check?

25    A.   Yes, it is.
```

1    Q.    And can you read the memo line of that check?

2    A.    "EFT Only.  For Discharge of Debt."

3    Q.    And please read the back of the check.

4    A.    "For deposit, EFT only.  For Discharge of Debt.

5    George Thomas Brokaw.  Authorized Rep.  April 26, 2012.

6    Without Recourse."

7    Q.    And do you see above "Pay to the Order of," there is

8    some handwriting.  Can you read that handwriting into the

9    record?

10   A.    Yes.  "For Civil Action 07-cv-01568-WYD-KMT."

11   Q.    I would now like to direct your attention to page 10

12   of that exhibit, if you would.  Can you identify that

13   document?

14   A.    This is the letter of instruction that was mailed to

15   me from Mr. Brokaw.

16   Q.    Was this letter mailed with the check?

17   A.    Yes, it was.

18   Q.    And what does he tell you there, if you could read

19   that first sentence?

20   A.    "Enclosed you will find the instrument to set off the

21   enclosed presentments regarding Mr. Charles Williams

22   Ledford, Civil Action 07-cv-1568 WYD-KMT."

23   Q.    Does it list the 5 million dollar plus -- 5.9 million

24   dollar amount there?

25   A.    Yes, it does.

1   Q.   Can you compare, is the case number referenced on

2   page 10 the same case number that was referenced on the

3   check that you received?

4   A.   It is.

5   Q.   Okay.  And is this letter on page 10 signed by

6   Mr. Brokaw?

7   A.   Yes, it is.

8   Q.   Next page of this exhibit, page 11, what is that?

9   A.   This is a copy of the Amended Judgment for the civil

10  case that was referred to on the check from Mr. Charles

11  Ledford.

12  Q.   Did Mr. Brokaw send this along with the check?

13  A.   Yes, he did.

14  Q.   Page 12, what does that appear to be?

15  A.   This is a spreadsheet of how he wanted the funds

16  applied toward Mr. Ledford's case.

17  Q.   Did you research whether there was, in fact, a debt

18  associated with that case number for Mr. Charles Ledford?

19  A.   Yes, I did.

20  Q.   And what did you determine?

21  A.   There was a debt, yes.

22  Q.   And what was the amount of the debt?

23  A.   Just over 5 -- over 5 million.

24  Q.   Okay.  And did the United States District Court for

25  the District of Colorado try to cash that check?

1    A.    Yes, we did.

2    Q.    And what happened?

3    A.    It was returned account closed.

4    Q.    Okay.  Would you please refer to page 4 of this

5    exhibit.

6    A.    Okay.

7    Q.    What is this document?

8    A.    This is a copy of the letter that I sent Mr. Brokaw

9    on May 4, 2012, letting him know the check was being

10   returned because the account was closed.

11   Q.    Did your signature appear on that page?

12   A.    It does.

13   Q.    Now I would like to direct your attention to page 3

14   of this exhibit.  Can you identify that document?

15   A.    This is a copy of the letter that Mr. Brokaw sent me

16   after he found out the check was returned.

17   Q.    Okay.  And I would like to direct your attention to

18   that first paragraph.  Could you read that for the record,

19   please?

20   A.    Sure.  "I recently forwarded an instrument directing

21   an electronic funds transfer, EFT, to your office on

22   4/26/2012 in the amount of 5,978,573 sent certified mail

23   and received by your office on 4/27/2012."

24   Q.    Thank you.  I will direct your attention now to the

25   seventh paragraph down of that letter, starting with "I

1   later received."  Do you see that paragraph?

2   A.   I do.

3   Q.   Can you read that first line of that paragraph?

4   A.   Sure.  "I later received notice 5/5/2012 and dated

5   5/4/212, via First Class Mail the EFT instrument was being

6   returned for the following unlawful reason.  Account

7   closed."

8   Q.   Okay.  Then if you go down to the next paragraph, the

9   second sentence -- second full sentence, starting with

10  "because the original EFT."  Would you read that one line?

11  A.   Sure, "because the original EFT was returned to me

12  stamped on the reverse with no fatal defect indicated, I

13  am returning the EFT instrument to you for the proper

14  processing."

15  Q.   And did he, in fact, return the original $5 million

16  dollar check to you?

17  A.   Yes, he did.

18  Q.   And is that the check that you have with you up there

19  at the witness stand?

20  A.   It is, yes.

21  Q.   Okay.

22       MS. PALUCH:  May I have a moment, Your Honor?

23       THE COURT:  You may.

24       MS. PALUCH:  No further questions.

25       THE COURT:  All right.  Thank you very much.  You

1    may step down.

2            THE WITNESS:  Thank you.

3            THE COURT:  All right.  The Government may call its

4    next witness.

5            MR. KIRSCH:  Your Honor, the Government calls David

6    Riordan.

7            COURTROOM DEPUTY:  Please enter and remain

8    standing.

9            Your attention, please.

10           Please raise your right hand.

11                    **SPECIAL AGENT DAVID RIORDAN**

12   having been first duly sworn, testified as follows:

13           COURTROOM DEPUTY:  Please be seated.

14           Please state your name, and spell your first and

15   last names for the record.

16           THE WITNESS:  My name is David Riordan.  Spelled

17   D-A-V-I-D.  Last name is R-I-O-R-D-A-N.

18           THE COURT:  You may proceed.

19           MR. KIRSCH:  Thank you, Your Honor.

20                      **DIRECT EXAMINATION**

21   **BY MR. KIRSCH:**

22   Q.   Mr. Riordan, how are you employed?

23   A.   Currently I am employed as a special agent with the

24   Federal Housing Financing Agency of the Inspector General.

25   Q.   And were you previously employed as a special agent

```
 1    with the IRS Criminal Investigation Division?
 2    A.    Yes, I was.
 3    Q.    How long did you hold that position?
 4    A.    From 1995 to March of 2012.
 5    Q.    Is that when you transferred over to the Federal
 6    Housing Financing Administration?
 7    A.    Yes.
 8    Q.    And you said you were a special agent with the IRS?
 9    A.    Correct.
10    Q.    At some point did you take on additional duties
11    related to computers or electronic evidence?
12    A.    Yes, I did.
13    Q.    When was that?
14    A.    That was approximately 2008.
15    Q.    And what was your title in that respect?
16    A.    I was still a special agent, but the title provided
17    to us was computer investigative specialist.
18    Q.    Did you engage in any training in order to become a
19    computer investigative specialist?
20    A.    Yes, I did.
21    Q.    What did you do?
22    A.    We went through 6 weeks of intensive training at the
23    Federal Law Enforcement Training Center in Glynco,
24    Georgia.
25    Q.    Since you switched agencies, do you do any computer
```

1   forensic work for your current agency?

2   A.   Yes, I do.

3   Q.   Okay.  I want to take you back to 2009, when you were

4   an IRS special agent.  Were you involved in a search

5   warrant that was executed at 5996 Pine Ridge Drive in

6   Elizabeth, Colorado, in 2009?

7   A.   Yes, I was.

8   Q.   Do you recall approximately when in 2009 that was?

9   A.   July 1st.

10  Q.   And do you know whose -- what kind of a building was

11  that?

12  A.   This was a ranch-style home in an area which had a

13  large tract of land.

14  Q.   Do you know who lived there?

15  A.   Curtis Morris.

16  Q.   Did Mr. Morris -- were you aware of whether or not

17  Mr. Morris operated a business from that location, as

18  well?

19  A.   Yes, I was.

20  Q.   What sort of business did he operate?

21  A.   Return preparer business.

22  Q.   Do you know the name of that business?

23  A.   I think it was Numbers and Beyond.

24  Q.   What role did you play in connection with the

25  execution of that search warrant?

1    A.    Initially, I was one of the original entry teams into

2    the location to effect the search warrant, which included

3    knocking and announcing and entering the location.  And

4    once the location was deemed safe, I then encountered the

5    computers and dealt with the computers.

6    Q.    And can you explain the process that you used when

7    you say that you "dealt with the computers"?

8    A.    Yes.  Simply what would happen is that as a computer

9    investigative specialist assisting with the search

10   warrant, my job was to handle any electronic media that

11   was found on site.  That would include triaging the

12   computers to determine what was there, what we needed to

13   do to access the information from those computers, and a

14   number of different ways that could have been done.

15        And what I did is I ended up handling a few

16   computers at the location.  One computer was seized and

17   taken back to our lab at IRS office space in Denver.

18   Another computer, a laptop, I conducted a forensic image

19   of that particular computer.  A third computer, which was

20   Curtis Morris' wife, I previewed that computer, found it

21   was outside the purview of the search warrant, and

22   provided that computer back to her.

23   Q.    Okay.  So I think in -- correct me if I am wrong,

24   implicit in what you said is the warrant you were under

25   authorized you to seize this kind of electronic evidence?

1    A.    Yes, it did.

2    Q.    And putting aside the one that you previewed and

3    determined didn't have responsive evidence, did you say

4    you essentially located two computers that did?

5    A.    Yes.

6    Q.    And then you -- I think you used the term that you

7    made an image of one of those computers?

8    A.    Correct.

9    Q.    What does that mean?

10    A.    Imaging a computer is a forensic terminology that we

11    use of making an exact copy of the hard drive that was on

12    the computer, and that way we can take that image back to

13    the lab, back to the IRS's space, to analyze it to find

14    any evidence on that particular computer copy.

15    Q.    So how is it that you determined that the copy that

16    you make or the image is, in fact, identical to what was

17    on the original computer?

18    A.    Forensically, when we conduct an image of a computer,

19    there is software that we use that actually uses an

20    algorithm that calculates where 1 and O lie on a hard

21    drive, because it is alphanumeric number in the process of

22    making a copy onto the government hard drive of the image

23    of the computer we are seizing.

24          There is a calculation done on that image to see

25    how the 1s and zeros lay out on that.  If the alphanumeric

323

1    number, known as SHA-1 matches, we know we have an exact

2    copy.

3    Q.   So after the images were -- well, let's start with

4    the creation of the images.  Was there a forensic image

5    created for both of the two computers that you described;

6    the laptop and the desktop?

7    A.   Yes, there were.  The laptop was imaged at the

8    location.  The computer that we seized and had taken back

9    to the lab was done at the lab.  An image was done there.

10   Q.   Did you then have an opportunity to do initial

11   additional analysis on those two forensic images?

12   A.   Yes, I did.

13   Q.   Before you did that initial additional analysis, did

14   you have the opportunity to compare those SHA-1 values

15   that you described for the original computers and the

16   forensic images?

17   A.   Yes, I did.

18   Q.   Did they match?

19   A.   Yes, they did.

20   Q.   What did that tell you?

21   A.   That I had an exact replica of the hard drive as it

22   was in the computer of the laptop imaged there, and when I

23   imaged the other computer at the IRS criminal

24   investigation CIS lab.

25   Q.   So once you have -- once you had determined that you

1    had those exact copies, what was the process generally

2    that you used to further analyze those copies?

3    A.   The process that I employed was I would make a copy

4    of the image that I made, would put the original image

5    into storage.  I would use that copy as my working copy,

6    which was an exact replica, once again, of that.  And I

7    would put it into a forensic analysis machine that I had

8    with the software program that would index the hard drive

9    and put the files into buckets of information, be they

10   e-mails, Word documents, pdf's, Excel spreadsheets and

11   also allow me to take a look at the file structure of the

12   computer as it were on the actual computer I was looking

13   at.

14   Q.   In the process of doing that analysis, were you able

15   to locate a number of e-mails from those computers?

16   A.   Yes.  The next process I employed was taking key word

17   searches and searching across the hard drive on the

18   indexed files for any word that may have been appropriate

19   to the special agent who was investigating the case within

20   the purview of the warrant.

21   Q.   At some point were you asked to review for e-mails

22   containing the names "Brokaw" and "Pawelski" and "Vigil"?

23   A.   Yes.

24   Q.   And "Mueller," as well?

25   A.   Yes.

325

1    Q.    And did you, in fact, locate e-mails that contained

2    those names on one or both of the computers that were

3    copied from Mr. Morris' residence?

4    A.    Yes, I did.

5    Q.    Before you came to court today, did you have an

6    opportunity to review some e-mails that had been marked as

7    exhibits for this trial?

8    A.    Yes, I did.

9    Q.    Did those include exhibits marked 90 through 106 and

10   300 and 301?

11   A.    Correct.

12   Q.    Did you make a determination about whether or not

13   those exhibits were contained on the images of the

14   computers that you obtained from Mr. Morris' residence?

15   A.    Yes.  Based off of reports that I provided to the

16   case agent who was investigating the case.

17   Q.    And were all of those e-mails on those computers at

18   Mr. Morris' house?

19   A.    Yes, they were.

20   Q.    I want to start by asking you about some e-mails

21   related to Ms. Vigil.  Can I ask you to take a look,

22   please, at what is marked as Government Exhibit 90.

23        MR. KIRSCH:  Actually, Your Honor, I may be able to

24   make this more efficient.  At this point I will move to

25   admit Exhibits 90, 94, 99, 103, 106.

1          THE COURT:  Hold on hold on 90, 94, 99.

2          MR. KIRSCH:  103, 106 and 300.

3          THE COURT:  All right.  Exhibits 90, 94, 99, 103,

4    106, and 300 admitted.

5          (Exhibit Nos. 90, 94, 99, 103, 106, 300 are

6    admitted.)

7          MR. KIRSCH:  Thank you, Your Honor.  Can I please

8    publish Exhibit 90?

9          THE COURT:  You may.

10   Q.   (BY MR. KIRSCH)  What are we looking at the on the

11   screen right now Special Agent Riordan?

12   A.   This is the software that I used to analyze the

13   computers from the search warrants of Curtis Morris'

14   residence.  And the computer software program would end up

15   allowing us to print out a copy of the e-mail that I found

16   doing the various searches by names or key word searches.

17         This is the format that the forensic tool kit, the

18   software I used, prints it out.  So it is not exactly what

19   it would look like on your computer if you printed it out,

20   but the header information:  To, from, the body

21   information, all of that is exactly the same.

22         MR. KIRSCH:  Your Honor, I am sorry, I meant to be

23   publishing Exhibit 90.  If I can do that please.

24         THE COURT:  I thought we were.

25         MR. KIRSCH:  We are now.  Thank you, Your Honor.

1    Q.    (BY MR. KIRSCH)   Okay.   So the -- you were saying, I

2    think this information that is in the sort of boxes at the

3    top, is that what you are referring to as the header

4    information?

5    A.    That is the to/from on the e-mail, itself, which is

6    part of the header information.

7    Q.    And at the very top, where it says "message 0077,"

8    where does that number come from?

9    A.    The computer program that I use would look at the

10   various folder structures of the PST, the personal storage

11   table of the Outlook, your e-mail system, and based on

12   where that particular e-mail was in the folder structure,

13   it would provide a number to it.

14          So this could have been in the inbox, and it was

15   the 77th message in the inbox.

16   Q.    Okay.   Does that number help you identify particular

17   messages when you are doing your analysis?

18   A.    That is one of the ways, yes.

19          MR. KIRSCH:   Okay.   Can we display page 4 of this

20   exhibit now, please.   And can we expand where -- beginning

21   where it says "Outlook Header Information."

22   Q.    (BY MR. KIRSCH)   So what is this information here?

23   A.    This is the computer program that I use to analyze

24   the computers.   Looking at e-mails, it picks up the

25   information that is on the local machine, the machine that

1    I was doing the analysis of the image, that would be the

2    e-mail systems' header information.

3    Q.   And then how about the information down below that,

4    under the caption "Standard Header Information."  We can

5    page down to that.

6    A.   The standard header information, this comes from the

7    metadata on the actual e-mail, itself; how it was sent

8    forward through the e-mail system.  Think of it as the

9    postage information that is on a typical envelope that is

10   sent through the system.

11        So it is the capturing of, one, the information was

12   sent through the e-mail systems available at that point in

13   time.  It was ultimately delivered to the computer that I

14   was looking at.

15   Q.   Okay.  So is this same kind of information under

16   these captions, is that going to be on all of the e-mails

17   that you previously mentioned that you reviewed before you

18   came to court today?

19   A.   The standard header information will be on the

20   incoming e-mails, because it is coming through the system

21   and the e-mail systems capture that.  But once you are

22   sending out an e-mail, you will not get the standard

23   header information, because all it is doing is creating it

24   on the local machine and sending it out through the e-mail

25   system.

329

 1          So it is like putting it in an envelope, itself,

 2     and putting a stamp on it and into the mailbox.  So you

 3     wouldn't see that information.  If you were receiving it,

 4     you would see it.

 5     Q.   Okay.  Now, can we go back to the top of this page,

 6     please.  So I just want to put that top part on.  I want

 7     to kind of display this for a moment, Special Agent

 8     Riordan.  Then, if we can go to the previous page please,

 9     page 3.

10          So what is that that we were just looking at on the

11     top of page 4?  Does that have some relationship to what

12     is on the screen on page 3 now?

13     A.   This would be the information on how it was checked

14     for any antivirus -- any viruses on that particular e-mail

15     coming into the machine.

16     Q.   Then can we go to page 2.  So there is sort of --

17     there is a couple of dashed lines.  It looks like some

18     more header information a couple of times here.  What does

19     that mean or what does that indicate?

20     A.   This is just if you receive an e-mail with various

21     e-mail chains on it.  So the first -- underneath the first

22     dashed lines is the first e-mail in the chain.  Next one

23     up after that is the next one responding to it.  But you

24     will notice as that process goes forward, the header

25     information doesn't appear because it is stripped off of

1    it.

2         MR. KIRSCH:  Okay.  So can we go ahead and expand

3    now what is at the bottom of the page there, starting with

4    the "From:  Curtis."

5    Q.   (BY MR. KIRSCH)  So is this the first message in the

6    chain on this e-mail?

7    A.   Yes, it is.

8    Q.   And it was from -- it says it was from who?

9    A.   From Curtis, with an mail address effnbks@myedl.com.

10   Q.   It says it went to?

11   A.   Mimi Vigil.

12        MR. KIRSCH:  And can we go back to page 3 now,

13   please.  And can we expand the paragraph in the middle of

14   the page, please.

15   Q.   (BY MR. KIRSCH)  Can you read the sentence in the

16   middle of that paragraph that starts "If this"?

17   A.   "If this is true, then I have put together an '05

18   return with the OID from Mistar Financial which has

19   already been sent in."

20   Q.   Is there then a reference to a refund amount for '05?

21   A.   "In filling out the '05 return with this as taxable

22   it gives a refund of $251,481."

23   Q.   Okay.  Now can we go back to page -- actually, can we

24   go to the bottom of this page.  Who signed, if you will,

25   that e-mail?

1    A.   Curtis Morris.

2         MR. KIRSCH:  Now can we go to page 2.  And expand

3    the message in the middle of that page.  And can you just

4    scroll up on that a little bit.

5    Q.   (BY MR. KIRSCH)  Who is this message from?

6    A.   This appears to be a response from Mimi Vigil with an

7    e-mail to mimiv07@comcast.net to Curtis.

8    Q.   What did Ms. Vigil say in the second paragraph about

9    $220,000?

10   A.   "I would love to get 220K back for '05.  Let's go

11   with that for now and see what happens."

12        MR. KIRSCH:  Now can we go to the first page of

13   this exhibit, please.  Expand the message at the bottom.

14   Q.   (BY MR. KIRSCH)  Is this the response to that message

15   from Mr. Morris?

16   A.   If you scroll up a bit you will see it is from Curtis

17   Morris to Mimi Vigil.

18        MR. KIRSCH:  Okay.  Now I would like to publish, if

19   I could, Your Honor, Government Exhibit 94.

20        THE COURT:  You may.

21        MR. KIRSCH:  Thank you.

22        Can we start with page 2 of this exhibit.  And can

23   we highlight the message at the bottom of that, please.

24   Q.   (BY MR. KIRSCH)  So what does the line say that

25   begins "here is the info"?

1    A.    "Here is the info for a house that was foreclosed on

2    in '05.  Lender:  Option One Mortgage Corporation.  Loan

3    No. 0004377313."

4    Q.    And then is there a reference a couple of lines below

5    that to getting that 1099?

6    A.    "I want to do this one right away, since the timeline

7    to get it 1099'd is the end of this year . . ."

8          MR. KIRSCH:  Now can we go back to page 1, please,

9    and display the message on the bottom.

10   Q.    (BY MR. KIRSCH)  Who is this message from?

11   A.    This is from Curtis Morris.

12   Q.    To Mimi Vigil?

13   A.    Correct.

14   Q.    What does the first line in that e-mail say?

15   A.    "So, do you want me to prepare an OID for this

16   mortgage and the other one you gave me at our meeting."

17   Q.    Now display the top message on this one, please.  And

18   how did Ms. Vigil answer that question?

19   A.    Well, if you scroll to the top, you will see this is

20   from Mimi Vigil to Curtis Morris.  The message of the body

21   says, "Yes, I would like to have you take care of the

22   1040s for the years I gave you that I got from the IRS.

23   Two mortgages are from '05 and '06.  One for '07.  That is

24   the one I still need to get the information for."

25         MR. KIRSCH:  Okay.  Now I am going to ask to

1    publish Government Exhibit 99.

2            THE COURT:  You may.

3            MR. KIRSCH:  Thank you, Your Honor.

4            This message at the top of the screen on Exhibit

5    99, can we expand that one, please.

6    Q.   (BY MR. KIRSCH)  Is this an earlier piece of this

7    chain that we looked at a moment ago with the reference to

8    "I would love to get 220K back"?

9    A.   I would have to take a look at that one.

10   Q.   Okay.  That was on Exhibit 90.

11   A.   It was on 90?

12   Q.   Yes.

13   A.   Yes, it is.

14           MR. KIRSCH:  Okay.  Now can I please publish

15   Exhibit 103?

16           THE COURT:  You may.

17   Q.   (BY MR. KIRSCH)  And I will start with page 2 of this

18   exhibit, and let's just start with the message there that

19   begins, "Hi, Curtis."  What does the first paragraph there

20   say, Special Agent Riordan?

21   A.   I don't know if I have the same one.  Which exhibit

22   number are we on?

23   Q.   103.  It is on the screen, if you want to look on the

24   screen.

25   A.   Sure.  What was the question?

1    Q.   What does the first paragraph say after "Hi, Curtis"?

2    A.   "I just got a letter from our friends at IRS.  They

3    have determined that the info filed as a return of tax on

4    December 15, 2008 is frivolous and there is no basis in

5    law for your position.  Blah blah blah."

6    Q.   Can we go to page 1, now.  At the bottom of the

7    screen, are there references to 3176C?

8    A.   Correct.

9    Q.   And then if we can go up to the top of the screen --

10   actually, see where it says it was sent by a Blackberry

11   from T-Mobile?

12   A.   Uh-huh.

13   Q.   What does that mean?  How did that get into one of

14   these?

15   A.   Quite often when you are using a smart phone, the

16   smart phones will have stamped on the signature, sent via

17   iPhone or via Blackberry.

18   Q.   Okay.

19   A.   You can have that removed if you want.

20   Q.   Can we now go to the top of that.  Okay.  So the

21   message at the top of this screen is from who?

22   A.   Mimi Vigil.

23   Q.   To who?

24   A.   Effnbks@myedl.com.

25   Q.   What does that message say?

```
 1   A.   "Just faxed it to you."

 2        MR. KIRSCH:  Now I will ask to publish Government

 3   Exhibit 106?

 4        THE COURT:  You may.

 5        MR. KIRSCH:  Thank you, Your Honor.

 6        So can we just expand the top of this down to right

 7   there.

 8   Q.   (BY MR. KIRSCH)  Okay.  So this one looks a little

 9   bit different, Special Agent Riordan.  Can you explain

10   what happened with this message?

11   A.   Sure.  Messages that my computer forensic program is

12   looking at will identify any messages that have

13   attachments.

14   Q.   So the message in the message body section here, it

15   looks blank; is that right?

16   A.   Correct.

17   Q.   So what would that indicate?

18   A.   Just somebody sending forward some documents as an

19   attachment to an e-mail.

20   Q.   Attachment, but no text?

21   A.   Correct.

22   Q.   And what is the subject line of this message?

23   A.   "From Mimi.  My 1099 OID and 1096 Information."

24   Q.   Who did Ms. Vigil send this message to?

25   A.   To Curtis.
```

1    Q.   What are the titles of the attachments that are

2    listed here?

3    A.   We have eight attachments here.  First one is:  %1099

4    OID Citibank.  1099 OID Citibank.  %1096 Citibank.  1096

5    Citibank.  %1099 OID Key Bank.  1099 OID Key Bank.  %1096

6    Key Bank.  1096 Key Bank.  All of those were pdf's.

7         MR. KIRSCH:  Now.  If I could, Your Honor, I would

8    like to publish Government Exhibit 300.

9         THE COURT:  You may.

10        MR. KIRSCH:  Can we display page 2 of this exhibit,

11   please, the message at the top.

12   Q.   (BY MR. KIRSCH)  Who is this message from that is

13   displayed on the screen now, Special Agent Riordan?

14   A.   This is from Mimi Vigil to Curtis Morris.

15   Q.   And can you read that message, where it begins "that

16   means you write"?

17   A.   "That means you write checks on the account and the

18   bank has to honor them or pay whoever you write the checks

19   to, but you don't have to deposit any funds in the

20   account.  What a deal."

21   Q.   Did you get -- I will ask you a different question.

22   Did you find some e-mails when you did your review that

23   involved Clara Mueller?

24   A.   Yes, I did.

25   Q.   Did those include e-mails that are marked as

1   Government Exhibits 93 and 98?

2   A.   93, yes.  And just verifying, 98, yes.

3        MR. KIRSCH:  I would move to admit Government's

4   Exhibit 93 and 98.

5        THE COURT:  93 and 98 are admitted.

6        (Exhibit Nos. 93, 98 are admitted.)

7        MR. KIRSCH:  Thank you, Your Honor.  May we publish

8   93?

9        THE COURT:  You may.

10  Q.   (BY MR. KIRSCH)  Start with page 2 of that exhibit,

11  please.  Who is this message from, Special Agent?

12  A.   From Curtis Morris to Clara Mueller.

13  Q.   And what does Mr. Morris say in the last paragraph of

14  this e-mail?

15  A.   You know, if you asked me which e-mail, that

16  information I just read you is the original e-mail from

17  Curtis to Clara Mueller.

18  Q.   I am asking you about the one displayed on the screen

19  right now on the second page.

20  A.   That is actually from Clara Mueller to Curtis.  If

21  you scroll up to the page 1, then work your way up.

22  Q.   Okay.  And the bottom -- let's look at the bottom of

23  page 1.  There is header information there at the top that

24  says from Clara Mueller, right?

25  A.   Right.

1    Q.   Is that what you are referring to?

2    A.   Yes.

3    Q.   Now I want to direct your attention down to near the

4    bottom of the page, where it says on November --

5    Wednesday, November 12, 2008.  Does that indicate that

6    Ms. Mueller's message contained an earlier message from

7    Mr. Morris?

8    A.   Yes.

9    Q.   All right.  So I want to go back to page 2 now and

10   look at that message from Mr. Morris.  In the last

11   paragraph, what did Mr. Morris say in his message?

12   A.   "So I have a total for 2005 as $559,873.27.  I wanted

13   to make sure you have this total.  I think that this is

14   correct.  I will create six, 1099 OIDs and get them in the

15   mail if this seems correct to you.  Curtis Morris."

16        MR. KIRSCH:  Can we now go back to the first page

17   of this exhibit.  And expand that response from

18   Ms. Mueller.

19   Q.   (BY MR. KIRSCH)  What did Ms. Mueller say after the

20   first sentence?

21   A.   "The numbers seem correct.  You're working from what

22   I gave you, and I can document my end.  So go for it."

23        MR. KIRSCH:  Now I am going to ask for permission,

24   Your Honor, to display or publish Government Exhibit 61

25   again, page 2 of that exhibit?

```
 1            THE COURT:  61 has been admitted.  You may publish.
 2            MR. KIRSCH:  Thank you, Your Honor.
 3            If we can go to the second page.  Actually, that
 4   was -- we were on the second page, I am sorry.  Can you
 5   expand the top half there.
 6   Q.  (BY MR. KIRSCH)  The total that is listed there on
 7   this page, page 2 of Government Exhibit 61, do you see the
 8   total there in the middle of the screen, Special Agent
 9   Riordan?
10   A.  Yes.
11   Q.  How does that compare to the total in that e-mail
12   from Mr. Morris that we just looked at?
13   A.  It matches.
14            MR. KIRSCH:  And can we put page -- display page 4
15   of Government Exhibit 61 now.
16   Q.  (BY MR. KIRSCH)  How many forms 1099 OID are
17   reflected on the screen there?
18   A.  Appears to be three.  Blurry, but appears to be
19   three.
20   Q.  Can we go to the next page of that exhibit, please.
21   Are there three more on that screen?
22   A.  Yes.
23   Q.  How does the total number of OIDs in this exhibit
24   compare with the number in the e-mail from Mr. Morris?
25   A.  They match.  Six 1099 OIDs.
```

340

 1          MR. KIRSCH:  Now I am going to ask to publish,

 2     please, Government Exhibit 98.

 3          THE COURT:  You may.

 4     Q.   (BY MR. KIRSCH)  We start with page 1 of that

 5     exhibit.  And let's start with the e-mail that begins,

 6     "from Clara Mueller."  Okay.  Who was this e-mail sent to?

 7     A.   From Clara Mueller to effnbks@myedl.com.

 8     Q.   Within the e-mail, what is the salutation?

 9     A.   To Curtis.  From Clara.

10     Q.   What is the caption there?  I am sorry, not the

11     caption, what is the first line of the actual message?

12     A.   "2005 OID additions.  Thanks for your help.  We're

13     all so happy to know you."

14     Q.   Is there a reference to Key Bank underneath that?

15     A.   Yes, there is.

16          MR. KIRSCH:  Can we go to the next page now,

17     please.  And expand the text.  You can start with the ENT.

18     Q.   (BY MR. KIRSCH)  Is there reference to ENT Federal

19     Credit Union there?

20     A.   Yes, there is.

21     Q.   Is there a reference to Wells Fargo Bank there?

22     A.   Yes, there is.

23     Q.   Is there a reference to Countrywide Home Loan on the

24     bottom of the page?

25     A.   Yes, there is.

1    Q.   What does Ms. Mueller say right before the reference

2    to Countrywide Home Loan?

3    A.   "First and second mortgage opened April 2004 to July

4    2006."

5    Q.   Can we go to the next page of this exhibit, please.

6    Is there a reference to a company called Carrington

7    Mortgage Company there?

8    A.   Yes.

9         MR. KIRSCH:   Can we publish one more time

10   Government Exhibit 61, page 4?

11        THE COURT:   You may.

12   Q.   (BY MR. KIRSCH)   The entities listed on these OID

13   forms, Special Agent Riordan, do they correspond to

14   entities that were listed in that e-mail from Ms. Mueller?

15   A.   Yes.   These three that are right here.

16   Q.   Can we go to page 5 of this exhibit, please.   Do

17   those correspond to the other entities that were listed in

18   that e-mail?

19   A.   Yes, they do.

20   Q.   Did you also locate during your search of the

21   computers from Mr. Morris' house, e-mails involving Tom

22   Brokaw or George Thomas Brokaw?

23   A.   Yes, I did.

24   Q.   Did those include e-mails marked as Exhibits 91 and

25   104?

1    A.    Yes.

2         MR. KIRSCH:  I am going to move to admit Exhibits

3    91 and 104.

4         THE COURT:  91 and 104 are admitted.

5         (Exhibit Nos. 91, 104 are admitted.)

6         MR. KIRSCH:  Thank you, Your Honor.  May we publish

7    91?

8         THE COURT:  You may.

9    Q.   (BY MR. KIRSCH)  I'll just focus on the message at

10   the top of this one, please.  What is the subject line for

11   this message, Special Agent Riordan?

12   A.   "Re:  OID and income tax workshop."

13   Q.   Who is this message from?

14   A.   This is from Tom Brokaw to effnbks@myedl.com.

15   Q.   What does that e-mail address sound like if you just

16   say it?

17   A.   F'ing banks at my EDL dot com.

18   Q.   And what does Mr. Brokaw say in this message about

19   "five letters from IRS"?  What does he say after that?

20   A.   "They applied my refund for 2008, over 62,000, the

21   whole amount from the OID, to clear up 1999, 2000, 2001

22   years.  Remember, I only sent in returns for 2003 forward.

23   The other envelopes were release of tax liens for 1999 and

24   2000.  Tom."

25   Q.   What does the last line of that e-mail?

1   A.   "You should put this info plus the other victories

2   out in an e-mail message."

3        MR. KIRSCH:  Now I am going to ask to publish

4   Government Exhibit 104.

5        THE COURT:  You may.

6        MR. KIRSCH:  And if we can display the top message

7   on this one, as well, please.

8   Q.   (BY MR. KIRSCH)  Is there a name of a person listed

9   as an IRS agent in this message?

10  A.   Yes, Michael Pryor.

11  Q.   And what did Mr. Brokaw ask Mr. Morris to do with

12  respect to Michael Pryor?  Begins with "as we discussed."

13  A.   "As we discussed, could you please call the IRS agent

14  who is harassing my partner and tell him my forms are all

15  in the mail to Fresno."

16  Q.   Thank you.  Now I would like to ask you whether or

17  not you located, in review of the computers from

18  Mr. Morris' house, e-mails involving John Pawelski?

19  A.   Yes, I did.

20  Q.   Did those include Exhibits 92, 96, 97, 100, 101, 102

21  and 301?

22  A.   Yes, they did.

23       MR. KIRSCH:  I will move to admit each of those

24  exhibits, Your Honor.  I can give you the list again.

25       THE COURT:  I have them.  Exhibits 92, 96, 97, 100,

1     101, 102, and 301 are admitted.

2              MR. KIRSCH:  Thank you, Your Honor.

3              (Exhibit Nos. 92, 96, 97, 100, 101, 102, 301 are

4     admitted.)

5              MR. KIRSCH:  Can we please publish Exhibit 92?

6              THE COURT:  You may.

7     Q.   (BY MR. KIRSCH)  And I would like to start with the

8     second page of this exhibit, please.  I am sorry, I

9     actually probably need to go back to the bottom of the

10    first page.

11             So is there some header information at the bottom

12    of the first page of this exhibit?

13    A.   Yes, there is.

14    Q.   And so that header information indicates who was

15    sending the message that will be on the next page?

16    A.   Correct.  From John Pawelski to Curtis Morris.

17    Q.   Okay.  Now if we can go to page 2.  What is the

18    message from Mr. Pawelski there on the screen now?

19    A.   "Curtis, please evaluate this response to IRS based

20    on the letter you sent.  I would like to send it out by

21    Thursday.  Thanks, John."

22             MR. KIRSCH:  Now can we go to -- can we display

23    that whole page again for a moment.

24    Q.   (BY MR. KIRSCH)  There is other information, then,

25    below that message from Mr. Pawelski.  Do you have an

345

         1    understanding about what the rest of that information is

         2    in the message?

         3    A.   This appears to be addresses for the Inspector

         4    General for Tax Administration, J. Russell George.

         5    Q.   You may need to just look at the next couple of

         6    pages.  My question is whether the rest of that message

         7    appears to be the proposed response?

         8    A.   Yes, it does.

         9         MR. KIRSCH:  Now if we can expand the lower part of

        10    this page.

        11    Q.   (BY MR. KIRSCH)  What are the tax years referenced

        12    there after the "Re:  Letters CP15"?

        13    A.   Tax years 2004 and 2006.

        14    Q.   Okay.  And at the very bottom of that page, what does

        15    Mr. Pawelski say starting with, "I filed"?

        16    A.   "I filed a fully valid, correct, complete and timely

        17    Form 1040 U.S. Individual Income Tax Return in November

        18    2008 for tax year 2004."

        19         MR. KIRSCH:  Okay.  Now can we go to page 4 of this

        20    exhibit, please.  One more down, please.  Sorry.  And can

        21    you expand the text on the bottom of this page.

        22    Q.   (BY MR. KIRSCH)  Are there -- is there reference

        23    there in paragraph 7 to a 1099 OID?

        24    A.   Yes.

        25         MR. KIRSCH:  Now can we go back to page 1 of this

1    Exhibit 92, and expand the message at the bottom first,

2    please.

3    Q.   (BY MR. KIRSCH)  Did Mr. Morris indicate that "the

4    response looked pretty good from here"?

5    A.   Yes.

6    Q.   And then if we go back to the top page -- I am sorry,

7    the top message, is there a reference to "TICTA," with a

8    "C" rather than a "G"?

9    A.   Yes.

10   Q.   What is Mr. Brokaw's description of TIGTA in the next

11   sentence?

12   A.   "The rats that investigate the rats."

13        MR. KIRSCH:  Now I would like to publish Government

14   Exhibit 96.

15        THE COURT:  You may.

16        MR. KIRSCH:  Thank you, Your Honor.

17        Can we start with page 1 of that exhibit.  And can

18   we begin by looking at the e-mail at the bottom of the

19   page.

20   Q.   (BY MR. KIRSCH)  So, this first e-mail, who is that

21   from?

22   A.   From John Pawelski to Curtis Morris.

23   Q.   And what is the first sentence of that e-mail?

24   A.   "I have 2008 1099 OID ready for you to process.  Do

25   you want me to wait until the 12th or shall we set an

1    appointment prior."

2         MR. KIRSCH:  If we can page up here, we can get

3    both of those message on at once.

4    Q.   (BY MR. KIRSCH)  How did Mr. Morris respond to that

5    question?

6    A.   "Either is fine with me."

7    Q.   And then did Mr. Pawelski indicate that he would

8    bring his paperwork with him?

9    A.   "I will bring my paperwork with me on the 12th."

10        MR. KIRSCH:  Now I will ask to publish Government

11   Exhibit 97.

12        THE COURT:  You may.

13        MR. KIRSCH:  And can you expand the top, just the

14   very top part of that one for us, please.

15   Q.   (BY MR. KIRSCH)  Who is this message from?

16   A.   This is from John Pawelski to Curtis Morris.

17   Q.   And what is the first line of this e-mail?

18   A.   "Need OID for these."

19   Q.   And then what is the -- is there an entity listed

20   underneath that?

21   A.   Bank of America Corporation.

22   Q.   Okay.  If we go down to the bottom of that -- under

23   the Bank of America section in the middle of the screen

24   there, is there a listing of account numbers and amounts?

25   A.   Yes, there are.

1    Q.   And then is there another company listed at the

2    bottom of the page?

3    A.   Chase Credit Company.

4         MR. KIRSCH:  Now I am going to ask to publish

5    Government Exhibit 100.

6         THE COURT:  You may.

7         MR. KIRSCH:  And on 100, I would like to start, if

8    we could, with page 3.  Can we expand that message that --

9    where it begins "Original Message."

10   Q.   (BY MR. KIRSCH)  Who is this message from?

11   A.   John Pawelski to Curtis.

12   Q.   And does -- are there references here to a

13   handwritten OID?

14   A.   Yes.

15   Q.   And then is there a heading for "new stuff"?

16   A.   Yes.

17   Q.   At the very bottom of the page, is there a reference

18   to -- it says "Attorney," and then "Beck & Cassinis, PC"?

19   A.   Yes, there is.

20        MR. KIRSCH:  Now can we please go to page 2 of this

21   Exhibit 100, and expand that message in the middle of the

22   page.  I don't think that is page 2.  Okay.  That looks

23   like page 2.  If we can expand the message in the middle

24   of that page.

25   Q.   (BY MR. KIRSCH)  Again, who is this message from that

```
 1    is on the middle of the screen?

 2    A.   Middle of the screen would be John Pawelski to

 3    Curtis.

 4    Q.   What is Mr. Pawelski saying in the text of that

 5    message?

 6    A.   "The fair finance and El Paso count treasurer need to

 7    be added.  I will create the OID data for the missing

 8    documents and e-mail them to you."

 9         MR. KIRSCH:  Now can we go to page 1 and display

10    the message again in the middle of the screen.

11    Q.   (BY MR. KIRSCH)  Who is that message from?

12    A.   This is from John Pawelski to Curtis.

13    Q.   And what did Mr. Pawelski say in the body of that

14    message?

15    A.   "I gave them to you on a 1099 OID.  If you do not

16    have them, I can re-create."

17         MR. KIRSCH:  Now I would ask to publish Government

18    Exhibit 101.

19         THE COURT:  You may.

20         MR. KIRSCH:  Can we highlight from the top of that

21    page down to the attachment, please.

22    Q.   (BY MR. KIRSCH)  Who is this message from?

23    A.   This is from John Pawelski to Curtis Morris.

24    Q.   And what is the subject line listed there?

25    A.   "CEO data with/ein."
```

1    Q.   What does the second sentence of that message from

2    Mr. Pawelski say?

3    A.   "I am attaching a notepad file.  I will update your

4    EIN list if you send me a spreadsheet."

5    Q.   Then there is an entry there, an attachment.  Does

6    that indicate there was an attachment to this message, as

7    well?

8    A.   Yes.

9    Q.   It says CEOdata.txt.  Does that "txt" tell you

10   something about that file?

11   A.   That would be a text file.

12         MR. KIRSCH:  Now I am going to ask to publish

13   Government Exhibit 102.

14         THE COURT:  You may.

15   Q.   (BY MR. KIRSCH)  Who is this message from, Special

16   Agent Riordan?

17   A.   This is from John Pawelski to Curtis Morris.

18         MR. KIRSCH:  Can we expand the text on the bottom

19   half that starts with "Curtis."

20   Q.   (BY MR. KIRSCH)  Does this information -- I am sorry,

21   does this e-mail also contain information about an entity

22   called Beck & Cassinis, PC?

23   A.   Yes, it does.

24         MR. KIRSCH:  And can we go to page 2 of this

25   exhibit now.  In the middle, if we can expand the text in

 1    the middle.

 2    Q.   (BY MR. KIRSCH)  What does the line that is listed at

 3    the top of the screen now say?

 4    A.   "I estimated my previous court cases at 6M."  6

 5    million.

 6    Q.   Now I am going to ask you to look at --

 7         MR. KIRSCH:  I will ask to publish Government

 8    Exhibit 301.

 9         THE COURT:  You may.

10         MR. KIRSCH:  Again, if we can expand just from the

11    top down to the attachment.

12    Q.   (BY MR. KIRSCH)  Who is this message from?

13    A.   This is from John Pawelski to Barb Walker.  The

14    e-mail behind that, Curtis Morris, Johnny Kerwin, Mimi

15    Vigil, Patti Lee, Patty Danzing, Tom Brokaw and Tom

16    Williams.

17    Q.   What is the first line of this e-mail?

18    A.   "Here is the updated bonds and BPN."

19    Q.   Did this message have an attachment?

20    A.   Yes, it does.

21    Q.   What was the attachment called?

22    A.   It was Section 3.  Bonds and Promissory Note Updated

23    6/24/09.doc.

24         MR. KIRSCH:  Your Honor, can I have just a moment,

25    please?

1          THE COURT:  You may.

2          MR. KIRSCH:  Thank you, Your Honor.  I don't have

3     any other questions for Special Agent Riordan.

4          THE COURT:  I want to make sure, because you had

5     originally asked him about exhibits we did not introduce,

6     Exhibit 95, 105.

7          MR. KIRSCH:  I did intentionally omit those two

8     exhibits, Your Honor.

9          THE COURT:  I wanted to make sure.

10          MR. KIRSCH:  Thank you.

11          THE COURT:  All right.  Thank you very much, you

12     may step down.

13          I am sorry, you may call your next witness.

14          MR. KIRSCH:  Thank you, Your Honor.  The Government

15     calls William McLeod.

16          COURTROOM DEPUTY:  Your attention, please.

17          Please raise your right hand.

18                       **WILLIAM MCLEOD**

19     having been first duly sworn, testified as follows:

20          COURTROOM DEPUTY:  Please be seated.

21          Please state your name, and spell your first and

22     last names for the record.

23          THE WITNESS:  William McLeod.  W-I-L-L-I-A-M

24     M-C-L-E-O-D.

25          MS. PALUCH:  May I proceed, Your Honor?

```
 1            THE COURT:  You may.
 2                    DIRECT EXAMINATION
 3   BY MS. PALUCH:
 4   Q.   Good morning, sir.
 5   A.   Good morning.
 6   Q.   How are you employed?
 7   A.   I currently am employed with the Evolve Bank & Trust
 8   in Denver.
 9   Q.   And how long have you held that position?
10   A.   For 3-and-a-half years.
11   Q.   You previously have been employed in the mortgage
12   business?
13   A.   I have.
14   Q.   And for how many years?
15   A.   For 27.
16   Q.   At one point were you employed by Mistar Financial?
17   A.   I was.
18   Q.   Approximately when was that?
19   A.   I have to go back, 2004, 2005 through 2007, -8.
20   Q.   What was your position with Mistar?
21   A.   President.
22   Q.   Okay.  While at Mistar, did you have any involvement
23   in the preparation of forms 1099 OID?
24   A.   I did not personally create the forms, the accounting
25   department did that, but I am aware of the forms as they
```

```
 1   went past my desk.

 2   Q.   Was it common for Mistar to prepare 1099 OIDs?

 3   A.   For any loans it was holding for a very short period

 4   of time prior to being sold into the secondary market,

 5   yes.

 6   Q.   I would like to show you what has been marked as

 7   Government's Exhibit 80.

 8        MS. PALUCH:  I am sorry, does he have Exhibit 80?

 9        COURTROOM DEPUTY:  Yes, he does.

10   Q.   (BY MS. PALUCH)  Do you see Exhibit 80?  There should

11   be a folder in front of you.

12   A.   I am sorry, I was looking at the screen.

13   Q.   Could you just state, sir, is that a packet of

14   documents you are looking at there?  Can you pull the

15   documents out of that?  I will direct your attention to

16   page 49.  Do you have that in front of you?

17   A.   I do.

18   Q.   Can you state the title of that form?

19   A.   It is Interest for 1099 for 2005.

20   Q.   What is the name of the payer represented on this

21   form?

22   A.   Mistar Financial would have been the lender.

23   Q.   I am sorry, is it listed as a payer?

24   A.   The payer's name is Mistar Financial.  Payer unknown.

25   Excuse me, I see it.
```

 1   Q.   Yes.

 2        MS. PALUCH:  Your Honor, at this time I move for

 3   admission of Government's Exhibit 80, and permission to

 4   publish.

 5        THE COURT:  All right.  The entire exhibit as

 6   opposed to just page 49?

 7        MS. PALUCH:  Just 49 at this point, Your Honor.

 8        THE COURT:  Just page 49 of Exhibit 80?

 9        MS. PALUCH:  Just page 49 of Exhibit 80.  I

10   apologize for not making that clear.

11        THE COURT:  Yes, not the entire exhibit?

12        MS. PALUCH:  Correct.

13        THE COURT:  You may publish page 49.

14        MS. PALUCH:  Thank you, Your Honor.

15        (Exhibit No. 80-p49 is admitted.)

16   Q.   (BY MS. PALUCH)  Sir, what tax year is this form?

17   A.   2005.

18   Q.   And who is listed as the recipient?

19   A.   Mimi Vigil.

20   Q.   And I will direct your attention to Box 1.  Can you

21   read the description for that box, the typed --

22   A.   $373,965.34.

23   Q.   What is that amount listed in Box 1?  Can you read

24   the typewritten description for that box?

25   A.   Original Issue Discount.

1   Q.   Do you see the Box 4 on this form?

2   A.   I do.

3   Q.   Is the same amount listed in that box?

4   A.   It is.

5   Q.   Can you read the typewritten description of that box?

6   A.   I can see the "federal withheld."  Assuming interest.

7   Q.   Okay.  And do you see on this form underneath Mistar

8   Financial's name there is a box?  Can you read that

9   payer's identification number?

10  A.   "Unknown."

11  Q.   Okay.  Would Mistar ever create a form for the IRS

12  and leave its payer's identification number as unknown?

13  A.   No, it would not.

14  Q.   Okay.  Now, at our request, were you able to attempt

15  to research this document?

16  A.   Yes.

17  Q.   And what did you find?

18  A.   We were unable to locate anything, since the business

19  is no longer in business, Mistar.

20  Q.   Okay.  In your experience, would Mistar ever withhold

21  funds -- first of all, let's go to the description on Box

22  5.  Can you state what the description is?

23  A.   "Mortgage Loan Account 2175.  Wake Forest Loan 1090."

24  Q.   Was Mistar in the business of offering mortgage loans

25  at that time?

1    A.    Yes, it was.

2    Q.    Okay.   To your knowledge and experience with Mistar,

3    as the president, would Mistar ever withhold funds from a

4    mortgage loan account and forward that amount on to the

5    IRS?

6    A.    No, it would not.

7    Q.    To your knowledge, did Mistar create this document or

8    issue this document?

9    A.    No, it did not.

10   Q.    Do you see on the right-hand portion of this form, it

11   says "Copy A"?

12   A.    Uh-huh.

13   Q.    Correct?

14   A.    Yes.

15   Q.    You are familiar with a 1099 OID?

16   A.    Yes.

17   Q.    Where would Copy A go?

18   A.    Copy A would be to the actual borrower of the loan.

19   Q.    It says here for Internal Revenue Service?

20   A.    And the IRS.   We're reporting any interest.

21         MS. PALUCH:   At this time I would like to ask the

22   witness questions about Government Exhibit 80, pages 52

23   and 50 of this same exhibit.

24         THE COURT:   All right.   And my understanding -- you

25   can ask questions.   Do you wish to publish?

```
 1              MS. PALUCH:  At this point I would, Your Honor.

 2              THE COURT:  All right.  And I understand from the

 3    witness' listed here you will link up a better foundation?

 4              MS. PALUCH:  I will, Your Honor.

 5              THE COURT:  I will conditionally admit -- what

 6    pages were they again?

 7              MS. PALUCH:  50 and 52.

 8              THE COURT:  I will conditionally admit 50 and 52,

 9    subject to later laying better foundation with other

10    witnesses for full admission.

11              MS. PALUCH:  Certainly, Your Honor.

12              (Exhibit Nos. 80-p50, p52 are admitted.)

13    Q.  (BY MS. PALUCH)  First I will direct your attention

14    to 52.  Do you have page 52 in front of you?

15    A.  I do.

16    Q.  Do you see who is listed as the payer?

17    A.  I do.  Mistar Financial.

18    Q.  Does this appear to be an identical form to the one I

19    just asked you about?

20    A.  Yes, it does.

21    Q.  Same amounts listed?

22    A.  Yes, they are.

23    Q.  Do you see on the right-hand side it says "Copy B"?

24    A.  Yes.

25    Q.  So who would receive Copy B?
```

 1    A.    The IRS.

 2    Q.    Okay.  When it says "for recipient," does the

 3    recipient then receive a copy of the 1099?

 4    A.    They would, yes.

 5    Q.    Then I have the same questions for you regarding page

 6    50.  If you can flip back to page 50.

 7    A.    I am here.

 8    Q.    Does this appear to be an identical copy to the form

 9    we just looked at?

10    A.    Yes, it does.

11    Q.    And on the right-hand corner, what copy is this?

12    A.    Copy C.

13    Q.    Okay.  And, again, final question.  Would Mistar have

14    issued any of these three forms?

15    A.    No, they would not.

16          MS. PALUCH:  Your Honor, if I may have a moment.

17          THE COURT:  Yes.

18          MS. PALUCH:  No further questions, Your Honor.

19          THE COURT:  All right.  Thank you very much.

20          THE WITNESS:  Thank you.

21          THE COURT:  Although we are not to 12:15, we are a

22    bit early and we got started late, but I think we should

23    take a lunch break now, if that is okay with the jurors.

24          All right.  We will go ahead and break for lunch

25    now.  So we will break about half an hour early.  We will

```
 1    reconvene at about 12:15, maybe a little bit after 12:15.

 2              Court will be in recess for half an hour.

 3              (Lunch is taken from 11:45 a.m. to 12:20 p.m.)

 4              THE COURT:  You may be seated.

 5              Ms. Hartmann, would you please bring in the jury.

 6              (The following is had in open court, in the hearing

 7    and presence of the jury.)

 8              THE COURT:  You may be seated.

 9              Government may call its next witness.

10              MS. PALUCH:  Your Honor, the Government calls Kelly

11    Hanson.

12              COURTROOM DEPUTY:  Please enter and remain

13    standing.

14              Your attention, please.

15                            KELLY HANSON

16    having been first duly sworn, testified as follows:

17              COURTROOM DEPUTY:  Please be seated.

18              Please state your name, and spell your first and

19    last names for the record.

20              THE WITNESS:  It is Kelly Hanson.  K-E-L-L-Y

21    H-A-N-S-O-N.

22              MS. PALUCH:  May I proceed, Your Honor?

23              THE COURT:  You may.

24                          DIRECT EXAMINATION

25    BY MS. PALUCH:
```

```
 1    Q.    Good afternoon, ma'am.  How are you employed?

 2    A.    I work for BBVA Compass Bank.

 3    Q.    What is your position with Compass Bank?

 4    A.    A district service operations' manager.

 5    Q.    How long have you held that position?

 6    A.    For 13 years.

 7    Q.    And prior to that position, have you held other

 8    positions with Compass Bank?

 9    A.    Yes.  For only 6 months I was an assistant manager at

10    a branch.

11    Q.    So how long total have you worked for Compass Bank?

12    A.    For 13-and-a-half years.

13    Q.    And prior to Compass, were you working in the banking

14    industry?

15    A.    Yes.

16    Q.    How many years total do you have in the banking

17    industry?

18    A.    I have 17 years.

19    Q.    Okay.  Were you asked to review certain documents in

20    preparation for your testimony today?

21    A.    Yes, I was.

22    Q.    You should have some folders up on the stand there,

23    ma'am.  I would ask you to first look at Government's

24    Exhibit 125.  And can you state -- describe what that

25    document is?
```

```
 1    A.   Sure.  This is a personal deposit account signature

 2    card.

 3    Q.   And for whom?

 4    A.   For John Pawelski.

 5    Q.   And are you considered a custodian of records for

 6    Compass Bank for this type of record?

 7    A.   Yes.

 8    Q.   Was this record kept in the regular-conducted -- I am

 9    sorry, was this record kept in the course of

10    regularly-conducted business activity of Compass Bank?

11    A.   Yes.

12    Q.   Was the making of this record a regular practice of

13    that activity?

14    A.   Yes.

15    Q.   Does Compass Bank rely on the accuracy of that record

16    in the course of its business?

17    A.   We do.

18         MS. PALUCH:  Your Honor, at this time I move to

19    admit and publish Government 's Exhibit 125.

20         THE COURT:  Exhibit 125 is admitted.

21         (Exhibit No. 125 is admitted.)

22         THE COURT:  You may publish.

23         MS. PALUCH:  Thank you, Your Honor.

24    Q.   (BY MS. PALUCH)  Can you explain what a personal

25    deposit account signature card is?
```

```
 1    A.    It is the account agreement between the customer and
 2    the bank disclosing that they have agreed upon all of the
 3    terms and conditions that the bank requires.
 4    Q.    What type of account is this?
 5    A.    This is a personal account.  Consumer.
 6    Q.    And towards the top, do you see an account number
 7    listed?
 8    A.    I do.
 9    Q.    Can you state what that number is?
10    A.    2503464546.
11    Q.    What is the date that account was opened?
12    A.    8/28/2003.
13    Q.    Is this account still open?
14    A.    No.
15    Q.    Do you know approximately when it closed?
16    A.    It closed prior to 2007.
17    Q.    And why is it you say prior to 2007?
18    A.    Because we, BBVA Compass Bank, only maintains those
19    records -- 2007 was the latest that we had on any of this.
20    Q.    I will direct your attention now to Government
21    Exhibit 216.
22          MS. PALUCH:  Your Honor, this has already been
23    admitted.  I would ask for permission to publish.
24          THE COURT:  You may.
25          MS. PALUCH:  Thank you.
```

1    Q.   (BY MS. PALUCH)  Ma'am, I will direct your attention

2    to page 5 of that exhibit.  Are you there?

3    A.   Uh-huh.

4    Q.   Can you state what that appears to be?

5    A.   It is a personal check drawn on John Pawelski's bank

6    account.

7    Q.   And is that the same account number that you just

8    referenced in the previous exhibit?

9    A.   Yes.

10   Q.   Okay.  What is the date of this check?

11   A.   12/5/2011.

12   Q.   What is the amount of that check?

13   A.   132,000.

14   Q.   Can you read the writing that appears at the top of

15   the check?

16   A.   "Not for Deposit.  EFT Only."

17   Q.   And, again, ma'am, if you could read the writing that

18   appears in the memo section?

19   A.   "EFT only.  For set off of dist."  Distribution

20   possibly.

21   Q.   And would Compass Bank have honored this check?

22   A.   No.

23   Q.   Why not?

24   A.   The account was closed at the time the check was

25   written.

 1          MS. PALUCH:  One moment, Your Honor.

 2          No further questions.

 3          THE COURT:  Thank you very much.  You may step

 4     down.

 5          THE WITNESS:  Thank you.

 6          THE COURT:  Government may call its next witness.

 7          MS. PALUCH:  Thank you, Your Honor.  The Government

 8     calls Mr. Mike Gorham.

 9          COURTROOM DEPUTY:  Your attention, please.

10          Please raise your right hand.

11                         **MIKE GORHAM**

12     having been first duly sworn, testified as follows:

13          COURTROOM DEPUTY:  Please be seated.

14          Please state your name, and spell your first and

15     last names for the record.

16          THE WITNESS:  It is Michael Gorham.  M-I-C-H-A-E-L

17     G-O-R-H-A-M.

18          MS. PALUCH:  May I proceed, Your Honor?

19          THE COURT:  You may.

20                      **DIRECT EXAMINATION**

21     **BY MS. PALUCH:**

22     Q.   Good afternoon, Mr. Gorham.  Sir, how are you

23     employed?

24     A.   Wells Fargo Bank.

25     Q.   What is your position with Wells Fargo?

1    A.    I am an assistant vice president/manager of the

2    information part of the group that deals with the IRS.

3    Q.    And how long have you held that position?

4    A.    For 8 years.

5    Q.    And how long total have you worked for Wells Fargo?

6    A.    For 17 years.

7    Q.    Okay.  And can you generally describe your duties?

8    A.    Yeah.  We're responsible for really a lot of the

9    higher-risk compliance, including filing 1099 statements

10   with the IRS and with our customers.

11   Q.    And are you familiar with Form 1099 OID?

12   A.    Yes.

13   Q.    Under what circumstances does a Form 1099 OID get

14   issued by Wells Fargo Bank?

15   A.    It is usually an investment purchase where somebody

16   might get a discount on the maturity of the instrument.

17   Q.    Okay.  Are you familiar with the IRS reporting

18   requirements regarding Forms 1099 OID?

19   A.    Yes.

20   Q.    And can you explain those reporting requirements?

21   A.    Yeah.  Generally, say you purchased a bond for a

22   thousand dollars maturity.  Maybe you got it for $900.

23   You would be responsible, as the institution, for

24   reporting that hundred dollars of income or interest.

25   Q.    So Wells Fargo would report that amount to the IRS?

1    A.    Right, the recipient.

2    Q.    The recipient, the person who purchased that

3    investment?

4    A.    Correct.

5    Q.    Does Wells Fargo maintain records pertaining to Form

6    1099 OIDs that it has issued?

7    A.    Yes.

8    Q.    For how long does Wells Fargo maintain those records?

9    A.    For 10 years.

10   Q.    Do you know if the IRS has a standard Form 1099 OID

11   for businesses to use?

12   A.    Yes.

13   Q.    Does Wells Fargo use that standard form?

14   A.    No.

15   Q.    What does Wells Fargo use?

16   A.    We generally use a substitute form.

17   Q.    Okay.  So when Wells Fargo issues the Form 1099 OID,

18   I believe you said a copy is sent to the IRS?

19   A.    Correct, yes.

20   Q.    And one copy to the customer?

21   A.    Recipient, yes.

22   Q.    In preparation for your testimony today, were you

23   asked to review a number of Form 1099 OIDs with respect to

24   this case?

25   A.    Yes, I was.

1    Q.   Were you asked to confirm whether or not Wells Fargo,

2    in fact, issued those Form 1099 OIDs?

3    A.   Yes, I was.

4    Q.   What was the process by which you were able to

5    perform that task?

6    A.   We have internal records files where we maintain

7    copies of previous years, and we usually research those by

8    a customer's Social Security number or account number.

9    Q.   You were able to access those programs?

10   A.   Correct.  Yes.

11   Q.   I will first start with Government's Exhibit 10.

12        MS. PALUCH:  Your Honor, this has been previously

13   admitted.  I would ask permission to publish.

14        THE COURT:  You may.

15        MS. PALUCH:  Thank you.

16   Q.   (BY MS. PALUCH)  I direct your attention, sir, there

17   should be a stack of exhibits.  You can either see the

18   exhibit on the screen or use the paper copies in front of

19   you.

20   A.   Okay.

21   Q.   I will send you to page 11 of Exhibit 10.  Can you

22   state what that document purports to be, or what is the

23   title of that document?

24   A.   It is a 1099 OID.

25   Q.   Okay.  And who is listed as the payer on this form?

1   A.   George T. Brokaw.

2   Q.   I am sorry, I am directing you to the payer.

3   A.   I am sorry, Wells Fargo Bank.

4   Q.   Recipient?

5   A.   George T. Brokaw.

6   Q.   For what tax year is this?

7   A.   2003.

8   Q.   Okay.  And do you see under Wells Fargo there appears

9   a box, the taxpayer's federal identification number?

10  A.   Yes.

11  Q.   Do you know whether or not that is Wells Fargo's

12  identification number?

13  A.   It is not one I am familiar with.

14  Q.   All of the forms that you reviewed in preparation for

15  your testimony today, were you able to look at the

16  identification numbers listed on those forms?

17  A.   Yes.

18  Q.   Were you able to determine whether or not those were

19  Wells Fargo's numbers?

20  A.   Yes.  And, no, they weren't.

21  Q.   They were not.  Okay.

22       Now, this particular form on page 11, did you

23  research this form?

24  A.   We have tried, but it is beyond our retention period.

25  Q.   State again the retention period?

1    A.    For 10 years.

2    Q.    Ten years.  So let's look at, for example, Box 1.

3    Can you read the description -- the typed description of

4    that box?

5    A.    It is Original Issue Discount for 2003.

6    Q.    Can you see -- can you read the dollar amount?  It is

7    a little hard to read.  Can you read the amount there?

8    A.    $148,341.19.

9    Q.    So understanding that this form would have been

10   outside of Wells Fargo's retention period, looking at the

11   description listed on this account, can you state in your

12   experience whether or not Wells Fargo would have issued

13   this form?

14   A.    No, we would not.

15   Q.    Why is it you say that, sir?

16   A.    Because the description seems to describe a bank

17   checking account, credit, if you will.

18   Q.    Would Wells Fargo withhold money from a bank account/

19   credit account and forward that money on to the IRS?

20   A.    In certain cases where we do pay interest on the

21   money in the account, yes, we would, but it would not be

22   on an OID form.

23   Q.    Okay.  I will turn your attention now to Government's

24   Exhibit 12.

25          MS. PALUCH:  Permission to publish this admitted

1    exhibit, Your Honor.

2             THE COURT:  You may.

3             MS. PALUCH:  Thank you.

4    Q.   (BY MS. PALUCH)  Do you have Exhibit 12 in front of

5    you?

6    A.   Yep.

7    Q.   And turn your attention to page 11 of that document.

8    Can you state the title of that document?

9    A.   It is a 1099 OID.

10   Q.   For what tax year?

11   A.   2004.

12   Q.   Who is listed as payer?

13   A.   Wells Fargo Bank.

14   Q.   Recipient?

15   A.   George T. Brokaw.

16   Q.   And same questions regarding Boxes 1 and 4.  Can you

17   state the amounts listed in those boxes?

18   A.   $55,140.59.

19   Q.   In Box 5, is that the same account we just looked at?

20   If you need to refer back to Exhibit 10, sir, but is that

21   the same bank account listed on that form there?

22   A.   Yes.  Yes.

23   Q.   And did you research this form?

24   A.   Yes.

25   Q.   Did Wells Fargo issue this form?

1    A.   No.

2    Q.   Did you determine whether Wells Fargo withheld any

3    income tax from this account for that tax year and

4    forwarded it onto the IRS?

5    A.   Yes.

6    Q.   Do you see on this form there is also a reference to

7    Key Bank below Wells Fargo.  Do you see the second form on

8    this page?

9    A.   Yes.

10   Q.   I am still on page 11.

11   A.   I got it right here.

12   Q.   Would Wells Fargo ever issue a 1099 OID on the same

13   form used by another financial institution?

14   A.   No.

15   Q.   Why is that?

16   A.   All financial institutions are responsible for filing

17   their own information, returns with the IRS.

18   Q.   Okay.  Turn your attention, sir, to Government's

19   Exhibit 14.

20        MS. PALUCH:  Your Honor, it has been previously

21   admitted.  Permission to publish.

22        THE COURT:  You may.

23        MS. PALUCH:  Thank you.

24        THE COURT:  Moving forward, if it has been admitted

25   you may publish.  We will leave the screen on.

```
 1           MS. PALUCH:  Thank you, Your Honor.
 2   Q.   (BY MS. PALUCH)  Sir, on Exhibit 14, can you please
 3   refer to page 10.  Are you there?
 4   A.   I am there.
 5   Q.   What is that form?  I am referring you to the top
 6   portion.  What is that form, the title of that form?
 7   A.   It is a 1099 OID.
 8   Q.   And for what year?
 9   A.   2005.
10   Q.   Again, the payer and recipient?
11   A.   Wells Fargo Bank and George T. Brokaw.
12   Q.   When you look at the description.  Does that appear
13   to be the same account number we have been referencing?
14   A.   Yes, it does.
15   Q.   What is the amount claimed on this form?
16   A.   I believe $57,817.47.
17   Q.   Did Wells Fargo issue this form?
18   A.   No.
19   Q.   Did Wells Fargo withhold any amount from this account
20   and forward it on to the IRS?
21   A.   No.
22   Q.   And, again, same question with regard to other
23   financial institutions listed on this form.  Would Wells
24   Fargo have issued this form?
25   A.   No.
```

1    Q.    Okay.  If we could move on to Government's Exhibit

2    16, please.  Exhibit 16, sir, I will send you to page 11

3    of that document.  Can you state what that second form on

4    that page appears to be?

5    A.    It is a 1099 OID.

6    Q.    And the name?  If you could just from here on say the

7    payer, the recipient, and whether the bank account appears

8    to be the same account, and the amount?

9    A.    Payer, Wells Fargo Bank.  Recipient, George T.

10   Brokaw.  Description seems to be the same bank account as

11   referenced previously.

12   Q.    And the amount listed on this form?

13   A.    $17,077.04.

14   Q.    Again, you see First National Bank referenced above

15   Wells Fargo?

16   A.    Yes.

17   Q.    Would Wells Fargo issue this form?

18   A.    No.

19   Q.    Did Wells Fargo withhold any money for 2006 from

20   Mr. Brokaw with respect to this account?

21   A.    No.

22   Q.    If you can move on to Government's Exhibit 18.  And I

23   will direct your attention to page 10.  Can you identify

24   that page?

25   A.    Yes.  It is a 2007 Original Issue Discount.  Payer,

1    Wells Fargo Bank.  Recipient, George T. Brokaw.  Amount is

2    $26,171.52.  And the description is the bank account

3    number we referenced previous.

4    Q.   Did you research this one?

5    A.   Yes.

6    Q.   Did Wells Fargo issue this form?

7    A.   Nope.

8    Q.   We will move on to Government's Exhibit 20, please.

9    And directing your attention to page 10 of that exhibit.

10   Same questions with respect to the form that appears in

11   the middle of this page.

12   A.   It is a 2008 1099 OID.  The payer is Wells Fargo

13   Bank.  Recipient is George T. Brokaw, for $13,278.89.  And

14   the description is the same bank account we referenced

15   previous.

16   Q.   Did Wells Fargo issue this form?

17   A.   No.

18   Q.   Did Wells Fargo withhold any money from Mr. Brokaw

19   for the year 2008?

20   A.   No.

21   Q.   Directing your attention now to Government's Exhibit

22   110.

23        MS. PALUCH:  This has not been previously offered,

24   Your Honor, Exhibit 110.

25   Q.   (BY MS.  PALUCH)  Can you identify this packet of

1   documents?  Do you have 110 before you, sir?

2   A.   Yes, I do.  Do you want me to start at the top here?

3   Q.   I am asking you generally if you can identify what

4   this packet of documents is.

5   A.   Yes.

6   Q.   What are these documents?

7   A.   These are account application forms you sign when you

8   open up a new account.

9   Q.   To what account or -- first of all, what is the name

10  on this account?

11  A.   George T. Brokaw.

12  Q.   And the account number?

13  A.   5005155729.

14  Q.   Does that appear to be the same account we have been

15  discussing in all of the previous exhibits?

16  A.   Yes.

17  Q.   Are you considered a custodian of records for Wells

18  Fargo for these types of documents?

19  A.   Yes.

20  Q.   Were these documents kept in the course of

21  regularly-conducted business activity of Wells Fargo?

22  A.   Yes.

23  Q.   Was the making of these records a regular practice of

24  that activity?

25  A.   Yes.

1    Q.    Did Wells Fargo rely on the accuracy of these records

2    in the course of its business?

3    A.    Yes.

4          MS. PALUCH:  At this time, Your Honor, I move to

5    admit and publish Government's Exhibit 110.

6          THE COURT:  110 is admitted.

7          (Exhibit No. 110 is admitted.)

8          THE COURT:  You may publish.

9          MS. PALUCH:  Thank you, Your Honor.

10   Q.    (BY MS. PALUCH)  Referring to the first page of this

11   exhibit, sir, can you say what the title of this document

12   is?

13   A.    It is account application information.

14   Q.    And do you see at the bottom, what was the date that

15   -- first of all, how about you explain for us what an

16   account application is.

17   A.    Generally, when you go into a bank branch to open up

18   a new account, they will have you fill out an account

19   application, much like this, with some personal

20   information, demographic information, to have the account

21   on the bank's records.

22   Q.    Okay.  And what is the date that Mr. Brokaw opened

23   this account?

24   A.    August 24, 1998.

25   Q.    And I see at the top left it appears to be Norwest

378

```
 1    Bank.  What is the relationship, if any, between Norwest
 2    and Wells Fargo?
 3    A.   Norwest Bank and Wells Fargo merged in, I believe the
 4    late 1990s.  So both assuming business under Wells Fargo
 5    Bank.
 6    Q.   I would refer your attention to the second page of
 7    this exhibit.  Can you identify this document?
 8    A.   Yes.  It is an account application.
 9    Q.   And whose names appears on this document?
10    A.   George T. Brokaw and Debra S. Brokaw.
11    Q.   And the date of the signatures at the bottom?
12    A.   August 31, 1998.
13    Q.   So what appears happened with this second document?
14    A.   It appears that Debra Brokaw was added to the account
15    after George Brokaw opened up the account on August 24th.
16    Q.   And did you research whether or not this account was
17    closed?
18    A.   Yes.
19    Q.   And when did that occur?
20    A.   Let me refer to some notes here.
21    Q.   If you could then just look up once you have had a
22    chance to look at your notes.
23    A.   It was closed on --
24    Q.   I am sorry, if you can take a look at that and then
25    set it down and then testify from your recollection.
```

1    A.    Okay.  November 17, 2011.

2    Q.    Okay.  And I will turn your attention now to

3    Government's Exhibit 31.

4          MS. PALUCH:  This has been previously admitted.  I

5    would ask for permission to publish 31.

6          THE COURT:  You may.

7          MS. PALUCH:  Thank you, Your Honor.

8    Q.    (BY MS. PALUCH)  I will direct your attention to page

9    5 of that document.  Do you have that in front of you,

10   sir?

11   A.    I do.

12   Q.    And what is this document -- the title of this

13   document?

14   A.    This is a 2004 1099 OID.

15   Q.    And the same questions with respect to payer,

16   recipient, and actually let's walk through that, since

17   this is for a different individual.  First of all, who is

18   the payer listed on this form?

19   A.    Wells Fargo Financial.

20   Q.    Who is the recipient for this form?

21   A.    John J. Pawelski.

22   Q.    And do you see the amounts listed in Boxes 1 and 4?

23   A.    Yes, $3,000.

24   Q.    Is Box 1 claiming that is federal income tax

25   withheld?

1    A.    Correct.

2    Q.    And you see the account number in Box 5?

3    A.    Yes.

4    Q.    Okay.  And were you able to research this form?

5    A.    Yes.

6    Q.    And how did you do that again?

7    A.    Again, we looked at bank internal records by Social

8    Security number and account number.

9    Q.    And account number.  And what, if anything, did you

10   determine based on this account number?

11   A.    Wells Fargo did not issue this form.

12   Q.    Okay.  Did you actually find an account for

13   Mr. Pawelski?

14   A.    That, I can't recall.

15   Q.    Okay.  And you see other financial institutions

16   listed on this form, as well?

17   A.    Yes.

18   Q.    Same question to you regarding whether Wells Fargo

19   would do that.

20   A.    No, we would not.

21   Q.    Okay.  Turn your attention to Government's Exhibit

22   35.  This has been admitted.

23         I will direct your attention to begin at page 13.

24   Can you state the title of that first form on this page?

25   A.    It is a 2005 1099 OID.

1    Q.   If you could state the payer the recipient and

2    account number.

3    A.   Wells Fargo Financial.   John J. Pawelski.

4    Q.   Just the last 4 digits if you would, on the account?

5    A.   On the Account 2286.

6    Q.   Does that appear to be the same we just looked at?

7    A.   Yes.

8    Q.   And the amounts claimed in Boxes 1 and 4?

9    A.   $3,000.

10   Q.   Did you research this form?

11   A.   Yes.

12   Q.   Did Wells Fargo issue this form?

13   A.   No.

14   Q.   Okay.  Turn your attention now to -- bear with me one

15   second -- Government's Exhibit 38, please.  And if you

16   could look at page 6 of that exhibit.  Can you identify

17   that document?

18   A.   It is a 2006 1099 OID.

19   Q.   Payer, recipient?

20   A.   Wells Fargo Financial, on the middle form.  With

21   J. J. Pawelski as recipient, for $3,000 for that credit

22   card installment.  Account referenced previously.

23   Q.   Okay.  Did Wells Fargo create or issue this form?

24   A.   No.

25   Q.   Turn your attention to Government's Exhibit 61.

1    Direct your attention to page 5 of that document.  Same

2    questions for you, sir, regarding the first form on that

3    page.

4    A.   It is 2005 1099 OID.  The payer is Wells Fargo Bank.

5    Recipient is Clara M. Mueller.  The amount is $6,079.43.

6    And the description is Bank Account Credit Account.

7    Q.   Did you research this form?

8    A.   Yes.

9    Q.   Using the same method you previously testified about?

10   A.   Yes.

11   Q.   Did Wells Fargo issue this Form 1099 OID?

12   A.   No.

13   Q.   I will ask you to look at Government Exhibit 70.  I

14   will not offer this at this time, I would just like you to

15   reference Exhibit 70.  And, just generally, if you could,

16   just describe what you are seeing there.

17        THE COURT:  We can't do that.

18        MS. PALUCH:  Can I ask him generally if Wells Fargo

19   would have created that document?

20        THE COURT:  You can ask him if you want to

21   conditionally admit it subject to linking up with a future

22   witness, I will allow that, but you can't have him testify

23   unless the exhibit has been admitted.

24        MS. PALUCH:  I would move to offer it

25   conditionally, Your Honor.

 1          THE COURT:  Subject to linking up foundation with a

 2   different witness?

 3          MS. PALUCH:  Yes, Your Honor.

 4          THE COURT:  So Exhibit 70 will be conditionally

 5   admitted subject to the laying of foundation with a future

 6   witness.

 7          (Exhibit No. 70 is conditionally admitted.)

 8          MS. PALUCH:  Thank you, Your Honor.  Permission to

 9   publish?

10          THE COURT:  You may.

11   Q.   (BY MS. PALUCH)  I will send you to, first, to page

12   10 of that exhibit, the middle form there.

13   A.   It is a 2008 1099 OID.

14   Q.   My question for you is, would Wells Fargo ever create

15   a handwritten OID?

16   A.   No.

17   Q.   And page 11, same question for you.

18   A.   It is a 20071099 OID, handwritten again.  And Wells

19   Fargo would not produce this form.

20   Q.   Same question with respect to page 14.

21   A.   2005 1099 OID.  Handwritten.  Wells Fargo would not

22   produce this form.

23   Q.   Last page, page 15?

24   A.   2004 1099 OID.  Handwritten.  Wells Fargo would not

25   have issued this form.

1    Q.    Page 16?

2    A.    2003 1099 OID.  Again, handwritten.  Wells Fargo

3    would not have issued this.

4    Q.    Thank you.  Refer you to Government's Exhibit 218,

5    which has already been admitted.  I would ask you to look

6    at and direct your attention to page 8 of that exhibit.

7    Can you identify what that appears to be?

8    A.    This looks to be a check that is drawn on a checking

9    account, demand deposit account, written out to the

10   Internal Revenue Service.

11   Q.    Do you see the account number listed at the bottom of

12   that check?

13   A.    Yes.

14   Q.    Is that the account number we discussed previously

15   with respect to the Brokaws?

16   A.    Yes.

17   Q.    What is the amount of that check?

18   A.    The amount is $522,692.48.

19   Q.    I would like you to read the handwritten notation

20   above the date there, if you could?

21   A.    It says "Not for Deposit.  EFT Only."

22   Q.    And the language in the memo section?

23   A.    "EFT Only.  Discharge of Debt."

24   Q.    And would Wells Fargo have honored this check?

25   A.    No.

1    Q.   And I believe you indicated previously the account

2    was closed on November 17, 2011; is that correct?

3    A.   Correct.  Yes.

4    Q.   This was dated three days later?

5    A.   Correct.

6    Q.   Government's Exhibit 219, if you could please refer

7    to that document, which has been admitted.  I will refer

8    your attention to page 9 of that exhibit.  Can you

9    identify that document?

10   A.   Yes.  It looks like a check drawn on a checking

11   account.  Yes, it is a check drawn on a demand deposit

12   account.

13   Q.   Is that drawn on a Wells Fargo account?

14   A.   Yes.

15   Q.   And what is -- who signed that check?

16   A.   George Thomas Brokaw.

17   Q.   And the date of that check?

18   A.   Is April 26, 2012.

19   Q.   Directing your attention to the account number on

20   that check, does that appear to be the same account number

21   we have been discussing?

22   A.   Yes.

23   Q.   And would Wells Fargo have honored that check?

24   A.   No.

25   Q.   And why is that?

1    A.    Because the account was closed previous to issue.

2    Q.    Okay.

3          MS. PALUCH:  May I have one moment, Your Honor?

4          THE COURT:  You may.

5          MS. PALUCH:  If I could have one second, Your

6    Honor.

7          I have no further questions of the witness.

8          THE COURT:  All right.  Thank you very much,

9    Mr. Gorham, you may step down.

10         Government may call its next witness.

11         MR. KIRSCH:  Thank you, Your Honor.  The Government

12   calls Toni Payne.

13         COURTROOM DEPUTY:  Remain standing.

14         Your attention, please.

15         Please raise your right hand.

16                         **TONI PAYNE**

17   having been first duly sworn, testified as follows:

18         COURTROOM DEPUTY:  Please be seated.

19         Please state your name, and spell your first and

20   last names for the record.

21         THE WITNESS:  Toni Payne.  T-O-N-I P-A-Y-N-E.

22         THE COURT:  You may proceed.

23         MR. KIRSCH:  Thank you, Your Honor.

24                    **DIRECT EXAMINATION**

25   **BY MR. KIRSCH:**

```
 1   Q.   Ms. Payne, where do you work?

 2   A.   The Federal Bureau of Investigation.

 3   Q.   What is your position there?

 4   A.   I am an intelligence analyst.

 5   Q.   Is that here in Denver?

 6   A.   Yes.

 7   Q.   What does an intelligence analyst do?

 8   A.   We can do anything from interviews to liaison.

 9   Mostly research with complex financial crimes.

10   Q.   Do you have any duties with the FBI with respect to

11   search warrants?

12   A.   Yes.

13   Q.   What are your duties there?

14   A.   I am an Evidence Response Team member and instructor

15   for both our basic classes and photography classes.

16   Q.   What does the Evidence Response Team do?

17   A.   We are tasked with processing, collecting all of the

18   evidence related to search warrants.

19   Q.   How long have you been working with the Evidence

20   Response Team?

21   A.   Approximately 7 years.

22   Q.   How long have you been with the FBI generally?

23   A.   Since 2005.

24   Q.   Okay.  In connection with your duties on the Evidence

25   Response Team, did you participate in the execution of a
```

```
 1   search warrant at 2260 Palm Drive, Unit C, in Colorado

 2   Springs, Colorado?

 3   A.   Yes, I did.

 4   Q.   Do you remember approximately when that was?

 5   A.   I guess that was the 20th of September 2011.

 6   Q.   Did you have an understanding about whose residence

 7   that was?

 8   A.   Yes, George and Debra Brokaw's.

 9   Q.   What role did you play in connection with that

10   search?

11   A.   I was actually the photographer and evidence

12   collector in that search.

13   Q.   So, as the photographer, what is it you would do in

14   connection with the search?

15   A.   So, in connection with the search warrant, I would

16   actually go into the residence.

17        THE COURT:  Please slow down so the court reporter

18   can keep up with you.

19        THE WITNESS:  I would actually enter the residence,

20   take entry photos of each room, every level of the

21   residence.  I would then take photos of evidence -- items

22   of evidence collected, and also do exit photos.

23   Q.   (BY MR. KIRSCH) And you mentioned that you were an

24   evidence collector, as well?

25   A.   Yes.
```

1    Q.    What is involved in being the evidence collector?

2    A.    So once I photograph an item of evidence, we actually

3    will label it, collect it, package it, and seal it.  And

4    then we will actually at this point, we would actually

5    either give it to the TIGTA person, who would take it into

6    their evidence, and we would also work with the chain of

7    custodies.

8    Q.    So in this particular search, do you know what

9    happened with the evidence that was seized?

10   A.    All evidence was seized and was turned over.  The

11   chains were all turned over to TIGTA.

12   Q.    Okay.  And did you have an opportunity before you

13   came to court today to review some of the items that were

14   seized during that search?

15   A.    Yes, I did.

16   Q.    Where did you do that?

17   A.    I actually went to the office -- the TIGTA office off

18   Broadway, in Denver.

19   Q.    Do you know whether or not there were any computers

20   that were seized during the search of Mr. Brokaw's

21   residence?

22   A.    Yes, they were.  There were two items of evidence.

23   There was one desktop computer and one CD external hard

24   drive.

25   Q.    Do you know what happened to those computer items

1   once they were seized?

2   A.   Those were seized, and then the chains were provided

3   to TIGTA, which returned both of those items over to the

4   computer specialist, Marty Zenthofer.

5   Q.   I want to start asking you about some of those

6   exhibits that you reviewed now.  I want to start with

7   Exhibits 70 through 73.  I think you will have them up

8   there at the witness stand.

9        Based on your previous review, did you determine

10   whether or not those were the items that were seized

11   during the search of Mr. Brokaw's residence?

12   A.   Yes, they were.

13   Q.   Did those items all come from a particular place

14   within the residence?

15   A.   The majority of the items came from the downstairs'

16   office.

17        MR. KIRSCH:  Okay.  At this point, Your Honor, I

18   will move to admit Exhibits 70 through 73?

19        THE COURT:  All right.  Exhibits 70 through 73 will

20   be admitted.

21        (Exhibit Nos. 70-73 are admitted.)

22        MR. KIRSCH:  Can we publish Exhibit 70, please?

23        THE COURT:  Just so I make the record, 70 was

24   conditionally admitted, now it is fully admitted.

25        MR. KIRSCH:  Thank you, Your Honor.

1          THE COURT:  You may publish any of the exhibits you

2     just had admitted without asking permission.

3          MR. KIRSCH:  Thank you, Your Honor.  I will wait

4     just a moment to get that up on the screen, Your Honor.

5     Q.   (BY MR. KIRSCH)  Is that the first page of Exhibit 70

6     that is on the screen now?

7     A.   Yes, it is.

8     Q.   I may ask you to flip back and forth between the

9     paper and the screen just a little bit.

10          Ms. Payne, the first six or so pages are all those

11     documents, sort of like these that show that items were

12     mailed?

13     A.   Yes.

14          MR. KIRSCH:  Then can we go to page 7 of this

15     exhibit, please.  Enlarge the text of that, please.

16     Q.   (BY MR. KIRSCH)  What are the papers that are

17     referenced on this Certificate of Service?

18     A.   These are 1099 OIDs and 1096 transmittals.

19     Q.   For which year?

20     A.   2003 through 2008.

21          MR. KIRSCH:  Can we please display page 9 of

22     Exhibit 70 now.  Can we enlarge the text of that, please.

23     Q.   (BY MR. KIRSCH)  Does this appear to be a cover

24     letter for this same mailing?

25     A.   Yes, it does.

```
 1    Q.   Now can we go to page 10, please.  These look like
 2    handwritten forms for 2008?
 3    A.   Yes.
 4    Q.   Just look through the next several pages, if you
 5    could, there.  What is contained in the next few pages
 6    there?
 7    A.   These are 1099 OIDs for '08, '07, '06, '05, '04, and
 8    '03.
 9    Q.   All handwritten?
10    A.   Yes.
11    Q.   Now I am going to go ahead and ask you to look at
12    Exhibit 72.
13         MR. KIRSCH:  And if we could publish page 6,
14    please.
15         Your Honor, can I ask Ms. Payne to just display
16    Exhibit 72 to the jury physically?
17         THE COURT:  You may.
18    Q.   (BY MR. KIRSCH)  It should be the big one there.
19    A.   This one?
20    Q.   Yes.  That is it.  Are there folders, other folders
21    contained within that expandible folder?
22    A.   Yes.
23    Q.   How are those other folders marked?
24    A.   Marked 2008 through 2003.
25    Q.   Is there a folder for each of those years?
```

1    A.    Yes.

2    Q.    Now I will ask you to look at the screen, and it will

3    display page 6 of the exhibit up on the screen, Exhibit

4    72.

5          So what are the -- are there categories of

6    exhibits -- or, sorry, categories of documents on this

7    list, as well?

8    A.    There are.

9    Q.    What are those categories?

10   A.    Cover letters for 1099 OIDs for 2003 through 2008.

11   Q.    Okay.  Does it also indicate that there are copies of

12   1040 X forms for those years here?

13   A.    Yes.

14         MR. KIRSCH:  Now can we display page 7 of this

15   exhibit, please.  And see if we can enlarge the top half

16   of that.

17   Q.    (BY MR. KIRSCH)  All right.  Is that -- are you able

18   to read that on the screen, Ms. Payne?

19   A.    Yes.

20   Q.    Who is this note addressed to?

21   A.    Curtis.

22   Q.    And what does it say at the beginning there?

23   A.    "I need an OID and a 1099 A for each of these four

24   cases.  One each to El Paso District Court and to Roxanne

25   Huber, DOR."

394

```
 1        MR. KIRSCH:  Okay.  Now, can we please go to page
 2   12 of this exhibit, and highlight the top portion there.
 3   Q.   (BY MR. KIRSCH)   What entity is referenced on the top
 4   form there?
 5   A.   District Court, El Paso County, Colorado.
 6   Q.   And what about on the bottom?
 7   A.   Colorado Department of Revenue.
 8   Q.   Do you know whether or not DOR is used as an
 9   abbreviation for the Department of Revenue?
10   A.   Yes, it is.
11   Q.   I want to ask you about some documents now that are
12   in the folder there marked 2008.  We will try to go ahead
13   and put it on the screen.  We will start with page 18.
14   Maybe we can start at the top half, again.  Hopefully that
15   will get dark enough to read.  Okay.  Can you see that on
16   the screen now, Ms. Payne?
17   A.   Yes.
18   Q.   So what is the caption at the top of this document?
19   A.   2008 1040.
20   Q.   Okay.  What is the heading over there on the left top
21   left?
22   A.   1099.
23   Q.   Okay.  Then is there a list of entities there?
24   A.   Yes.
25   Q.   What are the other headings on the left column that
```

1    you can read there?

2    A.   Interest, pension, and SS.

3    Q.   And then what is the SS?

4    A.   Retirement benefit.  And expenses.

5    Q.   Okay.  And then we got one more at the bottom left.

6    What is that?

7    A.   2008 OIDs.

8    Q.   Is there a total reflected for 2008 OIDs?

9    A.   Yes.  $97,378.60.

10        MR. KIRSCH:  Can we go to the next page of this

11   exhibit now, page 19.  And maybe we can expand the middle

12   of that.

13   Q.   (BY MR. KIRSCH)  What is this form?

14   A.   This is a 2008 1099 Miscellaneous.

15   Q.   Can you please compare the name there for the payer's

16   name and the amount on page 7 to what was on that

17   handwritten list?  Tell me if those match up.

18   A.   So, the Equitrust Life Insurance Company?

19   Q.   Yes, the 39,000 and change amount there.

20   A.   39,934.42 was also the exact same for the top left

21   1099.  39.934.42.

22        MR. KIRSCH:  Okay.  Now I will ask to display page

23   20.  Highlight that top portion, if we could.

24   Q.   (BY MR. KIRSCH)  Is that another 1099 Miscellaneous

25   Form?

1   A.   Yes, for 2008.

2   Q.   Does this entry match up to one of the entries on the

3   handwritten entry?

4   A.   Yes, it does.  Under the 1099, National Senior

5   Associates Company.

6        MR. KIRSCH:  Can you display page 22 of this

7   exhibit, please.

8   Q.   (BY MR. KIRSCH)  Is this another 1099 Miscellaneous?

9   A.   Yes, it is.

10   Q.   Does this match one of the entries on the handwritten

11   summary for 2008?

12   A.   Yes, it does.

13        MR. KIRSCH:  Can we display page 24, please.  And

14   expand that, if we could, please.

15   Q.   (BY MR. KIRSCH)  What is the -- what kind of form is

16   this?

17   A.   Form SSA 1099, Social Security Benefits Statement.

18   Q.   Does this form match anything that was on the

19   handwritten summary for 2008?

20   A.   Yes, the SS retirement benefit.

21        MR. KIRSCH:  And then can we look at page 28 of

22   this exhibit, please.  And expand that if we could.

23   Q.   (BY MR. KIRSCH)  What kind of a form is that?

24   A.   2008 Form 1099 Interest Income.

25   Q.   Does this information match any of the information on

1    the handwritten summary for 2008?

2    A.   Yes, it does.   Interest from First National Bank.

3         MR. KIRSCH:   Can we go to page 46 of this exhibit,

4    please.   And can you highlight the text of that, please.

5    Q.   (BY MR. KIRSCH)   What is this page that is on the

6    screen, Ms. Payne?

7    A.   Numbers and Beyond.   Looks like 5596 Pine Ridge

8    Drive, in Elizabeth, Colorado.   Enclosed copies of tax

9    returns for tax year ending December 31, 2008.

10   Q.   And was this sent to Mr. and Mrs. Brokaw?

11   A.   Yes, it was.

12   Q.   Can you go to page 54 of this exhibit now, please.

13   Is this some printed OID forms that are contained in that

14   same folder, Ms. Payne?

15   A.   Yes.

16        MR. KIRSCH:   Can we put that on the left side of

17   this screen and then on the right side of the screen

18   please publish page 10 of Government Exhibit 20,

19   previously admitted.

20   Q.   (BY MR. KIRSCH)   How do those compare, Ms. Payne?

21   A.   They are the same.

22   Q.   Now I want to ask you some questions about documents

23   in the folder that is labeled 2007.   We will start by

24   putting page 64 on the screen, if we could, please.   What

25   is that page?

1    A.    Handwritten 2007 1040s.

2    Q.    Does this have the same kind of entries on the left?

3    A.    Yes.

4    Q.    And if we page down just a little bit farther, does

5    that include an entry for a 2007 OID?

6    A.    Yes.

7    Q.    Can I ask you to just look through that folder and

8    tell us, does it contain similar copies of forms 1099

9    Miscellaneous and 1099 INT as those that we just looked at

10    in the 2008 folder?

11    A.    Yes, it does.

12    Q.    I will ask to put page 75 on the screen just as an

13    example.  Is that an example, again, of one of the 1099

14    INT forms in that folder?

15    A.    Yes, it is.

16          MR. KIRSCH:  And now can we display page 82.

17    Q.    (BY MR. KIRSCH)  Is this another cover letter for a

18    tax return?

19    A.    Yes.

20    Q.    From Numbers and Beyond again?

21    A.    Yes.

22    Q.    And in the folder, itself, does the actual tax return

23    follow that cover letter, or is it in that same folder?

24    A.    Yes, it is.

25    Q.    Okay.  I will direct your attention now to the 2006

1    folder.  I will put page 113 up on the screen.  This one

2    is not getting a lot darker on the screen.  Can you help

3    the jury out explain what that exhibit is?

4    A.   This appears to be the same sort of exhibit that you

5    showed in the previous two:  TB.  2006.  1040 on the same

6    side.  1099 dividend expense and pension on the left side.

7    Q.   The bottom of the left side, is there an entry for

8    1099 OID again?

9    A.   Yes, there is.

10   Q.   If you just flip through the rest of that folder,

11   does it contain the same kind of documents as the ones we

12   had looked at for the 2008 and the 2007 folders?

13   A.   Yes, it does.

14   Q.   Now I will ask you to look at the 2005 folder.

15        MR. KIRSCH:  I will ask to put page 141 up on the

16   screen.

17   Q.   (BY MR. KIRSCH)  Is this the handwritten summary from

18   the 2005 folder?

19   A.   Yes, it.

20   Q.   Does the 2005 folder also contain the same kinds of

21   other tax documents that you have described to the jury?

22   A.   Yes, it does.

23   Q.   Now I will direct your attention to the 2004 folder,

24   specifically, to page --

25        MR. KIRSCH:  Ask if we can put page 187 up on the

1    screen.

2    Q.   (BY MR. KIRSCH)   Is this a summary -- handwritten

3    summary for 2004?

4    A.   Yes.

5         MR. KIRSCH:   Can we go ahead and put page 188 on

6    the screen now.

7    Q.   (BY MR. KIRSCH)   In this case, does the summary carry

8    over onto this second page?

9    A.   Yes, it does.

10   Q.   And on the screen now is again 2004.   Is there an

11   entry for OID?

12   A.   Yes.

13   Q.   Is this document -- does this folder also contain the

14   same kinds of tax documents as those you previously

15   described?

16   A.   Yes, it does.

17   Q.   Finally, let me ask you about the 2003 folder.   And I

18   will put up on the screen for you page 292 of this

19   exhibit.   Is that a handwritten summary for 2003?

20   A.   Yes, it is.

21   Q.   Does that folder, again, contain the same kind of tax

22   documents as those you previously described?

23   A.   Yes, it does.

24   Q.   Now I am going to ask to -- I will show you

25   Government Exhibit 71.   I believe 71 has been admitted, as

1    well.  We can start with page 1.  What is this exhibit?

2    A.   This is an e-mail for the 1099 OID website.

3    11/5/2008.

4    Q.   Is there a series of -- are there a couple of pages

5    to this exhibit?

6    A.   Yes, there are.

7    Q.   Are there a series of e-mails contained in the

8    exhibit?

9    A.   Yes, there are.

10   Q.   I will start by directing your attention to page 3.

11   So, at the -- in the middle of screen there on page 3 --

12        MR. KIRSCH:  Maybe we can expand that portion.

13   Thank you.

14   Q.   (BY MR. KIRSCH)  Who does that first e-mail that is

15   on the screen, who does that appear to come from?

16   A.   John Pawelski, forwarded from Mimi.

17   Q.   Okay.  And is there a reference in the e-mail at the

18   bottom to 1099 OID?

19   A.   Yes, there is.

20   Q.   Is there also a reference to something called a 1040

21   V and money order?

22   A.   Yes, there is.

23        MR. KIRSCH:  Can we go to the second page of that

24   exhibit, please.  And then expand the middle of that,

25   please.

1  Q.   (BY MR. KIRSCH)  So who is that an e-mail from at the

2  very top of the screen?

3  A.   John Pawelski.

4  Q.   Who is it to?

5  A.   Appears to be to Tom Brokaw.

6  Q.   What does the handwritten notes say on the left side?

7  A.   "Attachments didn't come through."

8       MR. KIRSCH:  Okay.  Then can we go to the first

9  page, please.  And just highlight the top portion of that,

10 starting at the -- that will get it.

11 Q.   (BY MR. KIRSCH)  This is, I think you already

12 described, this is the e-mail from Mr. Pawelski to

13 Mr. Brokaw?

14 A.   Yes.

15 Q.   Do you see the name of the attachment to that e-mail?

16 A.   "1099 OID, Power Point."

17 Q.   Power Point.  Is that what PPT stands for?

18 A.   Yes.

19 Q.   Now I am going to ask you to look at Exhibit 73,

20 which we also admitted a few moments ago.

21      MR. KIRSCH:  Can we publish that, please?  And can

22 we highlight from the top down to just above the sticker,

23 please.

24 Q.   (BY MR. KIRSCH)  Is that big enough for you to read

25 on the screen, Ms. Payne?

1    A.    Yes.

2    Q.    What does this document appear to be?

3    A.    Appears to come from the Department of Treasury.

4    "Overpaid tax applied to other taxes that you owe."  Sent

5    to George T. and Debra S. Brokaw.

6    Q.    Can you read just the first sentence of the letter

7    for us there?

8    A.    "We applied $62,607 of the overpaid tax on your 2008

9    tax return to the unpaid balance of other federal taxes

10   which our records show you owe."

11   Q.    Thank you.

12         MR. KIRSCH:  Maybe we can put that over on the left

13   side of the screen, again.  And I will ask to publish

14   again page 1 of Government Exhibit 91, which we admitted

15   earlier today.

16         THE COURT:  You may.

17         MR. KIRSCH:  Thank you, Your Honor.

18         Can you expand the top message on the top, again,

19   there.

20   Q.    (BY MR. KIRSCH)  The amount and the years that are

21   referenced in the e-mail on the right side of the screen,

22   Ms. Payne, do those appear to have any relationship to the

23   information in the letter on the left?

24   A.    Yes, they do.

25   Q.    I want to ask you about a different set of exhibits

1   now.  These exhibits include Nos. 250, 251, 253 through

2   256, 258 through 262, and 272.  Are those all exhibits

3   that you also had the opportunity to review before you

4   came to court today?

5   A.   Yes.

6   Q.   Were you able to determine whether or not those

7   documents are -- those exhibits were found during the

8   execution of the search warrant of Mr. Brokaw's house?

9   A.   Yes, they were.

10   Q.   Do you recall generally, at least, where those

11   documents came from?

12   A.   Those all came from the downstairs office, around the

13   area of the credenza.

14        MR. KIRSCH:  Your Honor, I am going to move to

15   admit that set of exhibits at this point.

16        THE COURT:  All right.  Exhibits 250, 251, 253

17   through 256, 258 through 262, and 272 are admitted.

18        MR. KIRSCH:  Thank you, Your Honor.

19        (Exhibit Nos. 250, 251, 253-256, 258-262, 272 are

20   admitted.)

21        THE COURT:  You may publish as you deem necessary.

22        MR. KIRSCH:  Thank you, Your Honor.

23   Q.   (BY MR. KIRSCH)  I would like to begin --

24        THE COURT:  I do have 250 was admitted, I believe,

25   yesterday.

1          MR. KIRSCH:  That's right, Your Honor.  I

2     apologize.  I forgot about that.

3          I will ask to republish 250 briefly just to remind

4     the jury what that is.

5          THE COURT:  You may.

6     Q.   (BY MR. KIRSCH)  Thank you.  Okay.  So this document

7     is captioned "Notice of Federal Tax Lien"; is that right?

8     A.   Yes.

9     Q.   And you found this document near the credenza in the

10    office of Mr. Brokaw's house?

11    A.   Yes.

12         MR. KIRSCH:  Now I will ask to publish Government

13    Exhibit 251.

14    Q.   (BY MR. KIRSCH)  And what is this document captioned,

15    Ms. Payne?

16    A.   Notice of Levy on Wages, Salary and Other Income.

17    Q.   Who is the person listed under the Internal Revenue

18    Service on this document?

19    A.   Michael J. Pryor.

20    Q.   Okay.  And who is the taxpayer listed over on the top

21    right?

22    A.   George Brokaw.

23         MR. KIRSCH:  I will ask to publish now Government

24    Exhibit 253, starting with page 1.  You can go ahead and

25    highlight the text of that, please.

1   Q.   (BY MR. KIRSCH)  Is this the group of documents that

2   was found during that search?

3   A.   Yes, they are.

4   Q.   This first page, what does that appear to be?

5   A.   A letter written to the Internal Revenue Service with

6   a header of George Thomas Brokaw.

7   Q.   What is the date on this?

8   A.   May 2, 2011.

9   Q.   And what does the first sentence say there?

10   A.   "I have enclosed with this letter invoices and

11   instructions to balance and settle the listed accounts."

12        MR. KIRSCH:  Can we go to page 2 of this exhibit

13   now, please.  Go ahead and expand that text, if you would,

14   please.

15   Q.   (BY MR. KIRSCH)  Who acted as the notary, the notary

16   with respect to this document?

17   A.   The notary appears to be the agent for Mimi Vigil.

18        MR. KIRSCH:  And can we go to page 4 of this

19   exhibit now, please.  Can you expand the top portion of

20   that, please.

21   Q.   (BY MR. KIRSCH)  What is the title of this document?

22   A.   Registered Bonded Promissory Note for 10 million.

23   Q.   And who does this note indicate that it is payable

24   to?

25   A.   The United States of America.  Department of the

1    Treasury.

2    Q.   In care of Timothy Geithner, Trust?

3    A.   Yes.

4    Q.   And others?

5    A.   Yes.

6         MR. KIRSCH:   Can we scroll down on this, please.

7    Q.   (BY MR. KIRSCH)   Actually, before we get too far

8    down, who does -- what does it say after the "for credit

9    to," still toward the top of the screen?

10   A.   "For Credit to Internal Revenue Service for George T.

11   Brokaw --" Social Security number.   923,000 -- okay, hold

12   on a second.   The Social Security number "-- 923,546.88,

13   for the benefit of Debra S. Brokaw --" a Social Security

14   number "-- plus interest, penalties and extra fees."

15   Q.   Okay.   Thank you.

16        MR. KIRSCH:   Now I am going to ask to publish

17   Government Exhibit 254, starting with page 1.

18   Q.   (BY MR. KIRSCH)   The first couple of pages of 254,

19   what are the first couple pieces of paper there?   What are

20   they?

21   A.   Certified Mail receipts.

22   Q.   I will put page 4 on the screen -- sorry, page 5 on

23   the screen.   What is this document?

24   A.   A letter to the Internal Revenue Service from George

25   Thomas Brokaw and to Internal Revenue Service, Technical

 1   Support Division and Internal Revenue Service.

 2   Q.   What is the caption there under the addressee?

 3   A.   Instructions for the Enclosed Invoices.

 4        MR. KIRSCH:  Can we go to page 6.  Display page 6

 5   now, please.  Can you highlight the top portion of that.

 6   Q.   (BY MR. KIRSCH)  Are you able to read any of the

 7   writing at an angle there?

 8   A.   "Accepted for Value.  Exempt from levy.  Deposit to

 9   the U.S. Treasury.  Charge the Same Account --" which

10   appears to be a Social Security number.  "-- George T.

11   Brokaw.  Exemption number.  Return Settlement and

12   Discharge."  With an autograph and date.

13   Q.   Can you tell what this document is, before the

14   writing was on it?

15   A.   A reminder from -- a collection to George and Debra

16   Brokaw.  A notice to remind you of taxes still owed.

17        MR. KIRSCH:  Okay.  Can we go to page 7 of this

18   exhibit, please.  And can we highlight that text.

19   Q.   (BY MR. KIRSCH)  What is written there?  Is this the

20   back of that page we were just looking at?

21   A.   Yes, it is.

22   Q.   What is written there?

23   A.   "For deposit to U.S. Treasury.  For credit to U.S.

24   Revenue Service.  For Form:  9974."  Signed by George

25   Thomas Brokaw.

409

1    Q.   You have got that document in your hand there.  Are

2    there similar documents that follow these pages that we

3    have just been looking at?

4    A.   Yes, sir.

5         MR. KIRSCH:  I will ask if we can display page 16

6    of Exhibit 254.

7    Q.   (BY MR. KIRSCH)  Can you tell what this document is,

8    Ms. Payne?

9    A.   This is the Official Internal Revenue Service

10   Interest Computation.

11   Q.   Does it contain a similar stamp and text sort of at a

12   diagonal as one of the documents we just looked at?

13   A.   Yes, it does.

14        MR. KIRSCH:  Can we display page 25 of that

15   exhibit, please.

16   Q.   (BY MR. KIRSCH)  Can you tell what this document is?

17   A.   Appears to a Commission Statement from Equitrust Life

18   Insurance Company.

19   Q.   To who?

20   A.   To George Brokaw.

21   Q.   Does this document have the same kind of stamp and

22   handwriting on it as the one we just looked at?

23   A.   Yes, it does.

24   Q.   Can we scroll down to the bottom of that exhibit, or

25   that page, I am sorry.  And are the words "Money Order"

1    written down there?

2    A.    Yes, they are.

3          MR. KIRSCH:   Finally, can we go to page 27 of that

4    exhibit.   Go ahead and highlight the top part of that, if

5    you could.

6    Q.    (BY MR. KIRSCH)   What is the title of this document?

7    A.    Registered Bonded Promissory Note.

8    Q.    And what is the amount on this one?

9    A.    $6,243.

10   Q.    Who does this document purport to be payable to?

11   A.    James E.   Hohmann, Equifirst Life Insurance Company.

12         MR. KIRSCH:   Now I will ask to display Exhibit 255,

13   first couple of pages.

14   Q.    (BY MR. KIRSCH)   Again, Ms. Payne, do they relate to

15   proof of mailing?

16   A.    Yes.

17   Q.    Putting page 5 on the screen now, what is this

18   document?

19   A.    Handwritten notes, Internal Revenue Service.

20   Internal Revenue Service Technical Support Division, and

21   addresses associated.

22         MR. KIRSCH:   Okay.   Can we go to page 6, please.

23   Highlight that, if we could.

24   Q.    (BY MR. KIRSCH)   What is this document?

25   A.    Instructions for the enclosed invoices to the

1   Internal Revenue Service from George Thomas Brokaw.

2          MR. KIRSCH:  And then can we go to page 8, please.

3   Highlight that top portion, if we could.

4   Q.   (BY MR. KIRSCH)  What does this document appear to

5   be?

6   A.   It appears to be a payment voucher on 1040 A for the

7   tax period of December 31, 2004, and an assessed balance.

8   Q.   What is the name listed there?

9   A.   George Brokaw.

10  Q.   It is sort of faint in the middle of the screen right

11  now.  Can you help identify what that is in the middle of

12  the screen?

13  A.   It is the same as the last few documents that we had

14  seen.  "Accepted for Value.  Exempt From Levy.  Deposit to

15  U.S. Treasury."

16         MR. KIRSCH:  The next page of that exhibit, if we

17  can enlarge that up in the corner.

18  Q.   (BY MR. KIRSCH)  Does that seem to be information or

19  an endorsement similar to the one that we looked at a few

20  moments ago?

21  A.   Yes, it does.

22  Q.   While you have got the exhibit there in your hand, is

23  there a set of similarly-marked bills or invoices from the

24  IRS like that contained in that document for the next 10

25  or 20 pages?

 1   A.   Yes, there are, for those years.

 2        MR. KIRSCH:  Can we put page 30 up on the screen,

 3   please.

 4   Q.   (BY MR. KIRSCH)  Can you tell what this document

 5   appears to be?

 6   A.   Individual Variable Universal Life.  Individual

 7   Variable Universal Life.  Periodic Report to Contract

 8   Owner from Farmers New World Life Insurance Company.

 9   Q.   And what is the name listed in the upper left side of

10   the screen?

11   A.   Tom Brokaw.

12   Q.   Does this have a similar kind of stamp and marking on

13   it at a diagonal?

14   A.   Yes, it does.

15        MR. KIRSCH:  Can we scroll down to the bottom of

16   that page, please.  Actually, go to page 32.

17   Q.   (BY MR. KIRSCH)  Does this have the Money Order text

18   written on it again?

19   A.   Yes, it does.

20   Q.   Now I am going to ask you to look at Exhibit 256.

21        MR. KIRSCH:  If we can publish that, as well,

22   please.

23   Q.   (BY MR. KIRSCH)  Who is this addressed to?

24   A.   Addressed to Debra Brokaw, from the IRS.

25   Q.   Does it have the similar kind of stamp in the middle

1    of the page?

2    A.   Yes, it does.

3    Q.   Can you tell who appears to have signed that?

4    A.   George Thomas Brokaw.

5    Q.   Are there -- I will ask to you look through that

6    other -- the rest of the pages in that exhibit.

7         First of all, do the other pages in that exhibit

8    have Debra Brokaw's name on them?

9    A.   Yes, they do.

10   Q.   Do they appear to have the same sort of red ink stamp

11   and the signature on them, as well?

12   A.   Yes, they do.

13        MR. KIRSCH:   Now I am going to ask to publish

14   Exhibit 261.   Can you see that one on the screen,

15   Ms. Payne?

16   A.   Yes.

17   Q.   What is this document?

18   A.   It is from the IRS to George Brokaw.   Appears to be a

19   payment voucher.

20   Q.   Can we -- do you happen to recall whether or not

21   these documents were contained within a folder when they

22   were seized?

23   A.   Yes, they were.   There was one folder with:

24   Billingsley, Aubrey, IRS.

25   Q.   Can we go to page 2 of this exhibit, please.   What is

1    this letter?

2    A.   Also to George Brokaw from the IRS.  A letter to the

3    taxpayer George Brokaw.

4    Q.   Okay.  Can we go to the next page now, page 3,

5    please.  Can you read the person who signed this letter?

6    A.   Maureen Green, Operations Manager, Exam SC Suppor.

7    Q.   If we can page back up a little bit.  There up at the

8    top of that, is there a number listed at the top after the

9    date, where it says "LTR"?

10   A.   3176 C.

11        MR. KIRSCH:  Okay.  Let's go back to the first page

12   of the exhibit, please, first page of this letter.  Page 2

13   of Exhibit 261.  Let's make sure we are in the right

14   place.  Can you highlight just down to the "Dear Taxpayer"

15   if you would.

16   Q.   (BY MR. KIRSCH)  What is the tax period referenced in

17   this letter?

18   A.   December 31, 2006.

19        MR. KIRSCH:  Okay.  Now can we go, please, to page

20   7 of Exhibit 261.  Can you highlight just down to the

21   "Taxpayer" again.

22   Q.   (BY MR. KIRSCH)  Is there a reference -- the same

23   number referenced in the upper right-hand corner, the

24   3176 C?

25   A.   Yes.  That is the tax period listed in this one.

1    December 31, 2007.

2    Q.   Can you go to page 8 of this exhibit, please.  What

3    is the name under the signature on this letter?

4    A.   Maureen Green.

5    Q.   Now I am going to ask you to look at Exhibit 262.

6         MR. KIRSCH:  And we can start by publishing the

7    first page of that one.  Can you expand down to the "Dear

8    Taxpayer" again.

9    Q.   (BY MR. KIRSCH)  Does this appear to be the same kind

10   of letter?

11   A.   Yes.

12   Q.   What is the tax period referenced here?

13   A.   December 31, 2008.

14   Q.   Can we go to the second page of this exhibit, please.

15   Whose name appears under the signature on this exhibit?

16   A.   Maureen Green.

17        MR. KIRSCH:  Now can I publish, please, Government

18   Exhibit 260?  And can you just expand the text on that for

19   us, please.

20   Q.   (BY MR. KIRSCH)  You referenced a folder a moment

21   ago, Ms. Payne.  The name that you referenced, does that

22   appear on this document?

23   A.   Yes, it does.

24   Q.   And which name is that?

25   A.   Aubrey Billingsley.

1   Q.   And are you able to tell the people -- can you read

2   the signatures down at the bottom of the page, bottom

3   right?

4   A.   John Joseph Pawelski, George Thomas Brokaw, and --

5   Q.   Something -- looks like the person may have been a

6   doctor, perhaps?

7   A.   Possibly.

8   Q.   And then how about the notary?  Can you tell who it

9   is that acted as the notary there?

10  A.   Mimi Vigil.

11       MR. KIRSCH:  Can I have one moment, please, Your

12  Honor?

13       I would like to put on the screen, but not display

14  to the jury, if I could, please, Exhibit 213.

15       THE COURT:  You may.

16  Q.   (BY MR. KIRSCH)  How does that document appear to

17  compare to the one you were just looking at?

18  A.   The same.

19       MR. KIRSCH:  Okay.  I will ask to publish Exhibit

20  258.

21  Q.   (BY MR. KIRSCH)  Do you recall, Special Agent Payne,

22  whether or not this document was in the same folder as

23  that one we just looked at?

24  A.   Yes, it was.

25  Q.   And what is the title on this document?

1    A.    Notice of Claim of Maritime Lien.

2    Q.    And what is the amount listed there in the box 6?

3    A.    1,126,650.

4         MR. KIRSCH:  Can I now please publish Exhibit 259?

5    Q.  (BY MR. KIRSCH)  Was this a document in that same

6    folder?

7    A.    Yes.

8    Q.    What is the title of this document?

9    A.    Notice of Claim of Maritime Lien.

10   Q.    Is there a name listed there under "Name of Vessel"

11   that appears in some of the other documents you have

12   looked at today?

13   A.    Yes.  Ray Lahood.

14   Q.    What about higher, in Box No. 1?

15   A.    Maureen Green.

16   Q.    Okay.  Who is listed as the claimant on this

17   document?

18   A.    George Thomas Brokaw.

19   Q.    What is listed as the amount for this lien?

20   A.    2,232,000,000.

21   Q.    Who acted as the notary for this document?  Down in

22   the lower right, can you read that stamp?

23   A.    Appears to be --

24   Q.    In the blue.  The blue stamp in the lower right?

25   A.    Clara M. Mueller.

1          MR. KIRSCH:  And then I want to publish now Exhibit

2    272.  Can you expand down further.

3    Q.   (BY MR. KIRSCH)  Can you see that on the screen now,

4    Ms. Payne?

5    A.   Yes.

6    Q.   Do you know what this document is?

7    A.   Appears to be a People Search for Michael J. Pryor.

8    Q.   What is a People Search, do you know?

9    A.   People Search is going to be a database that you can

10   usually utilize -- it is paid fee-for-service, when you

11   are trying to find unique identifiers or information about

12   individuals.

13   Q.   And this is -- who was the person that this document

14   indicates the search was conducted on?

15   A.   Michael J. Pryor.

16   Q.   There is some handwriting on the lower part of the

17   screen now.  Can you read that?

18   A.   Yes.

19   Q.   Let's start with what is in the middle first.

20   A.   Mike Pryor.  7304 South Robb Street in Arapahoe.

21   Then Assessor's Office, with a telephone number.  And

22   underneath that "who, when, where and how my unalienable

23   rights were forfeited."

24   Q.   Okay.  I want to ask you about one other group of

25   exhibits, that is Exhibits 74, 257 and 263.  Are those

```
 1    exhibits that were also found during the search of

 2    Mr. Brokaw's residence?

 3    A.   Yes, they were.

 4    Q.   And do you remember, do those exhibits come from a

 5    particular place within the residence?

 6    A.   They also came from the office, downstairs office.

 7    Q.   Okay.

 8         MR. KIRSCH:  At this time I move to admit Exhibits

 9    74, 257 and 263.

10         THE COURT:  Exhibits 74, 257 and 263 are admitted.

11         (Exhibit Nos. 74, 257, 263 are admitted.)

12         MR. KIRSCH:  Thank you, Your Honor.

13         THE COURT:  You may publish as you deem necessary.

14         MR. KIRSCH:  Thank you, Your Honor.

15         I would like to publish Exhibit 74, please.

16    Q.   (BY MR. KIRSCH)  And can you identify what this

17    exhibit is?

18    A.   It is from the Internal Revenue Service to George

19    Brokaw from the Department of Treasury and Internal

20    Revenue Service.  Applies to a correspondence dated 5/31

21    of 2005.

22    Q.   Does this letter characterize arguments made by

23    Mr. Brokaw as frivolous?

24    A.   Yes, it does.

25         MR. KIRSCH:  If we can page down.  I am sorry,
```

 1    scroll down on that same page, 74, page 1.

 2    Q.   (BY MR. KIRSCH)  Can you read the paragraph that

 3    begins "people who violate"?

 4    A.   "People who violate the tax laws also may be subject

 5    to federal criminal prosecution and imprisonment.

 6    Information about the IRS's criminal enforcement program

 7    is available on the internet at www.irs.gov.  Once there

 8    enter the IRS key word 'fraud.'"

 9         MR. KIRSCH:  Can we go to the next page of that

10    exhibit, please.  We need to go one more down.  Then can

11    we highlight just the top paragraph there, please.

12         THE WITNESS:  "This letter advises you of a legal

13    requirement for filing and paying federal individual

14    income tax returns and informs you of the potential

15    consequences of the position you have taken.  Please

16    observe that the Intern Revenue Code sections listed below

17    expressly authorizes IRS employees to act on behalf of the

18    Secretary of the Treasury to examine taxpayer books,

19    papers, records or other data which may be relevant or

20    material; issue summons in order to gain possession of

21    records so that determinations can be made of the tax

22    liability or the ascertaining the correctness of any

23    return filed by that person and collect any such

24    liability."

25    Q.   Thank you.  Now I want to ask you to look at

1    Government Exhibit 263.  Do you recognize that exhibit?

2    A.    Yes.

3    Q.    What is it?

4    A.    Appears to be a March 2010 calendar book.

5         MR. KIRSCH:  Can I ask the witness to hold that up

6    so the jury can see it better?

7         THE COURT:  You may.

8         MR. KIRSCH:  Then I will ask to display one page on

9    the screen here, if we could, a page for March 24, 2010.

10        I think we have that up on the screen now.

11   Q.   (BY MR. KIRSCH) Can you see that?  Can you find that

12   entry?

13   A.    Yes.

14   Q.    What is listed over there for March 24th of 2010?

15   A.    Deb Maj.

16   Q.    How about -- looks like at 9 o'clock?

17   A.    At 9 o'clock, Aubrey Billingsley, IRS.

18   Q.    Can you read what is under that?

19   A.    "1040 OID Accepted.  UCC1.  Public Notice."

20   Q.    Do you recall seeing that exhibit?  Did that come

21   from a particular place within the office?

22   A.    It did, in the desk.

23   Q.    Okay.  And then I want to ask you to look at

24   Government Exhibit 257.  Did that come from the same place

25   in the office?

1  A.   Yes, it did, in the desk.

2  Q.   In the desk.

3       MR. KIRSCH:  Can I ask the witness to display

4  Exhibit 257 to the jury as well, please?

5       THE COURT:  You may.

6       MR. KIRSCH:  Can I have just a moment, please, Your

7  Honor?

8       THE COURT:  You may.

9       MR. KIRSCH:  Thank you, Ms. Payne.

10      No other questions, Your Honor.

11      THE COURT:  All right.  Thank you very much.  You

12 may step down.

13      THE WITNESS:  Thank you.

14      THE COURT:  Government may call its next witness.

15      MR. KIRSCH:  Can I have one moment real quick, Your

16 Honor?

17      THE COURT:  You may.

18      MR. KIRSCH:  Thank you, Your Honor.  The Government

19 will call Tamie Lucas.

20      COURTROOM DEPUTY:  Remain standing.

21      Your attention, please.

22      Please raise your right hand.

23                       **TAMIE LUCAS**

24 having been first duly sworn, testified as follows:

25      COURTROOM DEPUTY:  Please be seated.

1          Please state your name, and spell your first and

2     last names for the record.

3          THE WITNESS:  It is Tamie Lucas.  T-A-M-I-E.  Lucas

4     is L-U-C-A-S.

5          MS. PALUCH:  May I proceed, Your Honor?

6          THE COURT:  You may.

7                       **DIRECT EXAMINATION**

8     **BY MS. PALUCH:**

9     Q.   Good afternoon, ma'am.

10    A.   Good afternoon.

11    Q.   How are you employed?

12    A.   I work for the Internal Revenue Service Criminal

13    Investigation Data Processing Center.

14    Q.   Where is your office located?

15    A.   It is in Kentucky.

16    Q.   How long have you held your current position?

17    A.   I believe it has been 25 years.

18    Q.   Okay.  And can you explain what occurs at the IRS

19    Data Processing Center?

20    A.   Yes.  We receive documents from special agents where

21    they go on an investigation, they accumulate large volumes

22    of data, they ask us to input them into a database that we

23    program to house the information, either type it or scan

24    it.  And then we produce reports that summarize the data

25    for the agents for their cases.  We also do two other

1    specialty programs; site drafts and OID programs.  And

2    they are both document warehousing contracts.

3    Q.   Can you explain how mail arrives at the Data

4    Processing Center?

5    A.   For the site draft and OID data warehouse projects,

6    the documents are sent to the Department of Treasury in

7    Washington, D.C.  They are also sent to Fresno,

8    California, and they go through the mailroom.  They store

9    and sort the information, determine if it is considered

10   frivolous information, and they forward it to us on a

11   document transmittal outlining exactly which documents are

12   being sent to us.

13   Q.   Okay.  And once an item -- I will refer to the Data

14   Processing Center as the DPD.  Once an item arrives at the

15   Data Processing Center or DPD, can you explain what

16   happens to that document?

17   A.   For the site draft and OID project, we log the

18   information into the database.  We give each document its

19   own individual batch number.  It's a 4 digit alphanumeric

20   character.  Then we assign a box number.  Input just basic

21   information into the database, box number, alpha number,

22   alpha batch number, names, Social Security numbers,

23   addresses.  Then we box the data and house it within our

24   secure warehouse.

25   Q.   Okay.  Does the system that you have just described

1   produce accurate results in tracking documents that arrive

2   at the DPC?

3   A.   Absolutely.  We have had it batched.  It is a very

4   unique alphanumeric document to each document received.

5   Q.   I would like to ask you to look at what has been

6   marked as Government's Exhibit 51, please.  You should

7   have some documents in front of you there.

8   A.   51?

9   Q.   51.

10  A.   Okay.

11  Q.   Would you please look through that document.

12  A.   Yes.  It has our batch.

13  Q.   Can you state by looking at this document whether it

14  was received by the DPC?

15  A.   Yes.  This was received by the DPC.  We did batch it

16  and document this within the warehouse.

17       MS. PALUCH:  Your Honor, at this time I move for

18  admission and publication of Government's Exhibit 51.

19       THE COURT:  51 is admitted.

20       (Exhibit No. 51 is admitted.)

21       THE COURT:  You may publish.

22  Q.   (BY MS. PALUCH)  Ma'am, to who is this document

23  addressed?

24  A.   It is addressed to Timothy Geithner, the United

25  States Department of Treasury.

1   Q.   So was that document received by the DPC from the

2   Department of Treasury?

3   A.   Yes, it was.  It was sent to Washington, D.C., where

4   they go through and determine that it comes to us.

5   Q.   Okay.  And whose name appears in the return address?

6   A.   Return address is Clara Mueller.

7   Q.   Okay.  I direct your attention to pages 2 and 3 of

8   that exhibit.  Top of page 2, is there a date that appears

9   there?

10  A.   Yes.  May 14th.

11  Q.   And what does this document appear to be?

12  A.   It appears to be --

13  Q.   To whom is it addressed?

14  A.   Internal Revenue Service in Ogden, Utah.

15  Q.   Is there a specific name with attention to?

16  A.   Attention Ms. Maureen Green.

17  Q.   If you can turn to the second page.  Who signed that

18  document?

19  A.   Mimi Michelle Vigil.

20  Q.   Okay.  And for the record, could you state the batch

21  number of this document into the record?

22  A.   2NC4.

23  Q.   Thank you.  I will direct your attention now to

24  Government's Exhibit 203.  Can you look at that document.

25  And once you have had a chance to look at that, I would

1    like you to state whether or not that document was

2    received by the DPC.

3    A.   Yes.  It has our batch number, again, on it.

4         MS. PALUCH:  Your Honor, at this time I move to

5    admit and publish Government's Exhibit 203.

6         THE COURT:  203 is admitted.

7         (Exhibit No. 203 is admitted.)

8         THE COURT:  You may publish.

9    Q.   (BY MS. PALUCH)  To whom is that document addressed?

10   A.   Timothy Geithner, Secretary of the U.S. Department of

11   Treasury.

12   Q.   Whose name appears in the return address?

13   A.   Mimi Vigil.

14   Q.   And so would DPC have received that document from the

15   Department of Treasury?

16   A.   Yes, it would.

17   Q.   Second page of that document, do you see the title of

18   that document -- both of the titles in bold.  Could you

19   state those for the record?

20   A.   The Affidavit of Notary Presentment and Certificate

21   of Mailing.

22   Q.   What is the date this document was mailed?

23   A.   Was mailed April 1, 2009.

24   Q.   Okay.  And does it state in that first paragraph who

25   appeared with the following documents for mailing?

1    A.    George Thomas Brokaw.

2    Q.    Who signed the second page of that document?

3    A.    Looks like Mimi Vigil, Notary Public, Agent for Mimi

4    Vigil.

5    Q.    The date she signed that?

6    A.    Is 4/1/2009.

7    Q.    All right.  I would next like to direct your

8    attention to Government's Exhibit 204.  Can you state by

9    looking at this document whether that document was

10   received by the DPC?

11   A.    Yes.  It has our batch.

12   Q.    Okay.

13   A.    2QEB.

14   Q.    Can you hold that packet up?  Can you point where

15   that is?

16   A.    This little sticker (indicating).

17   Q.    Thank you.

18   A.    You are welcome.

19        MS. PALUCH:  Your Honor, at this time I move

20   admission of Government's Exhibit 204.

21        THE COURT:  It is admitted.

22        (Exhibit No. 204 is admitted.)

23        MS. PALUCH:  Permission to publish?

24        THE COURT:  You may.

25   Q.    (BY MS. PALUCH)  To whom is that addressed?

1    A.    Timothy F. Geithner, Secretary of the Treasury.

2    Q.    And return address, whose name appears there?

3    A.    Mimi Vigil.

4    Q.    Second page, can you state the title of that

5    document?

6    A.    A Notary Presentment.  Certificate of Mailing.

7    Q.    The date this document was mailed?

8    A.    April 1, 2009.

9    Q.    Do you see a signature at the bottom as to who is

10   certifying as to mailing that?

11   A.    Yes.  That is Mimi Vigil.  Agent for Mimi Vigil.

12   Q.    If you look in the paragraph, the first paragraph in

13   the document, who is she certifying that appeared before

14   her to mail the following documents?

15   A.    John Joseph Pawelski.

16   Q.    Next, ma'am, I am going to refer your attention to

17   Government Exhibit 205.  And before you hold that up, I

18   will ask you a few questions.  Can you look through the

19   document?

20   A.    No. 205?

21   Q.    Correct.  Look at the cover of that document.

22   A.    Yeah.  This one is also received by our office.

23   Q.    Before you hold it up, I have to ask a couple of

24   questions.  Thank you.

25          Can you state, by looking at the document, whether

```
1    it was received by the Department or by the DPC?

2    A.   Yes, it has.

3    Q.   How is it you can say that?

4    A.   By the sticker with the four-digit alphanumeric

5    batch, 2PEE.

6         MR. KIRSCH:  I move admission and publication of

7    205.

8         THE COURT:  205 is admitted.  You may publish.

9         (Exhibit No. 205 is admitted.)

10        MS. PALUCH:  Permission for the witness to hold

11   this up for the jury.

12   Q.   (BY MS. PALUCH)  Can you point to the stamp?

13   A.   (Indicating).

14   Q.   Thank you.  To whom is that document addressed?

15   A.   Timothy F. Geithner.

16   Q.   And whose name appears in the return address?

17   A.   Clara Mueller.

18   Q.   Second page, the title of that page?

19   A.   Affidavit of Notary Presentment.  Certificate of

20   Mailing.

21   Q.   And the date that this document is signed?

22   A.   10th day of April 2009.

23   Q.   Who signs the document?

24   A.   Clara Mueller.

25   Q.   Okay.  And in the body of that first paragraph, who
```

1    does it indicate appeared before Ms. Mueller to mail those

2    documents?

3    A.   Mimi Michelle Vigil.

4    Q.   And this document was received at DPC from the

5    Department of Treasury?

6    A.   Yes, ma'am.

7    Q.   Okay.  Moving on to Government's Exhibit 206.  Can

8    you please look at that document.  Can you state by

9    looking at that document whether it was received by the

10   DPC?

11   A.   Yes, it was received.

12        MS. PALUCH:  I move admission and publication of

13   Government's Exhibit 206.

14        THE COURT:  206 is admitted.

15        (Exhibit No. 206 is admitted.)

16        THE COURT:  You may publish.

17        MS. PALUCH:  Permission for the witness to hold

18   that up.

19        THE COURT:  She may.

20   Q.   (BY MS. PALUCH)  Can you point to the stamp?

21   A.   (Indicating).

22   Q.   Can you state to whom that document is addressed?

23   A.   Timothy F. Geithner, Secretary of the Treasury.

24   Q.   Whose name appears in the return address?

25   A.   Clara Mueller.

1    Q.   I refer your attention to the third page of that

2    document.  And what is that page entitled?

3    A.   It is a Private Registered Indemnity Bond.

4    Q.   I am sorry, ma'am, I am looking at page -- should be

5    page 3.  Page 3.  What is the date of this document?

6    A.   The Certificate of Service?

7    Q.   Yes, ma'am.

8    A.   Page 2.  The date is April 20, 2009.

9    Q.   Okay.  And who signed that document?

10   A.   Clara M. Mueller, looking at what I have as page 4.

11   Q.   What is the title of that document?

12   A.   That is a Private Registered Indemnity Bond.

13   Q.   And do you see down a few lines, who is the name that

14   this bond is for?

15   A.   This bond for is for Mimi Michelle Vigil.

16   Q.   Who is it paid to the order of?

17   A.   Timothy F. Geithner, Secretary of the Treasury of the

18   United States.

19   Q.   Can you read the amount of that bond listed above his

20   name?

21   A.   It is 300,000,000.

22   Q.   Okay.  I will ask you now to look at Government

23   Exhibit 207.

24   A.   207?

25   Q.   Yes, ma'am.  Was that document received by the DPC?

1    A.   Yes, it was.

2         MS. PALUCH:  Move admission of Government's Exhibit

3    207 and publication.

4         THE COURT:  207 is admitted.

5         (Exhibit No. 207 is admitted.)

6         THE COURT:  It may be published, and she may hold

7    it up.

8         MS. PALUCH:  Thank you.

9         THE WITNESS:  (Indicating).

10   Q.   (BY MS. PALUCH)  Can you state to whom that document

11   is addressed?

12   A.   Timothy F. Geithner, Secretary of the Treasury.

13   Q.   Whose name appears in the return address?

14   A.   Clara Mueller.

15   Q.   Page 2 of that document, can you state the title of

16   that document?

17   A.   It is a Registered Private Offset and Discharge Bond.

18   Q.   What in the amount of that bond?

19   A.   Is 300,000,000.

20   Q.   And to whom is that pay to the order of?

21   A.   To Timothy F. Geithner, Secretary of the United

22   States Treasury.

23   Q.   And for the benefit of whom?

24   A.   For Mimi Michelle Vigil.

25   Q.   The next page of that document, what is the date of

434

1    that Certification of Mailing?

2    A.   That is the 2nd day of June 2009.

3    Q.   And who certified as to mailing that document?

4    A.   Clara M. Mueller.

5    Q.   Turn to the next page, which is page 4.  The top half

6    of that document, if you could.  And can you read the

7    three names that appear on the right there?

8    A.   George Thomas Brokaw, surety one.  John Joseph

9    Pawelski, surety two.  And Mimi Michelle Vigil, principal.

10   Q.   Okay.  I would ask you to look at Government's

11   Exhibit 208, please.

12   A.   Okay.

13   Q.   Can you state whether that document was received by

14   the DPC?

15   A.   Yes, it is.

16        MS. PALUCH:  Move to admit and publish and show to

17   the jury Government Exhibit 208, Your Honor.

18        THE COURT:  208 is admitted.

19        (Exhibit No. 208 is admitted.)

20        THE COURT:  You may publish, and you may show the

21   envelope.

22   Q.   (BY MS. PALUCH)  Could you hold that up for the jury,

23   please?

24   A.   (Indicating).

25   Q.   To whom is that document addressed?

```
 1    A.    Addressed to Eric Thorson, U.S. Treasury Inspector
 2    General.
 3    Q.    Who mailed that document, or whose name appears in
 4    the return address?
 5    A.    Clara Mueller.
 6    Q.    I will direct your attention to page -- what is
 7    numbered as page 66 of that document.  Can you state the
 8    title of that document?
 9    A.    It is a Private Registered Bond for Setoff.
10    Non-Negotiable.
11    Q.    Whose name appears in the upper left-hand corner?
12    A.    Mimi Michelle Vigil.
13    Q.    Who is it addressed to?
14    A.    Timothy F. Geithner, Secretary of the Treasury.
15    Q.    What is amount of that bond?
16    A.    $100 billion.
17    Q.    If you look down to the right-hand side, who has
18    signed that document as principal?
19    A.    Principal is Mimi Michelle Vigil.
20    Q.    The two names that appear to the left?
21    A.    Are John Joseph Pawelski and Thomas Brokaw.
22    Q.    Okay.  Now I would like to ask you about directing
23    your attention to Government's Exhibit 215.  Can you
24    state, ma'am, whether that document was received by the
25    DPC?
```

 1    A.   Yes, it has been received.

 2         MS. PALUCH:  Your Honor, at this time I move for

 3    admission, publication, and showing of Government's

 4    Exhibit 215.

 5         THE COURT:  215 is admitted.

 6         (Exhibit No. 215 is admitted.)

 7         THE COURT:  It may be published and the envelope

 8    shown.

 9         THE WITNESS:  (Indicating).

10    Q.   (BY MS. PALUCH)  Thank you, ma'am.  To whom is that

11    envelope addressed?

12    A.   The IRS Technical Support Division.

13    Q.   The address in the return address?

14    A.   There is no name for return address, just an address.

15    Q.   What is that address?

16    A.   2260 Palm Drive, Colorado Springs, Colorado 80918.

17    Q.   Okay.  If you could look to the second and third

18    pages.  And whose name appears in that first paragraph on

19    the second page?

20         First of all, I apologize, let me back up.  On the

21    second page, whose name appears at the very top?

22    A.   George Thomas Brokaw.

23    Q.   To whom is he addressing that letter?

24    A.   Internal Revenue Service Criminal Investigation

25    Division.

1   Q.   Okay.  Can you just flip through these pages, ma'am.

2   Do you see stamps at a diagonal on the majority of these

3   pages?

4   A.   Yes, I do.

5   Q.   Let's just read -- I will just direct your attention

6   to page 4.  Can you read what that stamp says on page 4?

7   A.   "Accepted for Value.  Exempt from Levy.  Deposit to

8   the U.S. Treasury.  Charge the same Account 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.

9   George T. Brokaw.  Exemption No. 278402336."

10  Q.   That is good, ma'am.  Thank you very much.

11       Now I will direct your attention to Government's

12  Exhibit 221.  And I will ask you to look at the second

13  page of that document.  Actually, for you it might be the

14  first page.  Do you see the address on that?  Is that the

15  page you are looking at?

16  A.   Yes.

17  Q.   Can you state whether that document was received by

18  the Data Processing Center?

19  A.   I can by the envelope, yes.

20  Q.   Okay.

21       MS. PALUCH:  Your Honor, at this time I move for

22  admission and publication and presentment of Exhibit 221.

23       THE COURT:  Exit 221 is admitted.  You may publish

24  and present.

25       (Exhibit No. 221 is admitted.)

```
 1            MS. PALUCH:  Thank you.

 2    Q.   (BY MS. PALUCH)  Can you hold that up?

 3    A.   (Indicating).

 4    Q.   Thank you.  To whom is that document addressed?

 5    A.   The IRS Technical Support Division.

 6    Q.   And whose name appears in the return address?

 7    A.   Pawelski.

 8    Q.   And just ask you to flip through that document.  Do

 9    you see writing at a diagonal --

10    A.   Yes, I do.

11    Q.   -- throughout the pages?  Do those pages appear to be

12    signed by Mr. Pawelski?

13    A.   Yes, they do.

14            MS. PALUCH:  Can I have a moment, Your Honor?

15            THE COURT:  You may.

16    Q.   (BY MS. PALUCH)  I will direct your attention back to

17    215.  Let me get the page for you.  One second here,

18    please.  I will ask you to look at Exhibit 215.

19            MS. PALUCH:  And can you also display, side by

20    side, Exhibit 255.

21    Q.   (BY MS. PALUCH)  Do you have 215 in front of you,

22    ma'am?

23    A.   Yes, ma'am.

24    Q.   That appears to be an original document; is that

25    correct, that was received by DPC?
```

1    A.   This was received by DPC.  Yes, it does appear

2    original.

3         MS. PALUCH:  If I could have side by side Exhibit

4    255.  And if you could go to page -- page down a few more.

5    And if you could go to page 2 of Exhibit 215.

6    Q.   (BY MS. PALUCH)  Do those appear to be the same

7    documents, if you can look on your screen, and compare the

8    date.

9    A.   Yes, they do.

10   Q.   Okay.  Thank you.  I will refer your attention back

11   to Government's Exhibits 203, 204 and 205.  If you can get

12   those exhibits in front of you, I will refer your

13   attention to page 74 of Exhibit 203.  Are you at Exhibit

14   203?

15   A.   203, yes, ma'am.

16   Q.   And it is the last page of that exhibit, page 74.

17   What are you looking at, ma'am?  Just to be clear for the

18   record, that is the original document that was received at

19   the DPC; correct?

20   A.   Yes, it was.

21   Q.   Can you look at page 74?

22   A.   Yes, ma'am.

23   Q.   Can you say the title of that document?

24   A.   It is a Private Registered Bond for Setoff.

25   Q.   And what is the amount of that bond?

1   A.   It is $100 billion.

2   Q.   And the name that appears to the left?

3   A.   Is George Thomas Brokaw.

4   Q.   Paid to the order of whom?

5   A.   Paid to the order of United States Department of the

6   Treasury.

7   Q.   And who signs that document in the bottom right as

8   the principal?

9   A.   George Thomas Brokaw.

10  Q.   And the signature over to the left column, who signs

11  as Security number one?

12  A.   Surety number one is John Joseph Pawelski.

13  Q.   Who signs that document as a witness?

14  A.   As a witness -- there are two witnesses.  Andrew

15  William MacDonald and Clara Mae Mueller.

16  Q.   Okay.  I will direct your attention now to

17  Government's Exhibit 204, please.  Do you have that

18  original document in front of you?

19  A.   Yes, ma'am.

20  Q.   That was a document received by DPC?

21  A.   Yes, ma'am, it was.

22  Q.   If you could please refer to page 57 of that

23  document.  And what is the title of that document?

24  A.   It is a Private Registered Bond for Setoff.

25  Q.   And the amount of that bond?

1   A.   Is $100 billion.

2   Q.   The name that appears to the left?

3   A.   Is John Joseph Pawelski.

4   Q.   And what is the date of issue date?

5   A.   Is March 12, 2009.

6   Q.   And it was paid to the order of?

7   A.   The United States Department of the Treasury.

8   Q.   And who signs that document as the principal?

9   A.   That is John Joseph Pawelski.

10  Q.   And who signs as surety off to the left, surety

11  number one?

12  A.   George Thomas Brokaw.

13  Q.   And, again, this packet of documents -- let's go back

14  to the date that this whole packet of documents were

15  mailed.  If you can look at page 2 of that mailing.

16  A.   April 1, 2009.

17  Q.   So even though there is a date of March 12th on that

18  bond, it was mailed on April 1, 2009?

19  A.   Yes, ma'am.

20  Q.   And, lastly, if I could refer your attention to

21  Government's Exhibit 205.  Do you have 205 in front of

22  you?

23  A.   Yes, ma'am.

24  Q.   Is that the original mailing?

25  A.   Yes.

```
 1   Q.   Could I refer your attention to Government's Exhibit

 2   70.

 3   A.   Did you say 78?

 4   Q.   Actually, 70.

 5   A.   70.  Yes, ma'am.

 6   Q.   Can you read the title of that document?

 7   A.   Private Registered Bond for Set Off.

 8   Q.   And the name that appears in the upper left-hand

 9   corner?

10   A.   Is Mimi Michelle Vigil.

11   Q.   And who is this bond directed to?

12   A.   Timothy F. Geithner, Secretary of the Treasury.

13   Q.   And who signs as a principal?

14   A.   Mimi Michelle Vigil.

15   Q.   The two names that appear as sureties?

16   A.   Surety one is George Thomas Brokaw.  And surety two

17   is John Joseph Pawelski.

18   Q.   And I will direct your attention back to page 2 of

19   this document.  Can you state, again, what date this bond

20   and this packet was mailed to the Department of Treasury?

21   A.   On the 10th day of April of 2009.

22        MS. PALUCH:  Thank you.

23        One second, Your Honor.

24        No further questions.

25        THE COURT:  All right.  Thank you very much.  You
```

1    may step down.

2         THE WITNESS:  Thank you.  Do you want me to put

3    these back together?

4         THE COURT:  Yes, if you can.  Thank you.  Thank you

5    very much.

6         MS. PALUCH:  Thank you.

7         THE COURT:  All right.  We are approaching 2:30, so

8    I think we will go ahead and recess for the day.

9         Ladies and gentlemen, you are going to be allowed

10   to go home now.  Do not talk to anyone about this case.

11   Do not conduct any research.  We will see you back here at

12   8 o'clock tomorrow morning.

13        Other than that, the jury is excused.

14        (The following is had in open court, outside the

15   hearing and presence of the jury.)

16        THE COURT:  You may be seated.  With respect to the

17   Government's motion for electronic monitoring, the Court

18   has considered it and, for the record, Ms. Vigil was the

19   only defendant who complied with this Court's order

20   yesterday to contact her probation officer prior to 8

21   o'clock this morning to advise whether she intended to

22   participate further in this trial, and the other two did

23   not.

24        I had the probation officers call them.  They claim

25   they didn't understand the Court's directive, but that

1    they did not intend to participate.  I thought about it.

2    At this point, I am not going to order the defendants in

3    or picked up.  Because I would have to make them come all

4    of the way back here, we would have to have a hearing on

5    it.

6         I think we will go forward and see.  I will make

7    sure that they understand through their probation officers

8    that my other directive was that once the jury went to

9    deliberate and came back with a verdict, I would notify

10   them and they would have to be here for the verdict.

11        If they fail to show, there are sufficient

12   sanctions, I think, in the order for release, the

13   conditions of release that would address that.  So, at

14   this point, their failure to comply have been -- other

15   than being disruptive, have been minor.  And I am not at

16   this point going to proceed to order electronic monitoring

17   or modify in any way the conditions, other than what I

18   stated yesterday about when they have to appear before

19   this Court.

20        All right.  Court will be in recess until 8 o'clock

21   tomorrow morning.

22        (Proceedings conclude at 2:23 p.m.)

23

24

25

1      **R E P O R T E R ' S   C E R T I F I C A T E**

2

3          I, Darlene M. Martinez, Official Certified

4   Shorthand Reporter for the United States District Court,

5   District of Colorado, do hereby certify that the foregoing

6   is a true and accurate transcript of the proceedings had

7   as taken stenographically by me at the time and place

8   aforementioned.

9

10

11

12          Dated this 7th day of February, 2015.

13

14

15

16          _____

17          s/Darlene M. Martinez

18          RMR, CRR

19

20

21

22

23

24

25